# EXHIBIT A

THE WHITE HOUSE

WASHINGTON

May 12, 2006

Presidential Determination
No. _____2006-14_____

MEMORANDUM FOR THE SECRETARY OF STATE

SUBJECT: Certification on Rescission of Libya's Designation as a State Sponsor of Terrorism

Pursuant to the Constitution and laws of the United States, including section 301 of title 3, United States Code, and consistent with section 6(j)(4)(B) of the Export Administration Act of 1979, Public Law 96-72, as amended (50 U.S.C. App. 2405(j)), and as continued in effect by Executive Order 13222 of August 17, 2001, I hereby certify, with respect to the rescission of the determination of December 29, 1979, regarding Libya, that:

(i) the Government of Libya has not provided any support for international terrorism during the preceding 6-month period, and

(ii) the Government of Libya has provided assurances that it will not support acts of international terrorism in the future.

This certification shall also satisfy the provisions of section 620A(c)(2) of the Foreign Assistance Act of 1961, Public Law 87-195, as amended (22 U.S.C. 2371(c)), and section 40(f)(1)(B) of the Arms Export Control Act, Public Law 90-629, as amended (22 U.S.C. 2780(f)).

You are authorized and directed to report this certification and the attached memorandum justifying the rescission to the Congress and to arrange for their publication in the <u>Federal Register</u>.

[signature]

MEMORANDUM OF JUSTIFICATION FOR
RESCISSION OF LIBYA STATE SPONSOR OF TERRORISM DESIGNATION

The President's certification to permit rescission of Libya's designation as a state sponsor of terrorism represents the culmination of 15 years of concerted diplomatic effort and monitoring of Libyan behavior by the United States. In the wake of Libya's designation as a state sponsor of terrorism in 1979, relations deteriorated further during the 1980's, culminating in the destruction of Pan Am flight 103 over Lockerbie, Scotland in December of 1988, killing 270 people. Following an intensive investigation with the United Kingdom, the United States and United Kingdom announced criminal indictments against two Libyan agents and issued a joint declaration in November 1991. The declaration demanded that Libya surrender those charged for trial, accept responsibility for the actions of its officials, cooperate in the investigation, and pay appropriate compensation. On the same day, the United States, the United Kingdom, and France issued a declaration requiring "that Libya commit itself concretely and definitively to cease all forms of terrorist action and all assistance to terrorist groups. Libya must promptly, by concrete actions, prove its renunciation of terrorism." The demands in these two declarations were endorsed in subsequent resolutions of the U.N. Security Council, which imposed economic sanctions on Libya for its failure to comply.

In 1999, Libya began the process of fully meeting the requirements to distance itself from terrorism. In that year, it arranged for the transfer of the two Libyan suspects in the Lockerbie bombing to the Netherlands, where they were tried before a Scottish court under Scottish law. In 2001, one of the two suspects was convicted, and this verdict was affirmed on appeal in 2002. Also, beginning in 2001 the United States and the United Kingdom initiated three-way direct talks with Libyan representatives to secure Libya's compliance with the other international terrorism requirements. Based upon these discussions, on August 15, 2003, Libya sent a letter to the U.N. Security Council confirming its commitment "not to engage in, attempt, or participate in any way whatever in the organization, financing or commission of terrorist acts or to incite the commission of terrorist acts or support them directly or indirectly" and to "cooperate in the international fight against terrorism." Libya also accepted responsibility for the actions of its officials in the Pan Am 103 incident. Separately, Libya reached agreement with 269 of the 270 families affected by the Pan Am 103 incident. Libya set up a $2.7 billion escrow account

to fund this agreement, out of which each participating family was ultimately eligible to receive $8 million ($4 million when U.N. sanctions were lifted and $4 million when United States economic sanctions were lifted). Also, Libya referred in its letter to the U.N. Security Council to its cooperation with Scottish investigating authorities and pledged to cooperate in good faith with any further requests for information in connection with the Pan Am 103 investigation.

In December of 2003, again after intense discussions with the United States and the United Kingdom, Libya announced its decision to abandon its weapons of mass destruction (WMD) and Missile Technology Control Regime (MTCR) Category I missile programs. President Bush responded that Libya's good faith in implementing this change of policy would be reciprocated by the United States. Libya subsequently has been cooperating with relevant international institutions and with the United States and the United Kingdom to transparently and verifiably fulfill its commitment. Libya facilitated the removal of all critical elements of its declared nuclear weapons program, destroyed its munitions designed for use with toxic chemicals and secured chemical agents for destruction under international supervision, eliminated its Scud-C missile force and agreed to eliminate its Scud-B missiles, and engaged in comprehensive discussions over the scope and intent of its WMD and missile programs. By September of 2004, these measures were substantially complete.

