## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MANJULA PATEL, *et al.*,        ) <br>        ) <br>     Plaintiffs,       ) <br>        ) <br>    v.           ) <br>        ) <br> THE SOCIALIST PEOPLE'S   ) <br> ARAB JAMAHIRIYA, *et al.*,  ) <br>        ) <br>     Defendants.    ) | No. 06-CV-00626 (PLF) |

### PLAINTIFFS' OPPOSITION TO
### LIBYAN DEFENDANTS' MOTION TO DISMISS

This action arises from the September 5, 1986 terrorist hijacking of Pan American World Airways ("Pan Am") Flight 73, which killed 20 innocent civilian passengers and crew members and resulted in serious physical injuries to over 100 others. The attack was carried out by members of the terrorist organization known as the Abu Nidal Organization ("ANO") at the direction of, and with the material support of, *inter alia*, the Socialist People's Libyan Arab Jamahiriya ("Libya"); the Libyan External Security Organization ("LESO"), the Libyan intelligence service; Muammar Qadhafi, the head of the Libyan state; and Abdallah Senoussi, a high-ranking official in LESO.

Four of the nine defendants in this action – Libya, LESO, Qadhafi and Senoussi (collectively, the "Libyan Defendants") – have now moved to dismiss Plaintiffs' Amended Complaint on a variety of grounds, none of which has merit:[1]

1.      As every court to have addressed the issue, including the D.C. Circuit, has ruled, the recent removal of Libya from the list of state sponsors of terrorism does not divest this Court of subject matter jurisdiction where Libya was on that list at the time the terrorist attack – as it was here. Moreover, at this early stage in the case, the Federal Rules of Civil Procedure require only that Plaintiffs show that they are, in good faith, asserting claims within an exception to sovereign immunity – Plaintiffs have clearly satisfied the pleading requirements *and* shown a factual basis for their claims.

2.      The Circuit's law precludes the Libyan Defendants from asserting due process protections against the authority of United States courts over them beyond those contained in the Foreign Sovereign Immunities Act ("FSIA"). Regardless, the Libyan Defendants have sufficient contacts with the United States to comport with any Due Process Clause requirements.

---

[1]     Although Qadhafi and Senoussi have been sued in both their official and individual capacities, the motion to dismiss was filed on their behalf only in their official capacities. *See* Libyan Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss For Lack of Subject Matter and Personal Jurisdiction and Failure to State a Justiciable Claim ("Libyan Defendants' Motion"), dated October 18, 2006, at 1. Plaintiffs include both United States nationals, and non-United States nationals. However, only the United States national Plaintiffs assert claims against Libya, LESO, Qadhafi, in his official capacity, and Senoussi, in his official capacity.

3.    Plaintiffs have clearly stated viable claims against Libya and the other moving defendants not only under the law of the relevant states, but also under federal statutory law, including the Flatow Amendment, 28 U.S.C. § 1605 note, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, and under federal common law (which applies here because this case arises in connection with airplane piracy and hijacking directed specifically against the United States and United States nationals). Indeed, Libya does not even dispute the application of the federal statutory cause of action available under the TVPA. All of these sources of law are available against Libya because once sovereign immunity is lifted, 28 U.S.C. § 1606 specifically states that the foreign state will be liable for all of the causes of action that would be available against private individuals.

Accordingly, the Libyan Defendants' Motion to Dismiss should be denied in its entirety.

## BACKGROUND

Plaintiffs in this action are the estates of 13 of the 20 individuals killed in the September 5, 1986 hijacking of Pan Am Flight 73, their immediate family members and 134 other passengers and crew members, all of whom were injured during this horrific crime. The Plaintiffs include both United States nationals and non-United States nationals. Altogether, they seek judgment against the Libyan Defendants: (1) Libya; (2) LESO; (3) Qadhafi, in his official and individual capacities; (4) Senoussi, in his official and individual capacities; as well as against the ANO Defendants who carried out the attack: (5) Zaid Hassan Abd Latif Safarini ("Safarini"); (6) Jamal Saeed Abdul Rahim ("Rahim"); (7) Muhammad Abdullah

Khalil Hussain Ar-Rahayyal ("Khalil"); (8) Muhammad Ahmed Al-Munawar ("Mansoor"); and (9) Wadoud Muhammad Hafiz Al-Turk ("Al-Turk"). Amended Complaint at ¶ 6. The Plaintiffs who were United States nationals at the time of the hijacking bring claims against the Libyan Defendants, in both their official and individual capacities, and against the ANO Defendants. *Id.* The Plaintiffs who were not United States nationals at the time of the hijacking bring claims against all individual defendants in their individual capacities. *Id.*

Plaintiffs will not recount here all of the details regarding the September 5, 1986 terrorist hijacking, and instead provide only a brief summary of the role of the Libyan Defendants, and refer the court to their Amended Complaint for a full recitation of the facts. *See id.* at ¶¶ 198-445.

As evidenced by their prior inclusion on the United States' list of state sponsors of terrorism, Libya has long been a supporter of terrorist activities. Throughout the 1980's, both directly and through material support and resources provided to terrorist organizations, Libya engaged in a concerted campaign of terrorist activities directed at the United States, Europe, Israel and their allies. *Id.* at ¶ 199. One of the terrorist organizations to which it consistently provided "material support" was ANO, which has conducted over 100 terrorist attacks since its founding. *Id.* at ¶ 200. By 1985, Libya was supplying substantial material support and resources to ANO by, among other things, providing funds, training, facilities, supplies, transportation and use of its "diplomatic pouch." *Id.* at ¶ 204. During this time, ANO became intimately involved with the Libyan intelligence services. *Id.*

After United States airstrikes on Tripoli and Benghazi on April 15, 1986, Qadhafi ordered LESO, through Qadhafi's brother-in-law, Senoussi, to carry out retaliatory attacks on the United States. *Id.* at ¶¶ 214, 217. Senoussi then hired ANO, with Qadhafi's approval, to plan and execute the September 5, 1986 hijacking of Pan Am Flight 73. Libya also provided material support and resources to ANO for the operation. *Id.* at ¶ 217.

At their trial in Pakistan for the hijacking of and terrorist attack on Pan Am Flight 73, all of the ANO Defendants, each of whom was represented by counsel, voluntarily signed a joint 19-page statement in which they admitted coming to Pakistan for the express purpose of hijacking an *American* airplane. *Id.* at ¶ 257. The joint statements asserted that the terrorists' goal was to come to Pakistan, due to its "close relations with the Great Satan i.e. America," and "destroy sensitive strategic centre of Zionists situated in Palestine through American weapon i.e. explosion of American aeroplane. By this, we would have struck at the American imperialism." In reference to the United States' air-strike against Libya in April 1986, the hijackers further stated that "American imperialism came from a very very long distance to attack Libya" and that "[t]here is no alternative left for the Palestinian except to take weapons in his hands to kill the murderer and oust the usurper. A murderer of Palestinian[s] deserves to be assassinated." *See United States v. Safarini*, Criminal No. 91-504 (EGS) ("Attachment B" To Government's

Sentencing Memorandum Filed April 30, 2004).[2]  Amended Complaint ¶ 257.

Based on its investigation and intelligence, the United States government has determined that Libya not only provided ANO with material support – including "safe haven, money and arms" – for the terrorist hijacking of and attack on Pan Am Flight 73, but that Libya *ordered* and, through its agent, ANO, carried out the terrorist attack.  *Id.* ¶¶ 4, 221.  Indeed, this conclusion has been corroborated by one of the hijackers, Defendant Rahim, who has admitted that the ANO terrorists executed the hijacking at the behest of Qadhafi, the head of the Libyan state.  *Id.* ¶¶ 4, 219.