At the same time, Libya moved forward in implementing its pledge to cooperate in the fight against international terrorism. Since September 11, 2001, in particular, Libya has provided excellent cooperation to the United States and other members of the international community in response to the new global threats we face. Prominent examples include: Libya's close collaboration to curtail terrorism-related activities of the Libyan Islamic Fighting Group (LIFG); its extradition to Egypt of a member of the terror cell responsible for a bombing that claimed the lives of three tourists in a Cairo bazaar; and its role in the handover to Algeria of Amari Saifi, also known as Abderrazak al-Para, a senior figure in the Salafist Group for Preaching and Combat (GSPC), who was responsible for the kidnapping of 32 Western tourists in Algeria in 2003. Libya is a party to all 12 international counterterrorism conventions and protocols that have been developed under the auspices of the United Nations. Libya's latest action in this regard was to become a signatory to the Convention on the Suppression of Acts of Nuclear Terrorism last September.

Libya, of course, had a demonstrated record of supporting certain terrorist organizations in the 1970's and 1980's, so in making the statutory certifications it was prudent to review Libya's policies not only over the past 6 months but over the last several years to be sure of a definitive change. The result of that review is favorable -- for a number of years, Libya has ceased direct support for acts of terrorism and taken concrete steps to distance itself from terrorist organizations with which it used to maintain active ties. With respect to the past 6 months, Libya has continued to cooperate with the United States and the international community in the war on terrorism. Libya has worked closely with international partners to curtail the terrorism-related activities of the LIFG and other al-Qaida-associated groups and has continued to cooperate with the international community to help ensure that its territory is not used as a safehaven for international terrorists. Libya has continued to take steps to distance itself from past terrorist activities, and over the past 6 months there have been no allegations of Tripoli providing support for groups planning to engage in terrorist attacks.

In 2004, the United States was compelled to raise with Libya its serious concerns about the statement by Abdulrahman Alamoudi during his 2004 federal prosecution that he had been part of a 2003 plot to assassinate then-Saudi Crown Prince Abdullah at the behest of Libyan officials. The United States stressed the gravity of these allegations and the need to evaluate Libya's adherence to its assurances to halt all use of violence for political purposes in light of this report. Relations between Libya and Saudi Arabia have subsequently improved: Libya sent a representative to Saudi King Fahd's funeral in August 2005; and one of Abdullah's first acts upon becoming King in August 2005 was to pardon the five Libyans being held in Saudi Arabia on suspicion of having been part of the assassination plot. In September 2005, officials from Libya and Saudi Arabia announced that the dispute between their governments surrounding the alleged assassination plot was resolved. Libya and Saudi Arabia have returned their ambassadors to their respective posts in each other's country, and diplomatic relations have been normalized. The United States will continue to monitor Libyan performance carefully.

The United States has responded to Libya's actions to repudiate terrorism and its WMD programs through a careful step-by-step process designed to acknowledge Libya's progress while allowing continuing review at each subsequent stage. The easing of bilateral restrictions began in February 2004 with the lifting

of restrictions on travel to Libya. It was followed in April 2004 with the licensing of most economic transactions, the opening of diplomatic liaison offices, and the termination of the application of the Iran and Libya Sanctions Act of 1996 to Libya. In September of 2004, after Libya substantially completed elimination of its weapons of mass destruction program, the President terminated the national emergency applicable to Libya and the resulting executive orders limiting economic transactions, authorized United States Government assistance programs to be available to U.S. businesses in Libya, and released Libya's frozen assets. In connection with the latter step, because of remaining court cases against Libya, the United States secured a confirmation from Libya of its policy and practice of carrying out agreed settlements and responding in good faith to legal cases brought against it, including court judgments and arbitral awards. Libya also acknowledged that assets it owns and is introducing into the United States as part of economic normalization would be at risk if it does not implement any resulting court judgments. The Administration has subsequently facilitated discussions between representatives of American claimants and Libya as they explore the possibility of out-of-court settlements.

Direct engagement with Libya has also permitted the United States to secure additional assurances of its commitment to renounce international terrorism. In its August 15, 2003, letter to the U.N. Security Council, Libya condemned all acts of terrorism and pledged to refrain from any form of support for terrorism. In a September 17, 2005, joint statement with Secretary of State Rice, Libyan Foreign Minister Abd al-Rahman Shalgam "reaffirmed Libya's commitment to the statements made in its letter addressed to the Security Council on August 15, 2003, renouncing terrorism in all its forms and pledging that it will not support acts of international terrorism or other acts of violence targeting civilians, whatever their political views or positions." These assurances have been reiterated on a number of occasions by senior levels of the Libyan Government.

In conclusion, the designation of Libya in 1979 as a state sponsor of terrorism was designed to serve several purposes: to put pressure on Libya to change its policies, to provide it with an incentive to do so, and to act not as a permanent designation, but to respond to concrete behavior, both good and bad. It is now 27 years since Libya was designated, and seven years since it began seriously to address our terrorism concerns. After careful review, the President has decided that the record supports the statutorily required certifications that

Libya has not provided any support for acts of international terrorism during the preceding six month period and has provided assurances that it will not provide support for acts of international terrorism in the future.  This will permit the Secretary of State to rescind Libya's designation following the 45-day Congressional review period.  Rescission in this case will strongly support the objectives of the state sponsor legislation.  Libya has responded in good faith not only in the area of international terrorism but also in the related field of weapons of mass destruction.  Libya will become a useful model to point to as we press for changes in policy by other countries -- Iran, North Korea, and others -- vital to United States national security interests and international peace and security.