## STANDARDS OF REVIEW

### Rule 12(b)(1)

Challenges to subject matter jurisdiction under the "terrorism exception" of the Foreign Sovereign Immunities Act are governed by *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004).  If the defendant challenges only the legal sufficiency of the plaintiffs' jurisdiction allegations, "then the district court should take the plaintiff[s'] factual allegations as true."  *Id.* at 1127 (citations omitted).  In contrast, where the defendant challenges the factual basis of the court's jurisdiction, the "court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the

---

[2]    Documents relating to *United States v. Safarini*, Criminal No. 91-504 (EGS) can be found at http://www.usdoj.gov/usao/dc/Victim_Witness_Assistance/Pan_Am_73.html (last visited October 24, 2006).

motion to dismiss." *Id.* at 1131 (internal citations omitted). In challenging the factual basis of the court's jurisdiction, however, bare assertions that the terrorism exception to foreign sovereign immunity does not apply are insufficient. Rather, a defendant must put forth "affirmative evidence." *Id.* at 1131-33. *See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Felter v. Norton,* 412 F. Supp. 2d 118, 121-22 (D.D.C. 2006).

### Rule 12(b)(2)

To determine if a basis for personal jurisdiction under Fed. R. Civ. P. 12(b)(2) exists, the court should resolve factual discrepancies in the complaint and affidavits in favor of the plaintiff. *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir. 1990). The court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Arista Records, Inc. v. Sakfield Holding Co. S.L.,* 314 F. Supp. 2d 27, 30 (D.D.C. 2004) (internal quotations omitted).

### Rule 12(b)(6)

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all material factual allegations in the complaint and must draw all reasonable inferences in favor of plaintiffs. *See Harris v. Ladner,* 127 F.3d 1121, 1123 (D.C. Cir. 1997). The allegations of the complaint should be construed broadly and liberally in the plaintiffs' favor. Wright & Miller, <u>Federal Practice & Procedure</u> § 1350, p. 551 (2004); *see also Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt

that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See United States ex rel. New v. Rumsfeld,* 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004); *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).

## ARGUMENT

To aid the court in deciding the issues presented by the Libyan Defendants' Motion, we begin with a brief discussion of the legal framework applicable to terrorism cases such as this.

With enactment of the FSIA in 1976, Congress codified the historic practice of affording foreign states immunity from suit as a matter of comity in United States courts. That immunity is not, however, absolute. Section 1605, titled "General exceptions to the jurisdictional immunity of a foreign state," sets forth various circumstances, generally based on the nature of the case or the claims made, under which a foreign state may not properly claim immunity as a defense to actions brought in the United States. *See* 28 U.S.C. § 1605. For almost thirty years, the FSIA has provided that immunity may not serve as a jurisdictional bar against claims involving a foreign sovereign's (1) commercial activities; (2) expropriation of property in violation of international law; or (3) non-commercial torts. *Id.*

Although § 1605 lifts the immunity defense and provides a basis for federal jurisdiction, § 1605 does not itself create any causes of action. *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). Instead, if a § 1605 exception applies – meaning that immunity is revoked and jurisdiction in United States courts is proper – the foreign state is simply rendered subject to all of the

causes of action that its immunity previously barred. Thus, with immunity lifted, plaintiffs can pursue whatever causes of action fall within the scope of the exception (and are supported by the facts of the case and the relevant substantive law).

28 U.S.C. § 1606 makes this perfectly clear. Once sovereign immunity has been lifted under § 1605, the foreign sovereign stands in the same shoes as would an individual:

> § 1606. Extent of liability
>
> *As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances;* but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages . . . .

28 U.S.C. § 1606 (emphasis added). Thus, under § 1606, to determine whether a cause of action exists against the non-immune foreign state, one need determine only whether a cause of action would be available against a private individual in like circumstances. If it would, then the foreign state "shall be liable" in the same manner and to the same extent.

Nothing in § 1606 or the FSIA *limits* the sources of potentially applicable law under which a plaintiff may assert a cause of action against a non-immune foreign state. Thus, the foreign state may be liable under *state* statutory and common law; the foreign state may be liable under *federal* statutory and common law (including such principles of international law as are enforceable under federal common law); and the foreign state may be held liable under *foreign* law. With immunity lifted, plaintiffs commonly bring breach of contract claims based on state common law,

9

statutory law, or foreign law.[3]  Plaintiffs relying on the noncommercial torts

exception might rely on state common law or foreign law.[4]  Federal statutory law

claims – for example, RICO or antitrust claims – also may be brought against

foreign states which have had their immunity lifted.[5]

 The most recent addition to the § 1605 list of sovereign immunity exceptions

is § 1605(a)(7), the so-called "terrorism exception" at issue here.  Congress enacted

this exception in 1996 as part of a concerted response to terrorism that targeted

United States nationals.  Section 1605(a)(7) revokes immunity and confers

jurisdiction when:

> money damages are sought against a foreign state for
> personal injury or death that was caused by an act of
> *torture, extrajudicial killing, aircraft sabotage, hostage*
> *taking, or the provision of material support or resources …*
> *for such an act* if such act or provision of material support
> is engaged in by an official, employee, or agent of such
> foreign state while acting within the scope of his or her
> office, employment, or agency.

---

[3]  *See, e.g., Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F.
Supp. 2d 374 (S.D.N.Y. 2000) (New York law); *Walpex Trading Co. v. Yacimientos
Petroliferos Fiscales Bolivianos*, 789 F. Supp. 1268 (S.D.N.Y. 1992) (Bolivian law in
breach action).

[4]  *See, e.g., Joseph v. Office of the Consulate*, 830 F.2d 1018 (9th Cir. 1987)
(applying California law); *Barkanic v. Gen. Admin. of Civil Aviation of People's
Republic of China*, 923 F.2d 957 (2d Cir. 1991) (Chinese law in wrongful death
action).

[5]  *See, e.g., Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210 (10th Cir. 1999)
(evaluating RICO claims under FSIA); *Filetech S.A. v. France Telecom S.A.*, 157
F.3d 922 (2d Cir. 1998) (antitrust).

28 U.S.C. § 1605(a)(7) (emphasis added); *see Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 36 (D.D.C. 2003), *aff'd* 376 F.3d 1123 (D.C. Cir. 2004).[6]

With § 1605(a)(7), "Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003) (citation omitted); *see also* H.R. Rep. No. 104-383, at 62 (1995) ("[A]llowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted. [Section 1605(a)(7)] will give American citizens an important economic and financial weapon against these outlaw states."). Congress expressly provided that § 1605(a)(7) would apply retroactively, *see* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(c), 110 Stat. 1243 (immunity exception "shall apply to any cause of action arising before, on, or after the date of the enactment of this Act"). Significantly, as part of the continuing response to terrorism, the United States has also enacted statutes that create federal causes of action, supplement the causes of action available under state law and potentially federal common law for terrorist activities. *See, e.g.,* 28 U.S.C. §§ 1350 note, 1605 note.

---

[6]    In order to assert jurisdiction pursuant to § 1605(a)(7), a plaintiff must have been a United States national at the time the incident occurred. 28 U.S.C. § 1605(a)(7)(B)(ii).

As with the other § 1605 exceptions, the foreign state stripped of immunity under § 1605(a)(7) is thereby rendered amenable to suit under whatever causes of action are available under state statutory or common law, federal statutory or common law (including international law), or under foreign law.

## I.     This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims

This court may properly exercise subject matter jurisdiction, because Libya was designated as a state sponsor of terrorism at the time the hijacking occurred. Moreover, at this stage, Plaintiffs have clearly met their burden under the Federal Rules of Civil Procedure for pleading subject matter jurisdiction; the Libyan Defendants' superficial denial of the facts that give rise to subject matter jurisdiction – indeed, their denial that they engaged in the activity which is the basis for the claim – is insufficient to support their Motion to Dismiss.

### A.     Libya Was Designated As A State Sponsor Of Terrorism On September 5, 1986, The Date Of The Terrorist Attack

Section 1605(a)(7) only applies to countries that were designated as state sponsors of terrorism at the time of the acts in question. The Libyan Defendants argue that this Court lacks subject matter jurisdiction over these claims because "Libya's designation as a state sponsor of terrorism was has [sic] also been removed and its sovereign immunity has been reinstated." Libyan Defendants' Motion at 9. They are referring to the fact that by virtue of a Presidential Determination, Libya was removed from the list of those countries designated as state sponsors of terrorism.

The Libyan Defendants' position, however, is contradicted by the plain and unambiguous language of the FSIA. Libya's recent "de-designation" is irrelevant. That is because the FSIA grants subject matter jurisdiction in suits against a foreign state "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources [ ] for such an act," where such foreign state was "designated as a state sponsor of terrorism [by the United States] *at the time the act occurred*." 28 U.S.C. § 1605(a)(7) (emphasis added).

In this case, the act that gives rise to Plaintiffs' cause of action – the hijacking and terrorist attack on Pan Am Flight 73 – occurred on September 5, 1986. The Libyan Defendants do not dispute – nor could they – that Libya was designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, from 1979 until 2006. *See* Amended Complaint at ¶ 187; *see also* 22 C.F.R. § 126.1(d) (2005) and 31 C.F.R. § 596.201 (2005).

Because the Libyan Defendants' argument is contrary to the plain language of the FSIA and frivolous on its face, it is no surprise that *every* court in this Circuit – including the D.C. Circuit itself – has rejected the Libyan Defendants' argument.[7]

---

[7]    Libya's position is further belied by the very Presidential Determination on which it relies. In fact, the Determination acknowledges the continuing existence of terrorism suits against Libya, stating that "because of remaining court cases against Libya, the United States secured a confirmation from Libya of its policy and practice of carrying out agreed settlements and responding in good faith to legal

(continued...)

*See Kilburn v. Islamic Republic of Iran*, No. 06-7127 (D.C. Cir. Oct. 19, 2006)
("Because Libya was designated as a state sponsor of terrorism at the time the
alleged acts occurred, it is not entitled to sovereign immunity, even though it was
later removed from the list of state sponsors of terrorism.") (*see* Attachment 1);
*Pugh v. Socialist People's Libyan Arab Jamahiriya*, Civil Case No. 02-02026 [Docket
No. 64] (*see* Attachment 2); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
Civil Case No. 01-01301 [Docket No. 76] (*see* Attachment 3); *accord Acree v.
Republic of Iraq*, 370 F.3d 41, 56 (D.C. Cir. 2004), *cert. denied,* 125 S. Ct. 1928
(2005) ("the FSIA specifically provides that when a country, once designated as a
state sponsor of terrorism, is subsequently restored to good standing, that country is
still amenable to suit for acts that took place prior to the restoration of its sovereign
immunity").

As such, Libya's claim finds no support in the law and flies in the face of the
unambiguous statutory language that indisputably grants this court subject matter
jurisdiction to hear Plaintiffs' claims.

### B.    Plaintiffs Have Satisfied The Pleading Requirements For Subject Matter Jurisdiction

Libya does not suggest that the claims as pled do not fall within the terms of
the § 1605(a)(7).  Instead, citing *Kilburn*, 376 F.3d at 1127, the Libyan Defendants
argue that "if a defendant challenges the factual basis of the court's subject-matter
jurisdiction, the Court may not assume the truth of the facts asserted by the

_____

(continued)

cases brought against it, including court judgments and arbitral awards."
(Attached as Exhibit A to Libyan Defendants' Motion to Dismiss).

plaintiffs." Libyan Defendants' Motion at 9. While it is unclear what relief the Libyan Defendants seek in their four-sentence argument, this much is clear – their naked assertion that they "explicitly refutes all allegations asserting that Pan Am 73 was hijacked by ANO on behalf of, or because of instructions issued by or support provided by Libya,"[8] *id.*, falls woefully short of meeting its "burden of proving that the plaintiff[s'] allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *see also Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985).

At the "threshold" stage of litigation, a plaintiff need only show that it is, in good faith, asserting a claim within an exception to sovereign immunity. Just as with any other claim, a party need not come to court with evidence in hand. Rather, to open the doors to the courthouse it is only necessary to specifically plead a basis for jurisdiction. *Cf. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537 and n.3 (1995) ("Normal practice permits a party to establish jurisdiction at the

---

[8]     As the Libyan Defendants note in their Motion, Plaintiffs have provided citations and excerpts from documents that support their allegations. Libyan Defendants' Motion at 9. The Libyan Defendants, however, do not actually dispute *any* of these allegations, and instead state only that the documents have not been provided "for review." *Id.* Contrary to Libya's suggestion, however, plaintiffs are not required to "provide the documentation for review" at this stage of the litigation. *Id.; see* FED. R. CIV. P. 8(a); *Banks v. York*, No. 05-1514, 2006 WL 2666182, at *1 (D.D.C. Sept. 18, 2006) (where plaintiff sought leave to file an amended complaint for the purpose of attaching documents to the complaint, the court denied request because the "applicable rules of procedure do not mandate the filing of exhibits or attachments to a complaint"); Local Rule 5.1(g) (limiting the circumstances of when documents can be attached to a complaint).

outset of a case by means of a nonfrivolous assertion of jurisdictional elements."). These principles apply to sovereign immunity. *Kilburn*, 376 F.3d at 1131-33. When a defendant raises a jurisdictional challenge, the court may properly accelerate resolution of factual issues bearing on immunity. But plaintiffs are not put to their proof *before* discovery. In this case, still at its very earliest stages, the Plaintiffs have clearly satisfied the pleading requirements.

As with most jurisdictional statutes, § 1605, in conjunction with 28 U.S.C. § 1330, provides for jurisdiction over specified categories of claims. 28 U.S.C. § 1330 ("district courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state . . . as to any claim for relief . . . with respect to which the foreign state is not entitled to immunity . . . under sections 1605-1607"). Again, § 1605(a)(7) states that a "foreign state shall not be immune from the jurisdiction . . . *in any case* . . . *in which money damages are sought* against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources [ ] for such an act." At this threshold stage, Plaintiffs must show that they are pursuing the type of claims in which money damages are sought as described in § 1605(a)(7). That was done here. *See* Amended Complaint ¶¶ 198-484.

The Libya Defendants are correct that where immunity is at issue, the trial court need not stop at proper pleading. Jurisdiction should be addressed early on, even to the extent of resolving factual issues. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947). Courts properly attach special importance to the jurisdictional affirmative defense of sovereign immunity. *See Foremost-McKesson, Inc. v. Islamic*

16

*Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990).  If jurisdictional facts are to be resolved, however, the court must "give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction'."  *Phoenix Consulting*, 216 F.3d at 40.

That is where things stand in this case.  But it is not even clear that the Libyan Defendants have truly raised a jurisdictional challenge at all.  The FSIA's legislative history provides a framework in which to resolve factual issues relating to sovereign immunity:

> The burden will remain on the foreign state to produce evidence in support of its claim of immunity.  Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit *and that the plaintiff's claim relates to a public act of the foreign state – that is, an act not within the exceptions in sections 1605-1607*.  Once the foreign state has produced such *prima facie* evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.  The ultimate burden of proving immunity would rest with the foreign state.

H.R. Rep. No. 1487 (1976) (emphasis added); *see Gould*, 853 F.2d at 451 & n.5.

This framework reflects the fact that sovereign immunity is an affirmative defense.  *See Phoenix Consulting*, 216 F.3d at 40 ("defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity").  Therefore, the foreign state must come forward with evidence negating the alleged exception.  Here, there is no real challenge to jurisdiction:  all the Libyan Defendants have indicated is that they intend to

challenge the merits. They intend to deny that they did what they are accused of doing. That sounds a lot like – indeed it seems to be – the merits, not jurisdiction.

In any event, factual issues are not resolved until the court allows appropriate evidence gathering. And, because the Libyan Defendants have not put forth a shred of "affirmative evidence" that the FSIA's "terrorism exception" to immunity is not applicable here,[9] they have not rendered any factual issues ripe for resolution. *See Kilburn*, 376 F.3d at 1131-33 (noting that "[Libya] submitted no affirmative evidence whatsoever to show they did not fall outside the terrorism exception").

## II. This Court's Exercise of Personal Jurisdiction Over All Defendants Is Proper

### A. Personal Jurisdiction Over Libya Is Proper

The Libyan Defendants acknowledge that "the issue of the constitutionality of personal jurisdiction over the state has been decided adversely by this Court" in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), and asserts that the Court lacks personal jurisdiction over Libya solely to "preserve the issue for potential further review." Libyan Defendants' Motion at 11. Plaintiffs agree with the Libyan Defendants that their argument is foreclosed and further note that *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), which they cite, does not in any way call *Price* into question. Not only are the Libyan Defendants citing

---

[9]    The Libyan Defendants could have, for example, "file[d] an affidavit denying" the allegations or otherwise "proffer[ed] testimony denying that they had provided material support for those acts." *Kilburn,* 376 F.3d at 1132. However, the Libyan Defendants have not done so.

to a concurring opinion in *Altman*, and not the Court's opinion, the case is

inapposite to the issue of whether personal jurisdiction over Libya is proper.

**B.    Personal Jurisdiction Over The Individual Libyan
        Defendants In Their Official Capacity Is Proper**

**1.    The Due Process Clause Is Inapplicable To The
        Exercise of Personal Jurisdiction Over The
        Individual Libyan Defendants In Their Official
        Capacity**

The Libyan Defendants argue that this court "lacks *in personam* jurisdiction

over the individual defendants in their official capacity."[10]  Libyan Defendants'

Motion at 15.  In support of its convoluted argument, the Libyan Defendants attack

a self-constructed straw man in arguing that the fact that many of the Plaintiffs are

United States nationals does not, in and of itself, create personal jurisdiction.  *Id.* at

12.  While it is certainly germane to the jurisdictional issues, nationality is not the

sole basis for the court's exercise of personal jurisdiction over the Libyan

Defendants.[11]

_____

[10]    Counsel for Libyan Defendants states that he represents Libya, LESO,
Qadhafi in his official capacity and Senoussi in his official capacity, and therefore,
the motion to dismiss is filed only on their behalf.  Libyan Defendants' Motion at 1.
While counsel specifically notes, however, that he does not represent Qadhafi and
Senoussi in their individual capacities, he makes no similar statement regarding
the five other individuals (the ANO Defendants).  *See id.*  However, counsel for the
Libyan Defendants argues that the "Court should dismiss the complaint against the
*seven* individual defendants as it lacks *in personam* jurisdiction over the individual
defendants in their official capacity."  *Id.* at 15.  In light of this puzzling statement,
it is not at all clear whether counsel for the Libyan Defendants also represents the
ANO Defendants in this matter.

[11]    The fact that Plaintiffs include United States nationals *is* sufficient to confer
personal jurisdiction over Defendants Qadhafi and Senoussi.  The individual Libyan
Defendants are "agents" of Libya for purposes of the Flatow Amendment, which

(continued...)

This is especially so here, where the Libyan Defendants' argument is limited to the question of whether personal jurisdiction over Qadhafi and Senoussi, in their *official* capacities, is proper. As the Libyan Defendants concede, the D.C. Circuit has already decided that the exercise of personal jurisdiction over Libya is constitutional. Libyan Defendants' Motion at 11; *Price*, 294 F.3d 82. And, as the Supreme Court has ruled, a suit against an individual in his *official* capacity "is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997). As such, there can be no question that the Due Process Clause imposes no obstacle to subjecting the Libyan Defendants, in their official capacities, to personal jurisdiction in this court.[12]

### 2.    Even If The Due Process Clause Is Applicable, The Exercise of Personal Jurisdiction Is Proper

In any event, even assuming, *arguendo*, that this court's authority to hear Plaintiffs' claims against Qadhafi and Senoussi is constrained by the Due Process

---

(continued)

provides an express federal cause of action against both of them. § 1605 note. Therefore, it is clear that Defendants Qadhafi and Senoussi, "official" agents of a foreign sovereign (Libya), are subject to this court's jurisdiction pursuant to the FSIA and Flatow Amendment.

[12]    Contrary to the Libyan Defendants's suggestion, *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184 (D.C. Cir. 2003), does not require a different result. In *I.T. Consultants*, the plaintiffs unsuccessfully tried to argue that a suit against an employee of the State in his *personal* capacity was no different than a suit against the State. Indeed, Judge Roberts, in *I.T. Consultants*, cited with approval *Jungquist*, 115 F.3d at 1027, for the proposition that "[i]ndividuals acting *in their official capacities* are considered 'agenc[ies] or instrumentalit[ies] of a foreign state'." *I.T. Consultants*, 351 F.3d at 1191 (alterations in original) (emphasis added).

Clause, the individual Libyan Defendants have sufficient contacts with the United States such that the exercise of jurisdiction by this court over them comports with "traditional notions of fair play and substantial justice."[13] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). These contacts would be sufficient to hold them liable even in their individual capacity – and it is assuredly enough to subject them to liability – or, more precisely, to hold Libya liable – in their official capacity.

One of the primary canons of the due process "minimum contacts" analysis is whether or not Defendants had fair warning that their actions might subject them to suit in this court. Here, the Libyan Defendants had more than sufficient notice that premeditated and intentional terrorist attacks directed at American nationals, among others, while hijacking an American airplane bound for New York would subject them to the jurisdiction of United States courts. The United States has a long history of initiating judicial proceedings against those who commit terrorist acts against its nationals. For example, in 1984 – two years before the hijacking and terrorist act on Pan Am Flight 73 – Congress enacted three laws that reach extraterritorial conduct and were aimed at combating the rise of international terrorism against United States nationals. *See* Act to Combat International

---

[13]    For this reason, this court also has personal jurisdiction over the individual Defendants in their *individual* capacities. The assertion by counsel for the Libyan Defendants that Plaintiffs' counsel has at any time stated that service on Qadhafi and Senoussi in their individual capacities "was not perfected" is simply untrue. Indeed, Plaintiffs' Counsel has filed with this court its Proof of Service on Qadhafi and Senoussi, in both their official and individual capacities, which details the procedure followed for service of process on Qadhafi and Senoussi. *See* Plaintiffs' Notice of Proof of Service, dated July 19, 2006 [docket #14].

Terrorism, 18 U.S.C. § 3071; Hostage Taking Act, 18 U.S.C. § 1203; and Destruction of Aircraft Act, 18 U.S.C. § 32.[14]

In 1986, shortly before the hijacking and terrorist attack on Pan Am Flight 73, Congress provided for criminal penalties against those who kill, attempt or conspire to kill, or engage in physical violence intended to or resulting in serious bodily injury to United States nationals. *See* 18 U.S.C. § 2332, Pub. L. 99-399 (Aug. 27, 1986). Each provision applies with equal force to individuals outside the United States, including foreign nationals. *See, e.g., United States v. Rezaq*, 899 F. Supp. 697 (D.D.C. 1995) (finding extraterritorial reach of criminal hijacking appropriate given that victims were United States nationals), *aff'd* 134 F.3d 1121 (D.C. Cir. 1998); *United States v. Bin Laden,* 92 F. Supp. 2d 189 (S.D.N.Y. 2000) (confirming extraterritorial reach of criminal statutes to apply to foreign defendants for extraterritorial acts; specifically, the bombing of the United States Embassies in Kenya and Tanzania). Based on the foregoing, it is disingenuous for Qadhafi and

---

[14]    The Act to Combat International Terrorism, 18 U.S.C. § 3071, authorizes the Attorney General to pay rewards to persons who provide information leading to the arrest of suspected terrorists. Under the Hostage Taking Act, 18 U.S.C. § 1203, hostage-taking occurring outside the United States is criminalized as long as the victim is a United States national, the hostage-taker is found in the United States, or the United States Government is asked to take or refrain from taking some action as a condition of the hostage's release. Under the Destruction of Aircraft Act, 18 U.S.C. § 32, the destruction of airplanes registered in other countries is illegal under United States law whenever "a national of the United States was on board, or would have been on board, the aircraft; an offender is a national of the United States, or an offender is afterwards found in the United States" without reference to where the unlawful conduct occurred. The statutes themselves, and courts' interpretations of them, clearly illustrate that Congress intended them to apply extraterritorially. *See, e.g., United States v. Yunis*, 681 F. Supp. 896 (D.D.C. 1988), *aff'd* 924 F.2d 1086 (D.C. Cir. 1991).

Senoussi to claim that they did not have adequate notice that their acts would subject them to the jurisdiction of this court.

Further, personal jurisdiction is supported by the fact that Qadhafi and Senoussi intentionally directed their activities at United States nationals. *See Mwani v. Osama bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005) (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)). They took deliberate acts to target a United States owned airline (Pan Am) whose plane was traveling to New York. Amended Complaint ¶ 225. Indeed, during the hijacking of and terrorist attack on Pan Am Flight 73, United States nationals were singled out and specifically targeted before the terrorists' final assault on the passengers and crew.[15] *Id.* at ¶ 234.

Simply put, there can be no doubt that the impact on the interests of the United States was direct and intended. Under these circumstances, Qadhafi and Senoussi have sufficient contacts with the United States to satisfy any due process requirements. Therefore, this court's exercise of jurisdiction over Qadhafi and Senoussi is consistent with the protections afforded by the United States Constitution.

## III.    Plaintiffs Have Stated Viable Causes Of Action On Which Relief Can Be Granted

---

[15]    After hijacking Pan Am Flight 73, Defendant Safarini ordered that all passports from passengers be collected, and specifically ordered that the United States passports be separated out from the others. Amended Complaint ¶¶ 234-235. Moreover, when the Defendant terrorists' demands were not met, they singled out an American citizen, Rajesh Kumar, and executed him. *Id.* at ¶ 237.

The Libyan Defendants assert, in the alternative, that Plaintiffs have failed to state a cause of action on which relief can be granted.[16]  Libyan Defendants' Motion at 1.  As an initial matter, it is important to note that the Libyan Defendants have not challenged the applicability or viability of any of the causes of action asserted by the Plaintiffs who were *not* United States nationals on September 5, 1986.  Nor does counsel for the Libyan Defendants represent the individuals against whom such claims have been made.  Therefore, Plaintiffs limit their discussion herein to the causes of action against the Libyan Defendants, as asserted by those Plaintiffs who were United States nationals on September 5, 1986.

As discussed in detail above (*supra*, pp. 8-12) § 1605(a)(7) revokes sovereign immunity and confers jurisdiction when:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of *torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act* if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

---

[16]    In their Amended Complaint, Plaintiffs set forth several grounds for relief, including the TVPA, which provides a private right of action against individuals, and can also be – and has been – asserted against Libya and LESO.  Amended Complaint at ¶¶ 446, 482.  The Libyan Defendants have not challenged these federal statutory causes of action.  Nor do they challenge the claims brought against the ANO Defendants or against the Libyan Defendants, in their individual capacities.  For these reasons, the relief sought by the Libyan Defendants – dismissal of the Amended Complaint in its entirety – is inappropriate.

28 U.S.C. § 1605(a)(7) (emphasis added). Once § 1605 lifts the immunity defense and provides a basis for federal jurisdiction, 28 U.S.C. § 1606 then provides that the sovereign "state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This is true regardless of whether the underlying cause of action is found in state or federal common law, international law, foreign law, or applicable statutory law. *See* discussion, *supra*, at pp. 8-12.

Every court in this Circuit to have considered the issue has held that, *at a minimum*, state law provides viable causes of action in favor of victims of terrorism that can be asserted, via § 1606, against foreign nations responsible (under the standards of § 1605(a)(7)) for that terrorism. *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 132 (D.D.C. 2005) (finding that "[s]tate law may provide a basis for liability" on assault, battery and intentional infliction of emotional distress claims in cases involving physical and mental torture of plaintiffs by Libya and its agents); *see also Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 68 (D.D.C. 2006) ("[i]n this case, state law provides a basis for liability"); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, Civil Case No. 02-02026, Slip Op. at 14 (D.D.C. May 11, 2006) ("plaintiffs may properly state a claim against defendants under state law"); *Dammarell v. Islamic Republic of Iran*, Civil Action No. 01-02224, 2005 U.S. Dist. LEXIS 5343, *54 (D.D.C. Mar. 29, 2005) (finding that plaintiffs, survivors and surviving family members of U.S. citizens killed in April 1983 bombing of U.S. Embassy in Beirut, Lebanon could assert

causes of action and bases for recovery of damages under state common and statutory law).

Given the availability of state law claims that can be asserted in these circumstances, some of these courts have hesitated to find that federal causes of action also apply.[17]  However, at least one court has had little difficulty finding that the federal statutory causes of action that are explicitly available against individuals engaged in terrorism are rendered available against foreign states, under § 1606, once the immunity of the foreign state has been stripped away by § 1605(a)(7).  *See Dodge v. Islamic Republic of Iran,* Civil Action No. 03-252, Slip Op. at 8 (D.D.C. August 25, 2004) (explaining that a plaintiff may sue a foreign state "under any cause of action arising from common law, foreign law, or federal statute which might ordinarily give rise only to individual liability.") (*see* Attachment 4).

As described below, there are causes of action available under state law for each plaintiff to recover fully against each Libyan Defendant.  However, Plaintiffs are also of the view that the federal causes of action – because of their express language, their anti-terrorism purpose, and because of the special federal interests associated with the terrorism cases – are also available and provide an especially appropriate basis for imposing liability on the Libyan Defendants.  Similarly,

---

[17]     *See Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343 (D.D.C. Mar. 29, 2005); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, Civil Case No. 02-02026, Slip Op. (D.D.C. May 11, 2006); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005); *Price*, 384 F. Supp. 2d. at 133; *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230 (D.D.C. 2005).

federal common law, which has long applied in "piracy" and hijacking contexts, also provides a basis for imposing liability on the Libyan Defendants. We begin with the federal claims, before turning to the state claims.

### A.    The Plaintiffs Adequately State A Claim For Which Relief Can Be Granted Under Federal Statutory Law

The Plaintiffs have asserted causes of action against the Libyan Defendants under two federal statutes – the TVPA and the Flatow Amendment.[18] In not challenging Plaintiffs' cause of action under the TVPA, however, the Libyan Defendants apparently concede that it provides a statutory cause of action against them for certain terrorist acts, including those at issue here.[19]

------

[18]    United States national Plaintiffs have also brought a cause of action under 18 U.S.C. § 2333 against individual Defendants, in their individual capacities.

[19]    The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to *torture* shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to *extrajudicial killing* shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350 note (emphasis added).

As the Supreme Court recently held, the TVPA describes a cause of action available against individuals who commit certain types of terrorist acts. In explicit terms, the TVPA sets forth "a clear mandate . . . providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 751 (2004) (quoting H.R. Rep. No. 102-367, pt. 1, at 3 (1991)). By their very nature, these acts are associated with the improper actions of a foreign sovereign: Extrajudicial killing and torture are not simply murder and infliction of suffering, but rather murder and infliction of suffering under the auspices of a foreign nation acting outside its lawful authority. The TVPA was enacted prior to § 1605(a)(7) and, when first enacted, did not apply to foreign states. However, as explained, *supra*, Congress specifically made the TVPA applicable to foreign states that have been designated as state sponsors of terrorism when it enacted § 1605(a)(7). *See* 28 U.S.C. §§ 1605(a)(7) and 1606. By virtue of § 1606, the cause of action reflected statutorily in the TVPA – a cause of action which the Supreme Court recently described as

(continued...)

The Flatow Amendment[20] was enacted shortly after 28 U.S.C. § 1605(a)(7).  It creates a cause of action against individuals – officials and agents of foreign states sued in their individual capacity – for their terrorist activities.  It applies to

> [a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee or agent for which the courts of the United States may maintain jurisdiction under 1605(a)(7) . . . for money damages which may include economic damages, solatium, pain and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

28 U.S.C. § 1605 note.

Because the Flatow Amendment sets forth a cause of action and specific damages remedies against private individuals, § 1606 instructs, and indeed requires, that such causes of action and remedies likewise be available against the non-immune foreign state.  *Id.*  Contrary to the Libyan Defendants' assertion (Libyan Defendants' Motion at 16-17), the D.C. Circuit has *not* reached the question of whether the Flatow Amendment can be applied through § 1606 against a foreign state.  *Cicippio-Puleo*, 353 F.3d at 1034.  Rather, it has merely held that neither § 1605(a)(7) nor the Flatow Amendment (nor the two considered in tandem) creates

_____

(continued)

mirroring a cause of action provided by international law – is available against the Libyan Defendants.

[20]    The Flatow Act was enacted shortly after § 1605(a)(7) but is not – despite the common references to it as an "Amendment" – an amendment to the FSIA.  Rather, it is an independent cause of action that parallels the provisions of § 1605(a)(7) lifting immunity for terrorist acts.

a *direct* cause of action against a foreign government.  It did not decide the viability

of a cause of action, employing the Flatow Amendment, brought against a foreign

state with § 1606 acting as a "pass through."[21]  Although there was little legislative

history to the provision, it is clear on its face that it provides a cause of action

against individuals in circumstances that are intended to parallel the circumstances

under which immunity for terrorist actions against foreign states has been lifted.

Thus, the relationship between the two provisions is apparent.  Section 1606

provides that where immunity is lifted, actions available against individuals become

available against the state itself.

Indeed, after the *Cicippio-Puleo* ruling relied upon by the Libyan

Defendants, Judge Jackson expressly held in Dodge, that state law, the TVPA, and

the Flatow Amendment are necessarily available against a foreign terrorist state if

the foreign terrorist state's immunity for personal injury has been waived pursuant

to § 1605(a)(7).  Judge Jackson explained that this result is simply a reflection of

the plain words of § 1606, which requires that "[o]nce a foreign state is found

amenable to suite under § 1605(a)(7), that state is liable '*in the same manner and to

the same extent as a private individual under like circumstances*' by virtue of section

1606 of the FSIA."  *See Dodge*, Slip Op. at 7-8 (emphasis added).  Thus, a plaintiff

may sue the foreign terrorist state "under any cause of action arising from common

---

[21]    While Plaintiffs agree with the Libyan Defendants that *Cicippio* held that the
Flatow Amendment creates a cause of action which is limited to claims against
individuals, in their individual capacities, they disagree with this holding as it is
inconsistent with the plain language of the statute, and raise this issue in order to
explicitly preserve it for appeal.

law, foreign law, or federal statute which might ordinarily give rise only to individual liability." *Id.* at 8. Nothing in *Ciccippio-Puleo* addressed this aspect of § 1606.

There is nothing controversial about this approach. As most frequently applied, it means that if an individual would be liable under state law for such acts, the foreign state would likewise be liable in the same way. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 622 n.11 (1983) (where "state law provides a rule of liability governing private individuals, the FSIA *requires* the application of that rule to foreign states in like circumstances") (emphasis added). But § 1606 is not limited to state law claims. It applies by its terms to "claims for relief" pursuant to federal *statutes* as well.[22] *See Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210 (10th Cir. 1999) (evaluating RICO statutory claims under FSIA); *Filetech, S.A. v. France Telecom, S.A.*, 157 F.3d 922 (2d Cir. 1998) (antitrust statutes).

If Congress wanted to create a cause of action against foreign states for *all* of the types of conduct covered under § 1605(a)(7), the most appropriate way for it to have done so was to create a cause of action for that conduct against individuals. *And this is precisely what Congress did in enacting the Flatow Amendment.* By creating a cause of action against terrorist individuals for conduct covered by § 1605(a)(7), Congress was thereby – through operation of § 1606 – creating a cause

---

[22]     It would also apply to claims under federal common law, which includes international law. *See Sosa,* 542 U.S. 692.

of action against the foreign state employing those individuals. In other words, the

only appropriate way to create an action against a foreign state under the FSIA is to

create a cause of action against individuals in like circumstances.

Nothing in *Cicippio-Puleo*, 353 F.3d 1024, – the only case cited by the Libyan

Defendants – suggests any different result. That case, of course, preceded the

decision of Judge Jackson, which did not find that *Cicippio-Puleo* presented any

obstacle to relief. In *Cicippio-Puleo*, the D.C. Circuit simply held that neither

§ 1605(a)(7), nor the Flatow Amendment, *in and of themselves,* creates a federal

cause of action against a foreign state. 353 F.3d at 1034. In reaching its

conclusions, the D.C. Circuit did *not* consider § 1606 because no party had pointed

out the effect of that provision on the issue.

### B.    Federal Common Law, Incorporating International Law, Provides Viable Causes Of Action

Federal common law, to the extent that it incorporates international law

principles, provides a viable cause of action both on its own terms (against

individual defendants, acting in their individual capacities) and through § 1606

(against the Libyan Defendants). Although some courts have been reluctant to

recognize federal common law as a general, undefined matter, the acts at issue here

fall squarely within that narrow category of cases that the Supreme Court has

recently pronounced to be actionable. *See Sosa*, 542 U.S. 692.

Certain principles of international law are incorporated into, and are part of,

federal common law – and provide a private cause of action, with all appropriate

compensation, enforceable in United States courts. As the Supreme Court has long

stated, "[i]nternational law is part of our law, and must be ascertained and

administered by the courts of justice of appropriate jurisdiction as often as

questions of right depending upon it are duly presented for their determination."

*The Paquete Habana*, 175 U.S. 677, 700 (1900); *see The Nereide*, 13 U.S. (9 Cranch)

388, 423 (1815) (Marshall, C.J.) ("the Court is bound by the law of nations which is

a part of the law of the land"); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398,

423 (1964) ("United States courts apply international law as a part of our own in

appropriate circumstances").

More recently, the Supreme Court specifically acknowledged that certain

international law principles are enforceable in United States courts as federal

common law, even by non-United States nationals, in addition to or in the absence

of statutory causes of action such as the TVPA. Actionable international law

principles involve those concrete, well-defined international norms that are

universally accepted, involving conduct that is universally condemned. *Sosa,* 542

U.S. at 753-54.

*Sosa* dealt with the applicability of the Alien Tort Claims Act ("ATCA"),

28 U.S.C. § 1350, an enactment of the First Congress, and specifically how claims

arising in the context of today's international law fit within the confines of a two

centuries old domestic statute.[23] The Supreme Court held that the First Congress

understood the ATCA to "recognize private causes of action for certain torts in

---

[23]    The ATCA provides jurisdiction for this court to hear the claims of those
Plaintiffs who were not United States nationals at the time of the hijacking and is
not a jurisdictional basis as to the claims against the Libyan Defendants.
Nonetheless, the ATCA is germane as it sheds light on the court's approach to
federal common law as it relates to the conduct at issue in this case.

violation of the law of nations," including "violation of safe conducts, infringement of the rights of ambassadors, and piracy," 542 U.S. at 749, and that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of [those] 18th century paradigms." *Id.*

Although there was clearly no air travel in the 18th century, "violations of safe conduct" and "piracy," as noted, were among the non-exhaustive list of 18th century violations of "a norm of international character accepted by the civilized world" that were identified by the Supreme Court. A 20th century terrorist attack on an aircraft is an obvious parallel to those 18th century actions that provide a cause of action in violation of the law of nations and that are actionable under the ATCA.[24]

Indeed, the acts at issue here – specifically, the hijacking of an airliner, killing, maiming, and terrorizing many innocent passengers – are now, and were at the time of the events, both sufficiently well-defined and universally condemned to fall well within the *Sosa* paradigm. No state is likely to put its imprimatur on the

---

[24]    In a similar vein, the D.C. Circuit recently decided *Mwani v. Osama bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), a case involving the 1998 terrorist bombing of the United States Embassy in Nairobi, Kenya. In doing so, the court noted that the "plaintiffs' contention that bin Laden and al Qaeda attacked the American embassy intending, among other things, to kill American diplomatic personnel inside, would appear to fall well within [*Sosa's*] paradigms. *Mwani*, 417 F.3d at 14 & n.14. Thus, *Mwani* suggests that the D.C. Circuit would read *Sosa* as providing a basis – at least in certain cases involving acts of terrorism – for *federal* common law claims against foreign state defendants.

aircraft piracy at issue here, and contend that it is somehow acceptable.[25]  There

are, in fact, several treaties – to which Defendant Libya is a signatory – that

specifically proscribe the Libyan Defendants' conduct in connection with the attack

on Pan Am Flight 73.  For example, the 1971 Convention for the Suppression of

Unlawful Acts Against the Safety of Civil Aviation,[26] which Libya joined in 1974,

makes it an offense to "unlawfully and intentionally," among other things:

> (b) destroy[ ] an aircraft in service or cause[ ] damage to such
> an aircraft which renders it incapable of flight or which is
> likely to endanger its safety or its safety in flight; or
>
> (c) place[ ] or cause[ ] to be placed on an aircraft in service, by
> any means whatsoever, a device or substance which is
> likely to destroy that aircraft, or cause damage to it which
> renders it incapable of flight . . . .

The Convention also specifically makes it an offense to be an accomplice of

any person who commits such acts.  Similarly, the 1963 Convention on Offences and

Certain Other Acts Committed on Board Aircraft, which Libya joined in 1972,

condemns any acts on board aircraft that would be "offences against penal law," as

---

[25]    49 U.S.C. § 46501 provides:

> Pursuant to The Hague Convention, Federal law prohibits
> the seizure, by force or violence, of any aircraft within the
> special aircraft jurisdiction of the United States,
> interference with flight crew members while aboard such
> aircraft, the carrying of concealed weapons or explosives
> aboard such aircraft, and the commission of certain
> crimes, including murder (18 U.S.C. § 1111),
> manslaughter (18 U.S.C. § 1112), maiming (18 U.S.C. §
> 114), sexual abuse (18 U.S.C. §§ 2241-43), assault (18
> U.S.C. § 113) and robbery (18 U.S.C. § 2111), while
> aboard such aircraft . . . .

[26]    This is the very treaty from which § 1605(a)(7) derives its definition of
"aircraft sabotage."  *See* 28 U.S.C. § 1605(e)(3).

the terrorist attack at issue here assuredly is, as well as other acts that "may or do jeopardize the safety of the aircraft or of persons or property therein . . . ."

Further, the Restatement (Third) of Foreign Relations leaves no doubt that a nation violates clearly established and well-defined norms of international law if it "practices, encourages, or condones" murder, defined as the killing of an individual by a state "other than as lawful punishment pursuant to conviction in accordance with due process of law, or as necessary under exigent circumstances." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702 and cmt. f (1987). The prohibition on extrajudicial killing is recognized in numerous treaties – and, as discussed above, is affirmatively prohibited by statute in the form of the TVPA and the Flatow Amendment.

*Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004), upon which the Libyan Defendants rely, is inapposite. In that case, plaintiffs failed to identify *any* source of law that would provide a cause of action. Plaintiffs had simply argued that "general law" applied to allow them to collect from Iraq on their claims. They had argued only "general law" or "traditional torts" even in response to a specific written question from the D.C. Circuit about what specific law they were relying upon; they ultimately did not identify any specific laws or causes of action from any state that would fit their case. *Acree*, 370 F.3d at 59-60. Plaintiffs' "general law" argument in *Acree* was, of course, an unviable proposition: there is no such thing as "general law." Law comes in the form of specific statutes or specific common law, from some specific government or jurisdiction. As a result, the D.C. Circuit held that plaintiffs suing under § 1605(a)(7) cannot simply assert "generic common law"

or "allude[] to the traditional torts . . . in their generic form." *Id.* at 58-59 (quotations omitted). Instead, the Court indicated that plaintiffs must "identify a particular cause of action arising out of a specific source of law." *Id.* Here, of course, Plaintiffs have identified specific federal statutes and have shown that the law of each and *every* state potentially applicable to these claims would provide a cause of action for these atrocities. *See* Section III.C, *infra*.

In sum, the specific applicable treaties, as well as generally accepted international law norms, establish the universal condemnation for Defendants' acts, which in this context are well-defined and easily identifiable, and thus give Plaintiffs a viable cause of action based on federal common law incorporating international law. Plaintiffs may assert these federal common law claims against individual Defendants (acting in their individual capacities), as well as against the Libyan Defendants (through § 1606).

### C.    State Statutory And Common Law Provide Additional Causes Of Action

Where, as here, immunity is lifted because an exception to § 1605 applies, the foreign state is subject to *all* causes of action made available by the facts, whether under applicable federal law, state law or foreign law. 28 U.S.C. § 1606. As an alternative to their *federal* causes of action, those Plaintiffs who were United States nationals on September 5, 1986, are entitled to relief through *state* statutory and common law causes of action – including wrongful death, intentional infliction of emotional distress, assault, battery, and loss of consortium and solatium – against the Libyan Defendants.

36

There is no question that state law provides viable causes of action for the Plaintiffs. *See, e.g., Price,* 384 F. Supp. 2d. at 133 (finding that "[s]tate law may provide a basis for liability" on assault, battery and intentional infliction of emotional distress claims in cases involving physical and mental torture of plaintiffs by Libya and its agents); *see also Haim v. Islamic Republic of Iran,* 425 F. Supp. 2d 56, 68 (D.D.C. 2006) ("[i]n this case, state law provides a basis for liability"); *Dammarell v. Islamic Republic of Iran,* 2005 U.S. Dist. LEXIS 5343, *54 (D.D.C. Mar. 29, 2005) (finding that plaintiffs, survivors and surviving family members of United States citizens killed in April 1983 bombing of United States Embassy in Beirut, Lebanon could assert causes of action and bases for recovery of damages under state common and statutory law). Although different states may provide different mechanisms by which to recover under the torts asserted in this case, the actual underlying causes of action for the claims asserted – wrongful death, intentional infliction of emotional distress, assault, battery, and loss of consortium and solatium – are provided for and are fairly uniform in every state. At issue here are only those claims brought by those Plaintiffs who were United States nationals at the time of the hijacking.

Under the District of Columbia choice-of-law rules and the federal conflicts law set forth in the Restatement (Second) of the Conflict of Laws (in particular, §§ 6, 145 and 175), there are a limited number of states whose laws might apply to each Plaintiff's claims. In similar cases involving claims asserted by the victims of state-sponsored terrorism, where there is little connection between the site of the underlying incident and the people killed or harmed in the underlying act or event,

courts attempting to resolve this issue have utilized, consistent with District of Columbia law, a "constructive blending" of the "governmental interests analysis" and the "most significant relationship" test. *See generally Dammarell*, 2005 U.S. Dist. LEXIS 5343, at \*57-59 (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C. 1989)). Applying these standards, the applicable state law for each plaintiff is either District of Columbia law or the law of the state in which the Plaintiff was domiciled at the time of the attack on Pan Am Flight 73.

Based on the "constructive blending analysis," the court in *Dammarell*, which involved claims asserted by direct survivors of, and surviving family members of United States citizens killed in, the April 1983 bombing of the United States Embassy in Beirut, determined that claims of the estates of United States citizens killed in the Embassy bombing are "traditionally governed by the laws of the decedent's domicile" at death. *Id.* at \*67. With respect to the surviving family members of the victims of a terrorist attack, the court indicated that it would, in the first instance, apply the law of each survivor's domicile at the time of the terrorist act in question. *Id.* at \*69-70. Other courts have subsequently adopted the same approach. *See Cicippio-Puleo*, Civil Action No. 01-01496, Slip Op. at 21-22 (applying law of Pennsylvania, plaintiffs' domicile state) (*see* Attachment 5); *Price*, 384 F. Supp. 2d at 133 (applying Texas and California law, to claims of plaintiffs detained and tortured by Libya where plaintiffs were domiciled in these states at the time of Libya's terrorist actions).

Of the 179 Plaintiffs seeking redress for the hijacking of Pan Am Flight 73, 43 Plaintiffs, from 12 different states, were United States nationals at the time of

the incident. Attachment 6 sets forth the domiciles (at the time of the incident) of those Plaintiffs who were United States nationals on September 5, 1986. Under the governing law in those 12 states and the District of Columbia, each Plaintiff has viable causes of action for wrongful death, intentional infliction of emotional distress, assault, battery, and loss of consortium and solatium. Although these causes of action may vary slightly among the 12 states in which Plaintiffs were domiciled in September 1986, each cause of action shares the same fundamental elements across the states and the District of Columbia. And under any formulation of the causes of action, Plaintiffs have pled sufficient facts to prevail.

### 1.    Intentional Infliction Of Emotional Distress

In order to successfully allege a claim for intentional infliction of emotional distress, and as set forth in Attachment 7, the Plaintiffs must generally show four elements: a plaintiff must demonstrate that (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct was the cause of the plaintiff's distress; and (4) he endured substantial emotional distress. In each of the relevant states, intentional infliction of emotional distress is a viable cause of action and there is a great deal of similarity among the elements that must be shown.

The Plaintiffs have alleged sufficient facts to support claims for intentional infliction of emotional distress. Throughout the 16-hour hijacking and terrorist attack on Pan Am Flight 73, the hijackers threatened, abused and tortured the passengers. Amended Complaint at ¶¶ 239-263. The terrorists specifically sought out United States nationals and they shot and killed Rajesh Kumar – a United

States national – in plain view of the passengers. *Id.* at ¶¶ 234-238. Following the brutal murder of Mr. Kumar, the terrorists threatened to kill another passenger every ten minutes. *Id.* at ¶ 239. Toward the end of the ordeal, the hijackers ordered the passengers to the center of the plane, where they were forced to sit on top of each other. *Id.* at ¶ 243. Shortly thereafter, the hijackers opened fire with automatic weapons and threw hand grenades into the crowd of passengers. *Id.* at ¶ 244. The terrorists inflicted unimaginable physical trauma on the victims, in addition to tremendous emotional suffering. *Id.* at ¶¶ 247, 262. This attack has ruined careers, destroyed families and caused many victims to live with constant fear and grief. *Id.* at ¶¶ 262-265.

## 2.    Assault and Battery

A plaintiff can prevail on an assault claim by showing that the defendant threatened to inflict any sort of bodily harm. As set forth in Attachment 8, assault is an actionable tort in all of the relevant states. As set forth in Attachment 9, each relevant state also recognizes battery as an actionable tort. In order to succeed in a battery action, the plaintiff must show that the defendant intentionally initiated some sort of harmful physical contact with the plaintiff. However, "contact" is defined broadly enough to include direct or indirect contact.

Plaintiffs have set forth allegations that are sufficient to prevail on claims for both assault and battery. The terrorists threatened passengers with torture and death – and the terrorists delivered on those promises. Amended Complaint at ¶¶ 239, 244. Throughout the ordeal, the hijackers threatened to kill a passenger every ten minutes. *Id.* at ¶ 239. They forced passengers into stressful and painful

positions, including sitting on top of each other on the floor of the aircraft. *Id.* at ¶¶ 233, 243. With the goal of killing as many passengers as possible, the hijackers used automatic weapons and hand grenades during the final minutes of the siege. *Id.* at ¶ 244. As a result, many passengers were killed, severely maimed or otherwise injured. *Id.* at ¶ 247-253. Plaintiffs suffered wounds to their legs, arms, abdominals, faces and backs. *Id.*

### 3. Wrongful death

The Plaintiff family members of Surendra Patel have set forth allegations that are sufficient to prevail on their claims for wrongful death, which requires a showing of death "by the wrongful act or neglect of another."[27] Mr. Patel had just celebrated his 50th birthday and, at the time of his death, was the father of three young children, ages 14, 12, and 6. Amended Complaint at ¶ 268. He and two daughters were returning home to California after a visit with relatives abroad. *Id.* Mr. Patel was brutally murdered by the terrorists – clearly a wrongful act. *Id.*

### 4. Loss of solatium and consortium

The hijackers have also deprived Surendra Patel's family (including his surviving spouse and his three children) of his love, support, society and companionship. Amended Complaint at ¶¶ 268-272. Therefore, members of his

---

[27]    Cal. Civ. Proc. § 377.60 (2005); *Mayo v. White*, 178 Cal. App. 3d 1083, 1088 (Cal. Ct. App. 1986).

immediate family can also assert a claim for loss of solatium and/or consortium under the law of California.[28]

## IV.    Defendant Qadhafi Is Not Entitled To "Head Of State" Immunity Unless And Until The State Department Declares Otherwise

The Libyan Defendants argue that since Qadhafi is the head of the Libyan state,[29] he must "enjoy[ ] head-of-state immunity and the Court should grant Libya's cross-motion for summary judgment and dismiss plaintiffs' complaint against him."[30] Libyan Defendants' Motion at 10.  At the same time, however, the Libyan Defendants concede that the decision regarding "who" is a head of state and whether a head of state may be entitled to immunity is a matter of United States diplomatic policy that is left to the Executive Branch, which, to date, has taken no position on the issue.  *Id.*

In other words, head of state immunity is available if, *and only if,* the United States government asserts the immunity by filing a "suggestion of immunity" on behalf of the foreign official.  *See Ye v. Zemin,* 383 F.3d 620 (7th Cir. 2004).  No such suggestion has been filed here.  Indeed, the Libyan Defendants note that in two *different* cases, the United States has been asked to – but, to date, has not –

---

[28]    *Buell-Wilson v. Ford Motor Co.,* 141 Cal. App. 4th 525, 548 (Cal. Ct. App. 2006).

[29]    Notably, this argument has no impact on any of the claims against any of the Defendants, other than Qadhafi.

[30]    The Libyan Defendants state that "the Court should grant Libya's cross-motion for summary judgment."  Libyan Defendants' Motion at 10.  Obviously, neither Libya nor Plaintiffs have filed any summary judgment motions, and Plaintiffs assume that Libya's statement is in error.

expressed its position on whether Defendant Qadhafi is entitled to head of state immunity. *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, Civil Case No. 02-02026, Slip Op. (D.D.C. May 11, 2006); *Collett*, 362 F. Supp. 2d at 237-38; Libyan Defendants' Motion at 10. If, in either of those cases, something changes by virtue of the United States' submission of a statement of position about Qadhafi, he can bring it to the attention of the court at that time, based on such new information.

*          *          *

There can be no doubt that Plaintiffs have alleged a set of facts in support of their claim that would entitle them to relief and, as such, the Libyan Defendants' Motion to Dismiss must be denied. *See United States ex rel. New,* 350 F. Supp. 2d at 88-89; *Browning,* 292 F.3d at 242.

## CONCLUSION

For the foregoing reasons, the Libyan Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

_____
Stuart H. Newberger, D.C. Bar No. 294793
Wilma A. Lewis, D.C. Bar No. 358637
Michael L. Martinez, D.C. Bar No. 347310
Andy Liu, D.C. Bar No. 454986
Justin P. Murphy, D.C. Bar No. 477718
Peter J. Eyre, D.C. Bar No. 500053
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 628-5116 facsimile

Counsel for Plaintiffs

October 30, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MANJULA PATEL, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE SOCIALIST PEOPLE'S<br>ARAB JAMAHIRIYA, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. 06-CV-00626 (PLF)<br>)<br>)<br>)<br>) |

## PROPOSED ORDER

Upon consideration of the Libyan Defendants' Motion to Dismiss, dated

October 18, 2006, and Plaintiffs' response thereto, IT IS

HEREBY ORDERED, that Libyan Defendants' Motion to Dismiss be denied;

IT IS SO ORDERED.

_____
Judge Paul L. Friedman
United States District Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of October 2006, a true and correct copy of the foregoing was filed via the court's Electronic Filing/Case Management System. In addition, I hereby certify that a copy of the foregoing was sent via first-class mail, postage prepaid, this 30th day of October 2006, to Defendants Safarini, Qadhafi, Senoussi, Rahim, Ar-Rahayyal, Al-Munawar, and Al-Turk at the following addresses:

Zaid Hassan Abd Latif Safarini
USP Florence ADMAX
U.S. Penitentiary
P.O. Box 8500
5880 Highway 67 South
Florence, CO  81226

Muammar Qadhafi
Libyan External Security Organization
Ministry of Foreign Affairs
Tripoli, Libya

Abdallah Senoussi
Libyan External Security Organization
Ministry of Foreign Affairs
Tripoli, Libya

Jamal Saeed Abdul Rahim
Adiala Jail
Rawalpindi, Pakistan

Muhammad Abdullah Khalil Hussain Ar-Rahayyal
Adiala Jail
Rawalpindi, Pakistan

Muhammad Ahmed Al-Munawar
Adiala Jail
Rawalpindi, Pakistan

Wadoud Muhammad Hafiz Al-Turk
Adiala Jail
Rawalpindi, Pakistan

_____
Peter J. Eyre