# ATTACHMENTS

# ATTACHMENT 1

# United States Court of Appeals

#### FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

**No. 06-7127**                           **September Term, 2006**

01cv01301

**Filed On: October 19, 2006**

[998720]

Blake Kilburn, Individually on his own behalf and as
Executor of the Estate of Peter C. Kilburn, deceased,

      Appellee

   v.

Islamic Republic of Iran, et al.,

      Appellants

**BEFORE**:    Sentelle, Henderson, and Tatel, Circuit Judges

### O R D E R

Upon consideration of the motion for summary affirmance, which includes a request for costs; the opposition thereto; and the reply, it is

**ORDERED** that the motion for summary affirmance be granted.  The merits of the parties' positions are so clear as to warrant summary action.  See Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam).  The district court properly denied the motion to dismiss for lack of subject-matter jurisdiction.  Because Libya was designated as a state sponsor of terrorism at the time the alleged acts occurred, it is not entitled to sovereign immunity, even though it was later removed from the list of state sponsors of terrorism.  See 28 U.S.C. § 1605(a)(7); Acree v. Republic of Iraq, 370 F.3d 41, 56 (D.C. Cir. 2004); Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1126-27, 1133 (D.C. Cir. 2004); see also Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 221(c), 110 Stat. 1214, 1243; Republic of Austria v. Altmann, 541 U.S. 677, 697-700 (2004).  It is

**FURTHER ORDERED** that the request for costs be denied.  There are no allowable costs taxable against appellants in this case.  See D.C. Cir. Rule 39(a).

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 06-7127**                                   **September Term, 2006**


Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc. <u>See</u> Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**<u>Per Curiam</u>**

                    **FOR THE COURT:**
                    Mark J. Langer, Clerk

BY:

                    Deputy Clerk/LD

# ATTACHMENT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBERT L. PUGH, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action 02-02026 (HHK)** |
| **SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al.,** | |
| **Defendants.** | |

## ORDER

Before the court is the motion of defendants to Dismiss for Lack of Jurisdiction (#60).  Upon consideration of the motion, the opposition thereto, and the record of this case, it is this 3rd day of September, 2006, hereby

**ORDERED** that defendants' motion (#60) is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge

# ATTACHMENT 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BLAKE KILBURN, individually       :
on his own behalf and as Executor  :
of the Estate of Peter C. Kilburn,   :
deceased,                             :
                                 :
          Plaintiffs,        :     Civil Action No.:    01-1301 (RMU)
                                 :
          v.                :     Document No.:     69
                               :
THE REPUBLIC OF IRAN *et al.*,    :
                               :
          Defendants.      :

## ORDER

### DENYING DEFENDANT LIBYA'S MOTION TO DISMISS

For the reasons stated in the court's Memorandum Opinion separately and

contemporaneously issued this 26th day of July, 2006, it is hereby

**ORDERED** that defendant Libya's motion to dismiss is **DENIED.**

**SO ORDERED**.

RICARDO M. URBINA
United States District Judge

1

# ATTACHMENT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— )
                                        )
DAVID S. DODGE, *et al.*,                )
                                        )
                                        )
                    Plaintiffs,          )
                                        )
                                        )
            v.                           )        Civil Action No. 03-252 (TPJ)
                                        )
                                        )
THE ISLAMIC REPUBLIC OF IRAN, *et al.*, )
                                        )
                                        )
                    Defendants.          )
———————————————————————— )


**MEMORANDUM & ORDER**


    On July 19, 1982, plaintiff David S. Dodge, the 59-year old Acting President of the

American University of Beirut ("AUB"), was kidnapped in broad daylight while walking home

from work on AUB's campus in Beirut, Lebanon.  He was held captive for one year at various

locations in Lebanon and Iran by soldiers of the Iranian Revolutionary Guard and an organization

of civilian Shiite Lebanese known as Hizbollah, a politico-paramilitary group.[1]  Dodge, his son,

Bayard, and the estate of his deceased wife, Doris, now bring this action against the Islamic

Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS"), as the

_____

    [1] This organization's name has been spelled in a variety of ways including
"Hizbollah," "Hizballah," and "Hezbollah."

principals responsible for the multiple tortious injuries inflicted upon David Dodge and his

family by his abduction and imprisonment.  Subject matter jurisdiction is conferred upon this

Court by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330(b) and 1605(a)(7),

the latter being a 1996 amendment to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-

1611.  Defendants have been properly served with process pursuant to 28 U.S.C. § 1608(a)(4),

and have failed to answer or otherwise respond to the complaint within the time allotted or

otherwise.  The Clerk of Court has entered a default, and the case has, as others have done in the

past, therefore proceeded *ex parte*.  Upon the evidence presented to the Court July 15, 2004, and

the facts found therefrom as set forth below pursuant to Fed. R. Civ. P. 52(a), for the reasons

hereinafter set forth the Court concludes that judgment will be given for the plaintiffs.[2]


## I.

David Dodge was born on November 17, 1922 in Beirut, Lebanon, of American

parentage and is thus a citizen of the United States.  Dodge grew up in Lebanon, and after

completing undergraduate and graduate degrees at Princeton University, he returned to the

Middle East to work for the Arabian American Oil Company.  Upon his retirement in 1976 he

began serving AUB in various capacities, culminating in his appointment as acting president of

the university in 1982.[3]  At that time Lebanon was in the throes of a protracted civil war which

---

[2] The Court also adopts as its own (and attaches hereto as an appendix) the proposed Findings of Fact and Conclusions of Law submitted by plaintiffs' counsel at the close of the evidence.

[3] AUB is an institution of higher learning that was founded in Beirut by American missionaries, including David Dodge's great grandfather, in 1866.  In the ensuing decades, AUB obtained a reputation for educational excellence throughout the Middle East and the world.  Students from all over the Middle East earned degrees at AUB and throughout the years of the mid- and late 20th century many government ministers of

had begun in 1975, disrupting the country's complex and delicate political and religious balance

of power, exacerbated by the recent invasion by military forces of neighboring Israel.  By July

1982 the city of Beirut was essentially surrounded by the Israeli army, and Lebanese security

forces had become ineffective.  The Islamic Republic of Iran, already seeking to expand its

influence in Lebanon by funding, training, and supporting the terrorist element of Hizbollah,

seized the opportunity to attempt to drive all Westerners, particularly the Americans and French,

from Lebanon.

At approximately 5:00 p.m. on July 19, 1982, Dodge was accosted while walking on

AUB's campus, struck on the head with a bludgeon and thrown into the back of a car by four

men in civilian clothes.  He was forced to stay on the floor of the back seat and driven to an

unknown place of confinement somewhere in the city.  When he regained full consciousness,

Dodge found that he had been blindfolded, his head wound had been cleaned and bandaged, and

that he was in a roomful of males speaking Arabic, in which Dodge was fluent.

A day or two later Dodge was moved to another location, but knew from the noise of

nearby explosions that he was still in Beirut.  Some of his Lebanese guards treated him roughly,

asserting that the United States government was assisting Israel in its invasion of Lebanon.

Within a week or so, Dodge was moved yet again, prior to which he was sedated with an

injection.

Dodge was moved several more times over short distances during the summer of 1982,

and in each instance he was blindfolded and placed in rooms with covered windows.  From the

─────────────────────

various Middle Eastern countries obtained an education and degree at AUB.  *See Kerr v.
Islamic Republic of Iran,* 245 F. Supp. 2d 59, 60 n. 3 (D.D.C. 2003).

dramatic temperature changes from daytime to nighttime, however, at one location he surmised that he was in the Bekaa Valley of Lebanon, a place he had previously visited many times.[4]

Dodge was always confined alone, with his guards for company, who were allowed to talk to him only about food or permission to use the bathroom. Some of his guards were Lebanese, while others he discovered to be Iranian on whom he observed, through a slit in his blindfold, the insignia of the Iranian Revolutionary Guard, an elite Iranian military unit. The Iranian guards also conversed in Farsi, the language of Iran.

Dodge was told several times that he would be released if Bechir Gemayel, the pro-Israeli Maronite Catholic leader of a Lebanese militia who had recently been elected president of Lebanon, would release four Iranian diplomats who had reportedly been kidnapped by Gemayel's militia. Dodge's guards even forced him to write a letter to Gemayel requesting such an exchange, but Gemayel was assassinated in September 1982.

Dodge was not allowed to communicate with anyone during his captivity, including his family. He was also not allowed to receive any communications from outside sources, and had no access to radio, television, or other media. To occupy his time he was given paper and a pen, which he used to make a deck of cards to play solitaire. He was also given three books to read, one of which he translated from French to English. For exercise, Dodge would walk around his room numerous times, aggregating by his calculation several miles each day.

During the entire eight months of his captivity in Lebanon, Dodge was allowed to bathe no more than three or four times and was rarely given a change of clothing. He kept track of

_____

[4] At one point, Dodge was brought a meal with bread wrapped in plastic with Arabic writing indicating that it was from the village of "Doris" which he knew to be a village in the Bekaa Valley, near the town of Baalbeck.

time with his wristwatch and a calendar of his own making, by which he marked the passage of his 60th birthday and his wedding anniversary.

In April 1983, Dodge was falsely told that he would be taken to Beirut and released, but when he regained consciousness after his customary injection he discovered that he was inside a box aboard an airplane. When it landed, Dodge was transported in a van, but through a slit in his blindfold he could see that the license plate of a vehicle in front was Iranian, and he quickly realized that he was not to be released as promised. He was taken to a prison cell where he spent the rest of his time as a captive, later learning that he was being held in the notorious Evin Prison, known as the "Bastille of Tehran."[5]

While in Evin Prison, Dodge was interrogated, in Arabic, every two weeks by a man he understood to be an Iranian intelligence officer. He was shown photographs of an Iranian leader executed by the Khomeini regime in the 1979 revolution and told that he would suffer a similar fate. Indeed Dodge was not only threatened with death, but he was slapped and abused on several occasions and accused of being a CIA agent.

On July 19, 1983, while being led to what he thought was going to be another interrogation session, Dodge was given back his personal possessions and escorted to an automobile, where a man in civilian dress told him that he was en route to the airport to be flown to Syria. When he deplaned in Damascus, Dodge was taken to the home of Rifaat al-Assad, the brother of the then president of Syria, Hafez al-Assad, where he was able to shower, shave, get a

_____

[5] The conditions in Evin Prison were, however, in some ways, better than they had been in Lebanon: Dodge was allowed weekly showers, along with other prisoners *en masse*. He was also given pajamas to wear, which were changed relatively frequently, and occasionally he was escorted to a place on the roof, enclosed with heavy wires, where he could run and bounce a ball against a wall adorned with a large portrait of Ayatollah Khomeini.

haircut, and change into a suit given to him by a Syrian officer. The next day Dodge was delivered to the United States Ambassador, and for the first time in a year, he was finally able to talk to his wife by telephone.

The following day Dodge and the Ambassador flew to Germany, from whence Dodge was flown on to Hartford, Connecticut. He was taken first to the Yale-New Haven hospital for treatment, and was there reunited with his wife and children, learning that, while he was a hostage, his son Bayard had gotten married.

Dodge has retained his commitment to AUB. Over the years, he has been a member of its board of trustees, and he has again served briefly as its acting president, although *in absentia*: He has never returned to Beirut.


## II.

The Foreign Sovereign Immunities Act's "state sponsored terrorism exception" found at 28 U.S.C. section 1605(a)(7), abrogates a country's sovereign immunity from suit, and confers jurisdiction on federal courts in cases in which:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, *hostage taking*, or the provision of material support or resources. . . for such an act if such act or provisions of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C § 1605(a)(7) (emphasis supplied);[6] *see also* H.R. Rep. No. 104-383, at 62 (1995)

---

[6] The reach of § 1605(a)(7) is limited to foreign states designated as "state sponsors of terrorism" by the Department of State. In addition, the claimant or victim must be a U.S. national. 28 U.S.C. § 1605(a)(7)(A) & (B). Iran was designated a state sponsor of terrorism in January 1984. *See* 22 C.F.R. § 126.1(d)(2004); 31 C.F.R.

("[A]llowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted. [Section 1605(a)(7)] will give American citizens an important economic and financial weapon against these outlaw states.")  Congress expressly provided that § 1605(a)(7) would apply retroactively.  *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(c), 110 Stat. 1243 (immunity exception "shall apply to any cause of action arising before, on, or after the date of the enactment of this Act").

This Court has previously held on several occasions that Iran sponsored via Hizbollah a number of terrorist activities in Lebanon during the 1980s, including the kidnapping of David Dodge.  *See Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 62 (D.D.C. 2003) (the kidnapping of David Dodge was the commencement of a "pattern of terrorist attacks perpetrated against prominent Americans by Hizbollah."); *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 85 (D.D.C. 2002); *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 132 (D.D.C. 2001); *Anderson v. Islamic Republic of Iran,* 90 F. Supp. 2d 107, 112 (D.D.C. 2000).  The Court takes judicial notice of the evidentiary record in those cases, as well as the record in this case. These records, in conjunction with the evidence produced at trial on July 15, 2004, have established conclusively to the Court's satisfaction that Hizbollah, at the instigation of and supported by Iran, executed the seizure and imprisonment of David Dodge, as a hostage to serve Iranian objectives.  *See Cicippio v. Islamic Republic of Iran,* 18 F. Supp. 2d 62, 68 n.6 (D.D.C. 1998).

Once a foreign state is found amenable to suit under §1605(a)(7), that state is liable "in

---

§ 596.201 (2004).

the same manner and to the same extent as a private individual under like circumstances" by

virtue of section 1606 of the FSIA.  *See* 28 U.S.C. § 1606.  A plaintiff, therefore, may sue that

state under any cause of action arising from common law, foreign law, or federal statute which

might ordinarily give rise only to individual liability.  The appropriate causes of action giving

rise to defendants' liability here are those created by the Torture Victim Protection Act (TVPA),

Pub. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C. § 1350 note), and the Flatow Amendment,

28 U.S.C. § 1605 note.

    The TVPA provides in Section 2 (a)(1), that "[a]n individual who, under actual or

apparent authority, or color of law, of any foreign nation . . .subjects an individual to torture

shall, in a civil action, be liable for damages to that individual . . ." 28 U.S.C. § 1350 note.[7]  The

---

[7] As defined by Congress in the TVPA's section 3(b):

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from –

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the

Flatow Amendment states that:

> [a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee or agent for which the courts of the United States may maintain jurisdiction under 1605(a)(7) . . . for money damages which may include economic damages, solatium, pain and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

28 U.S.C. § 1605 note; *see also Flatow v. Islamic Republic of Iran,* 999 F. Supp 1 (D.D.C. 1998). These two statutes provide a basis for plaintiffs' recovery under the facts as found.[8]

The paradigm established by this Court in the various other decisions it has issued concerning compensation for victims of terrorism setting forth the framework for awarding damages to the plaintiffs both under federal statutory law and alternatively under federal and

---

> senses of the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

[8] The D.C. Circuit's recent ruling in *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024 (D.C. Cir. 2004), does not undermine the ability of any victim of terrorism to bring an action under any potentially applicable law otherwise applicable to individuals. In particular, *Cicippio-Puleo* did not address § 1606, and therefore did not consider whether 28 U.S.C. § 1606 provides a basis for asserting federal *statutory* causes of action against foreign states. *See Webster v. Fall,* 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"); *Stapf v. United States,* 367 F.2d 326, 330 (D.C. Cir. 1966) (same).

state common law, continue to apply, and allow recovery for the plaintiffs in this case. *See Kerr*,

245 F. Supp. 2d at 63-64; *Stethem*, 201 F. Supp. 2d at 87-93; *Wagner*, 172 F. Supp. 2d at 135-38;

*Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 47-53 (D.D.C. 2001); *Dammarell v.*

*Islamic Republic of Iran*, 281 F. Supp. 2d 105, 194-203 (D.D.C. 2003).[9]


## III.

David Dodge sues along with his son, Bayard Dodge, and the estate of his deceased wife,

Doris Dodge, under the Torture Victim Protection Act and the Flatow Amendment, as well as

upon various common law causes of action.

In hostage cases similar to this one, this district court has generally applied a formula of

awarding compensatory damages to the hostage in the amount of $10,000 per day for each day of

captivity. *See e.g. Anderson*, 90 F. Supp. 2d at 113; *Sutherland*, 151 F. Supp. 2d at 51.

Each of the hostage-plaintiffs in those cases, however, were subjected to brutalities not as

a rule inflicted upon Dodge: They were chained to the floor or wall, forced to lie in darkness in

their own bodily wastes, made to witness the torture and death of fellow captives, and fed

minimal rations for periods of several years. Dodge's treatment appears to have been relatively –

but *only* relatively – more humane. He was, nevertheless, held *incommunicado*, with no

expectation he would ever be released, and on occasion physically abused. The Court will

compute his damage award at $8,000 per day of captivity.

---

[9] The Court notes that even were this not so, federal common law causes of action
still give rise to liability for the defendants. *See .e.g.*, *Stethem,* 201 F. Supp. 2d at 87
(application of federal common law in case where one hostage murdered and others
tortured) and *Wagner,* 172 F. Supp. 2d at 134-35 (application of federal common law in
the bombing of a United States Embassy Annex in Beirut, Lebanon).

There is less precise guidance with awards to spouses in a case like this.  In cases like *Anderson,* 90 F. Supp. 2d at 113 and *Sutherland,* 151 F. Supp. 2d at 51-52, as well as in this Court's decisions in *Polhill v. Islamic Republic of Iran*, 2001 U.S. Dist. LEXIS 15322 at *16-17 (August 23, 2001) and *Turner v. Islamic Republic of Iran*, 2002 U.S. Dist. LEXIS 26730 at *9-10 (October 2, 2002), the Court awarded the spouse of each hostage $10,000,000.  In each of those cases, however, the hostage was held for multiple years in conditions similar to those experienced by Mr. Dodge.  There is some, but not much, guidance on this issue for cases where hostages were not held for multiple years.  For example, in *Daliberti v. Republic of Iraq,* 146 F. Supp. 2d 19, 26-27 (D.D.C. 2001), Judge Oberdorfer awarded $1,500,000 to each of the spouses of hostages held in Iraq from between 5 and 205 days.

For at least two reasons, a larger award than was received by the spouses in *Daliberti* is warranted here for Doris Dodge's estate.  First, David Dodge was held hostage for a significantly longer period of time than the hostages in *Daliberti*.  Moreover, the Court heard testimony that Mrs. Dodge never recovered from her ordeal; her personality underwent a profound change for the worse, and she remained depressed for the remainder of her life.

Bayard Dodge, like David and Doris, suffered greatly by the events involving his father in 1982-83.  The cases cited above have generally settled on a formula of $1,000,000 per year for the child of a hostage.  *See e.g. Anderson,* 90 F. Supp. 2d at 113-14*; Sutherland,* 151 F. Supp. 2d at 52.

It is, therefore, this 25th day of August, 2004,

ORDERED, that judgment be given, and the Clerk of the Court is directed forthwith to enter judgment for plaintiffs for compensatory damages against defendants the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, in the amounts

specified below:

| | |
|---|---|
| David Dodge | $2,920,000.00 |
| Estate of Doris Dodge | $1,750,000.00 |
| Bayard Dodge | $1,000,000.00 |

IT IS FURTHER ORDERED, that judgment be given, and the Clerk of the Court is

directed forthwith to enter judgment for plaintiffs, jointly and severally, for punitive damages

against defendant the Iranian Ministry of Information and Security in the amount of

$3,000,000.00

_____/s/_____
Thomas Penfield Jackson
United States District Judge

# ATTACHMENT 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**ELIZABETH A. CICIPPIO-PULEO, et al.,**

**Plaintiffs,**

v.

**ISLAMIC REPUBLIC OF IRAN, et al.,**

**Defendants.**

</td><td>

**Civil Action 01-01496 (HHK)**

</td></tr>
</table>

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action came before this court for an evidentiary hearing on August 9-10, 2005. Based upon the testimony of the witnesses presented during the hearing, the sworn testimony of witnesses presented in other similar proceedings, and sworn affidavits and documents entered into evidence in accordance with the Federal Rules of Evidence. The court makes the following:

## Findings of Fact

1.    Plaintiffs are the immediate family members of Joseph J. Cicippio, Sr. They are:

> a.  Elizabeth A. Cicippio Puleo, the daughter of Joseph J. Cicippio, Sr.;
>
> b.  Helen Melnick, the daughter of Helen Fazio, sister of Joseph J. Cicippio, Sr.;
>
> c.  Dominic Cicippio (deceased), the brother of Joseph J. Cicippio, Sr.;

    d. David B. Cicippio, the son of Joseph J. Cicippio, Sr.;

    e. Eric R. Cicippio, the son of Joseph J. Cicippio, Sr.;

    f. Richard Dennis Cicippio, the son of Joseph J. Cicippio, Sr.;

    g. Thomas J. Cicippio, the brother of Joseph J. Cicippio, Sr.;

    h. Allen John Cicippio, the son of Joseph J. Cicippio, Sr.;

    i. David J. Abell, the son of Rose Abell, sister of Joseph J. Cicippio, Sr.;

    j. Anthony Cicippio, the brother of Joseph J. Cicippio, Sr.;

    k. Nicholas B. Cicippio, the brother of Joseph J. Cicippio, Sr.;

    l. Ann Gabrielson, the widow of Joseph J. Cicippio, Jr., son of Joseph J. Cicippio, Sr.;

    m. Alexander Cicippio (deceased), the brother of Joseph J. Cicippio, Sr.; and

    n. Paul Vincent Cicippio (deceased), the son of Joseph J. Cicippio, Sr.

2.    On September 12, 1986, Joseph J. Cicippio, Sr., was employed as the controller for the American University of Beirut in Lebanon. In the early morning hours while walking through the university campus, Mr. Cicippio was abducted by a group of men who proceeded to attack him. The assailants pistol-whipped Mr. Cicippio about his head until he lost consciousness and then transported him to a dwelling off of the campus where he was stripped, provided with a robe and left bleeding, dizzy and in severe pain.

3.    This Court has already determined liability in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805.* In *Cicippio*, this Court found that Joseph C. Cicippio, Sr., was abducted by Hizballah, a politico-paramilitary organization sponsored, financed and controlled by the Islamic Republic of Iran.

2

4.  Plaintiffs learned of Mr. Cicippio's abduction on the morning of September 12, 1986.

5.  Joseph J. Cicippio, Sr. was held in captivity for 1,908 days; during this time, he had no direct communication with any family members.

6.  On July 31, 1989, on worldwide television, Hizballah murdered another hostage, Lieutenant Colonel William Higgins, and displayed his body on television following his hanging. The terrorists then announced that, unless certain demands were met, Joseph J. Cicippio, Sr., would be the next hostage to be executed and set a date certain.

7.  Plaintiffs saw the body of Lt. Higgins on television and heard threats upon Mr. Cicippio's life.

8.  Joseph J. Cicippio, Sr., was forced to appear on television by his captors following the hanging of Lt. Colonel Higgins and demand the release of Sheik Obeid who was believed to be a terrorist and had been abducted by Israel. During this televised statement, Mr. Cicippio said good-bye to his wife. Plaintiffs witnessed the televised statement of Joseph J. Cicippio, Sr.

9.  On the date of the initial execution, Plaintiffs gathered at the house of Thomas Cicippio, brother of Joseph J. Cicippio, Sr., fully expecting to witness his execution. Mr. Joseph Cicippio appeared on television and read a good-bye note to the members of his family.

10. Unexpectedly, the terrorists granted a stay of execution promising that Joseph J.Cicippio, Sr., would be executed eventually.

11. From July 31, 1989 until August 4, 1989, Mr. Cicippio's captors made numerous threats to execute him. These threats were witnessed by Plaintiffs and as the terrorists had already murdered several other hostages, Plaintiffs fully expected that Defendants would execute Joseph J. Cicippio, Sr. at any time.

12.    The respective experiences of plaintiffs following and caused by the the
kidnaping of Joseph J. Cicippio, Sr. were and are as follows:

a.    **Elizabeth A. Cicippio-Puleo** was 27 years old at the time
of her father's kidnaping.  She lived in constant fear that
her father would not survive his ordeal.  Thoughts of her
father filled her days and nights; sleep was near impossible
when Joseph Cicippio was threatened with death.  Ms.
Cicippio-Puleo has a clear recollection of the hanging of Lt.
Colonel Higgins and the Defendants' ongoing threats to
execute her father.  To this day, she is haunted by the
memories of the five years her family waited for the return
of her father.

b.    **Helen Melnick**, niece of Joseph J. Cicippio, Sr., testified
on behalf of the Estate of Helen Fazio, Mr. Cicippio's
sister.  Ms. Melnick stated that her mother was 67 years
old when Joseph J. Cicippio, Sr. was abducted.  Her
mother traveled several times to Washington, D.C., North
Carolina as well as New Jersey in an attempt to keep the
public aware of her brother's captivity.  Ms. Fazio, who had
previously survived ovarian cancer and was in remission
for over twelve years, was, once again, stricken with
cancer.  While she received her chemotherapy treatments,
Ms. Fazio expressed to her family members her desire to
stay alive until her brother was released.  Ms. Fazio, who
was seen on national television hugging her brother, passed
away on April 23, 1992, four months after the release of
Joseph J. Cicippio, Sr.

c.    **Dominic Cicippio** (deceased), brother of Joseph J.
Cicippio, Sr., was 65 years old when his brother was

4

abducted. He worked tirelessly with family members to keep the public aware of his brother's situation. Dominic testified that he thought of his brother daily and feared for his safety. Until the time of his death, the events of the five years of his brother's captivity affected his family.

d.    **David B. Cicippio**, son of Joseph J. Cicippio, Sr., was 26 years old when he received a call from the U.S. Department of State that his father had been abducted.  He described his emotions upon seeing Lt. Colonel Higgins' body displayed on national television; David experienced daily fear for the safety of his father and that the Defendants would carry out their repeated threats to execute his father. Even today, he relives the days of his father's captivity whenever anyone questions him as to this ordeal.  David testified that, to this day, when he returns to his home and sees messages on his answering machine, he fears that something tragic has happened to a family member.

e.    **Paul V. Cicippio** (deceased),was the son of Joseph J. Cicippio, Sr.  At the time of the abduction, Paul was 23 years old and had enjoyed a close relationship with his father.  During the five years that Mr. Cicippio was held captive, Paul worked with other family members keeping the hostages' plight in the media.  Unfortunately, Paul died suddenly at the age of 31 after being reunited with his father for only two years.  His family expressed concern that the stress of the hostage situation was a contributing cause to Paul's untimely death.

f.    **Eric Cicippio**, son of Joseph J. Cicippio, Sr., was only 19 years old when his father was abducted.  Although he also worked with

5

family members in an attempt to free his father, he described himself as a very private person who was uncomfortable in the spotlight. Eric testified the fear he experienced when the Defendants threatened to execute his father several times and stayed those executions. He described his inability to hope for his father's safe return after there were several reports that his father had, in fact, been executed. As a result of this false information, Eric was unable to trust any information he heard with regard to his father during the captivity. He testified as to a time when he and his brother, Paul, learned that another hostage, Edward Tracey, had been released; unfortunately, Mr. Tracey did not completely survive the experience and returned with severe emotional issues. As a result, Eric then began to wonder as to his father's mental health and as to whether his father would return to his family in good health. Eric described feeling hopeless and was unable to sleep imagining the torture that his father was forced to endure. To this day, Eric has not recovered from the experience. He described the changes in his father's behavior and his own reluctance to reveal to others that his last name is Cicippio.

g.    **Richard Dennis Cicippio**, son of Joseph J. Cicippio, Sr., was 30 years old at the time of his father's abduction and was enlisted in the Navy. After learning of his father's capture, Richard was advised by naval personnel to remain quietly in the background due to their concerns that the terrorists would hold his father as a spy due to Richard's military service. Richard testified that throughout his father's confinement the Defendants' actions in executing Lt. Colonel Higgins as well as CIA agent, William Buckley, and displaying their bodies on television caused him grave concern for his father's safety. In July of 1989, however, Richard became even

more distraught when the terrorists paraded his father on international television and threatened several times to execute him. To this day, Richard described the emotional trauma he continues to suffer each time he is asked if he is related to the "...Cicippio that was held hostage." Although he has proudly distributed a book about the hostage crisis which was authored by his father, to date, Richard is unable to read about his father's account of the ordeal.

h.      **Thomas J. Cicippio**, brother of Joseph J. Cicippio, Sr., was 63 years old when his sister told him their brother had been taken hostage by the Defendants. Appointed as the official spokesperson for the Cicippio family, Thomas lead the family in their five year effort to free Joseph J. Cicippio, Sr. Thomas testified that he met with U.S. Congressmen and Senators as well as the State Department urging their support to free the hostages. He is known world wide for building signs for each of the Iranian hostages which displayed the number of days each were held in captivity. Thomas testified of his concern that his actions in attempting to free his brother would serve only to agitate the terrorists further. Still, Thomas continued in his efforts to keep the public aware of the hostages. He vividly remembered when, as a result of Sheik Obeid being kidnaped by the Israelis, the Defendants threatened to execute his brother. The last year of Joseph's captivity, his captors released photographs of Joseph Cicippio. With each new picture, Thomas became more concerned as his brother appeared less and less recognizable. Even to this day, although his brother has returned home, Thomas cannot forgot those difficult days.

i.      **Alexander Cicippio** (deceased) was 71 at the time of his brother's abduction. Although he was unable to actively participate in the family's attempts to free Joseph Cicippio, he was very aware of the

circumstances of those five years. During his brother's captivity, Alexander spent his days reading the newspapers and watching the television for any information as to Joseph's situation. He, along with his family members, was unable to sleep for fear for his brother's safety and experienced a wide range of emotions during that five year period.

j.    **Allen John Cicippio**, son of Joseph Cicippio, Sr., was only 17 at the time of his father's abduction. He described his fear that actively keeping the public aware of his father's ongoing captivity would cause the Defendants to become angry and inflict even greater harm upon his father. Allen testified that he spent his days and nights worried for his father's safety and was unable to sleep following the numerous death threats made against his father by the Defendants. He described the loss he felt in not having the one person he could count on to help him with is problems. As Allen was such a young man, the experience which surrounded the five years of his father's captivity affects him even today. Allen testified that, even now, he cannot forget the fear and anxiety which existed within his family during that time.

k.    **Rose Cicippio Abell** was 73 when her brother was abducted by the Defendants. Prior to his captivity, she had been diagnosed with breast cancer and received an enormous amount of support from her brother, Joseph J. Cicippio, Sr. Rose spent the days of her brother's captivity trying to battle her cancer while assisting the Cicippio family in securing his release. Her only wish was to see Joseph prior to her death. In fact, while receiving chemotherapy, she became so ill that her son begged her to stop the treatment and let God take her home. It was at this time that Rose told her son that, as long as Joseph was fighting for his life, she would fight for

her own as well. She experienced great mental anguish every time the Defendants threatened to execute her brother but remained determined to see her little brother one more time. Unfortunately, Rose did not live to see her brother brought safely back home.

l.    **Anthony Cicippio**, brother of Joseph J. Cicippio, Sr., was 68 when his brother was abducted in 1986. From the this time until Joseph was returned, Anthony worked with members of his family trying to secure his brother's release. He remembers the fear that he felt that the Cicippio family's activities would ultimately result in Joseph's death. Anthony testified that, following the execution of Lt. Colonel Higgins, he lived in constant fear that the Defendants' would carry out their threats to execute Joseph. Even though his brother has been home since 1991, to this day, Anthony cannot forget those terrible years.

m.    **Nicholas B. Cicippio**, brother of Joseph J. Cicippio, Sr., was 59 years old when his brother was kidnaped. He, too, worked tirelessly to secure his brother's release. Each day, from the time he awoke until he went to sleep at night, Nicholas spent his days worrying about the safety of his brother. He testified as to the fear he felt when the Defendants continuously threatened to execute Joseph unless Sheik Obeid was released. Nicholas described the anxiety he experienced each time there was a news report with regard to his brother. To this day, he cannot forget the days Joseph was in captivity and the effect that this event had on the lives of his family members.

n.    **Joseph J. Cicippio, Jr.** (deceased) was 30 when his father was captured by the Defendants. Joseph's former wife recalled that upon hearing of his father's abduction, her former husband listened to the initial report which indicated that his father's glasses had

been found with blood on them.   Not knowing whether his father was alive or dead, Joseph, Jr., immediately called his mother.  From that time until his death, he worked to keep the plight of all the hostages in the media forefront by granting interviews, writing to Washington, D.C. and pressuring the State Department to secure his father's release.  Several times during the years of his father's captivity, the family received news reports that Joseph J. Cicippio, Sr., had been killed.   Once Lt. Colonel Higgins had been hanged and an initial date set for Joseph Sr.'s execution, the entire family gathered at the home of Thomas Cicippio on the date initially announced by the captors.  Joseph, Jr., watched his father on television as he read a good-bye note to his wife, children and siblings.   Believing that his father was to be executed, he prepared himself for the worse.  Until the day he died at age 35, Joseph, Jr., firmly believed that his father would be murdered at any time. Unlike his siblings, Joseph, Jr., never saw his father again.

13.    On December 2, 1991, Joseph J. Cicippio, Sr., was released from captivity and eventually returned to the United States.

14.    Plaintiffs, having witnessed the death of Lt. Colonel Higgins and the subsequent threats of the terrorists upon the life of Joseph J. Cicippio, Sr., directly experienced severe emotional trauma.

15.    In parading the body of Lt. Colonel Higgins on worldwide television and in repeatedly threatening to execute Mr. Cicippio also via the media, it was the clear intention of the terrorists to directly inflict severe emotional distress upon Plaintiffs.

16.    Plaintiffs, in actually witnessing the body of Lt. Higgins and the repeated threats of Mr. Cicippio's captors to execute him have are deemed to have been "present" for these threats.

17.    Cicippio's captors were members of the Hezbollah, a politico-paramilitary group responsible for carrying out acts of terrorism in Lebanon. Hezbollah has claimed responsibility for and in fact perpetrated the terrorist acts which consisted of taking Joseph J. Cicippio, Sr., as a hostage in Lebanon, as well as his subsequent captivity and torture. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

18.    Defendant the Islamic Republic of Iran ("Iran") is a foreign state that has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371 since January 19, 1984. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

19.    Iran provides material support and resources to Hezbollah, a politico-paramilitary terrorist organization operating in Lebanon. Iran sponsors Hezbollah, within the meaning of 28 U.S.C. § 1605(a)(7) and 26 U.S.C. § 1605, by providing it with funding, direction, and training for its terrorist activities in Lebanon. At all times material hereto, especially with regard to Joseph J. Cicippio, Sr., Iran acted by and through Hezbollah. In such capacity, Iran caused Mr. Cicippio to be abducted, tortured, and held as a hostage for 1,908 days in Lebanon. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

20.    Defendant, the Iranian Ministry of Information and Security ("MOIS"), is the Iranian intelligence service and functions both within and beyond Iranian territory. At all times material hereto, MOIS acted as part and parcel of the Islamic Republic of Iran and, in such capacity, performed acts which caused Mr. Cicippio to be abducted, tortured, and held as a hostage for 1,908 days in Lebanon. Specifically, Iran used the facade and/or structure of MOIS as a conduit for the Islamic Republic of Iran's provision of funds, training, and direction to Hezbollah for its terrorist activities in Lebanon including the specific actions relating to Mr. Cicippio's

11

kidnaping and captivity. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

21.  At all relevant times, the Islamic Republic of Iran, through its facade and/or structure of MOIS, provided material resources and support in the form of funding, training, and direction to Hezbollah. In providing said material resources and support, MOIS was acting within the scope of its capacity as the alter ego of, and as part and parcel of, the government of the Islamic Republic of Iran. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

22.  In an effort to obtain the release of the hostages, including Joseph J. Cicippio, Sr., Colonel Oliver North, then a member of the President's National Security Council, traveled to Iran in May of 1986 to meet with Iranian officials. Colonel North testified that Iran's demands were unreasonable; it was clear, however, that if those demands had been met, Iran would have directly caused the hostages, including Joseph J. Cicippio, Sr., to be released. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

23.  Iran spends approximately $75 million each year in direct support of terrorist activities.  See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

24.  The United States State Department has classified Iran as one of the most active and dangerous of the state sponsors of terrorism. (*Patterns of Global Terrorism*, April 1998, p. 31; April 1993, p.22).

25.  In sponsoring the terroristic activities of Hezbollah, Iran acted directly through its President and other senior governmental officials, who acted within the scope of their respective offices. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805*).

26.    Iran's oil exports generate income of approximately $12 billion per year. (See, Findings of Fact and Conclusions of Law in the matter of *Joseph J. Cicippio, et al. v. Islamic Republic of Iran, U.S.D.C., D.C. No. 96-1805,* specifically, notes of testimony of Dr. Patrick Clawsen).

## CONCLUSIONS OF LAW

### A. SUBJECT MATTER JURISDICTION

1.    As this action is brought against a foreign state, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.A. §§1602-1611 et seq., as amended, controls. *Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S. Ct. 1962 (1983); 28 U.S.C. §1330.* The sole basis for subject matter jurisdiction in an action against a foreign state defendant are the enumerated exceptions to the Foreign Sovereign Immunities Act. *Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 109 S. Ct 683 (1989).*

2.    In the Anti-Terrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states officially designated by the Department of State as terrorist states, if the foreign state commits a terrorist act or provides material support and resources to an individual or entity which commits such an act which results in the death or personal injury of a United States citizen. *See* 28 U.S.C.A. §1605(a)(7); *See also* H. R. Rep. No. 383, 104th Cong., 1st Session 1995 at 137-38, available at 1995 WL 731698.

3.    Although Cicippio was released from captivity more than five years prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C.A. §1605(a)(7) provides the basis for subject matter jurisdiction. Congress has expressly directed the retroactive application of 28 U.S.C.A. §1605(a)(7) in order to further a comprehensive counter terrorism initiative by the legislative branch of government as follows:

The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this act  [April 24, 1996].

13

4.    The federal choice of law rule follows that of the *Restatement (Second) of Conflicts*, which provides that the law of the tort is to apply. When another jurisdiction however has a stronger interest and closer connections to the case, it is appropriate to apply that jurisdiction as Law. *Restatement (Second) of Conflicts* §175 (1969). Although the actions complained of in the instant case took place in Lebanon, the United States has a much stronger interest than Lebanon in adjudicating this action arising from the kidnaping and torture of United States citizens. Moreover, as explained in *Flatow v. Islamic Republic of Iran, et al., 999 F.Supp. 1 (D.D.C. 1998)*, the amendment of 28 U.S.C.A. §1605(a) indicated Congressional intent that the federal courts create coherent national standards to support this initiative of national significance. The utilization of federal common law will promote uniformity of determinations with respect to the liability of foreign states for terrorists acts.

5.    Article One of the Constitution establishes that Congress has "authority to enact laws applicable to conduct beyond the territorial boundaries of the United States." *EEOC v. Aramco, 499 U.S. 244, 111 S. Ct. 1227 (1991)*. Congressional intent and legislative purpose demonstrate that 28 U.S.C.A. §1605(a) (7) not only applies to extra-territorial conduct, but also has one of its express purposes to affect the conduct of terrorist states outside the United States in order to promote the safety of United States citizens traveling overseas. See 142 C.R. S3454-1 (April 17, 1996) (remarks of Senator Hank Brown on consideration of the conference report); 142 C.R. H2129-05, H2132 (March 13, 1996) (remarks of Representative Ileana Ros-Leahtinen on the proposed Anti-Terrorism Act); see also, 2A *Southerland on Statutory Construction* §45.05, §45.09. Congress intended 28 U.S.C.A. §1605(a) (7) to create subject matter jurisdiction for claims arising from conduct which occurred within a foreign state.

6.      In order to establish subject matter jurisdiction pursuant to 28 U.S.C.A. §1605 (a) (7), a claim must contain the following statutory elements:

    (1)    that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage or hostage taking; and

    (2)    the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

    (3)    the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

    (4)    that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

    (5)    if the incident complained of occurred with the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

    (6)    either the plaintiff or the victim was a United States national at the time of the incident; and

    (7)    similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C.A. §1605(a)(7).

7.      Sections 1605 (e) (1) and (2) of the Foreign Sovereign Immunities Act provides guidance with regard to interpreting the terms "'torture" and "hostage taking."

8.      Article One of the International Convention Against the Taking of Hostages defines the term "hostage taking " as:

    [a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage")

in order to compel a third party, namely, a State, an intentional intergovernmental organization, a natural or juridical persona, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages within the meaning of this Convention.

"Torture" is defined in §3 of the Torture Victim Production Act of 1991, as the following:

(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from–

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personalty;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality."

9.    Joseph J. Cicippio, Sr., was a victim of "torture" as defined in section 3 of the

Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note), pursuant to 28

U.S.C. §§ 1605(a)(7) and 1605(e)(1).

10      Joseph J. Cicippio, Sr., was a victim of "hostage taking" as defined in Article 1 of
        the International Convention Against the Taking of Hostages, pursuant to 28
        U.S.C. §§ 1605(a)(7) and 1605(e)(1).

11.     Joseph J. Cicippio, Sr., has suffered "personal injury" as the result of Defendants'
        actions and activities as defined in 2 8 U.S.C. §§ 1605 (a)(7).

12.     The state sponsored terrorism provision adopts the definition of providing material
        support or resources set forth in the federal criminal code. 28 U.S.C. §1605(a)(7)
        incorporates 18 U.S.C. §2339A(a) by reference, which provides that:

        . . . material support or resources" means currency or other financial
        securities, financial services, lodging, training, safehouses, false
        documentation or identification, communications equipment, facilities,
        weapons, lethal substances, explosives, personnel, transportation, and
        other physical assets, but does not include humanitarian assistance to
        persons not directly involved in such violations.

        The routine provision of financial assistance to a terrorist group in support of its

        terrorist activities constitutes "providing material support or resources" for a

        terrorist act within the meaning of 28 U.S. C.A. §1605 (a) (7) . Moreover, a

        plaintiff need not establish that the material support or resources provided by a

        foreign state for a terrorist act contributed directly to the act from which his claim

        arises in order to satisfy 28 U.S.C.A. §1605(a) (7) statutory requirements for

        subject matter jurisdiction.  Sponsorship of a terrorist group which causes the

        personal injury or death of a United States national alone is sufficient to invoke

        jurisdiction. *Flatow v. Islamic Republic of Iran, et al., 999 F.Supp. 1 (D.D.C.*

        *1998).*

17

13.     The law of *respondeat superior* demonstrates that if a foreign state's agent, official
or employee provides material support and resources to a terrorist organization,
such provision will be considered an act within the scope of his or her agency,
office or employment. See, e.g., *Guzel v. State of Kuwait, 818 F. Supp. 6, 10
(D.D.C. 1993); Skeen v. Federative Republic of Brazil, 566 F. Supp. 1414, 1417
(D.D.C. 1983).*

14.     In order for an agent, official, or employee's unlawful conduct to be imputed to a
government, however, the government must share a degree of responsibility for the
wrongful conduct. The government must have engaged in the wrongful conduct,
either deliberately or permissively, as a matter of policy or custom. See, e.g.,
*Monell v. N. Y. Dept. of Social Services, 436 U.S. 658, 694-95 (1978)* (discussing
municipal liability under 42 U.S.C. §1983). If a foreign state's heads of state
routinely provide material support or resources to a terrorist group whose activities
are consistent with the foreign state's customs or policies, then that agent and those
officials have acted squarely within the scope of their agency and offices within the
meaning of is 28 U. S.C. §1605 (a) (7). *Flatow v. Islamic Republic of Iran, et al.,
999 F.Supp. 1 (D.D.C. 1998)*

15.     If officials of the United States, while acting in their official capacities, provided
material support and resources to a terrorist group which was responsible for
hostage taking and torture within the United States, those officials would not be
immune from civil suits for wrongful death and personal injury. See U. S. Const.
Amend. 5; 42 U.S.C. §1983. See also 18 U.S.C.A. §§1203, 3339(a) and 2340(a).

16.     Initially, Plaintiff asserted separate claims and causes of action against Defendant
MOIS, ostensibly as an entity separate and distinct from the actual government of
the Islamic Republic of Iran,  including, *inter alia*, claims for punitive damages

18

under the Flatow Amendment to the FSIA, 28 U.S.C.A. § 1605 note.  However, the

Court notes the recent decision by the District of Columbia Circuit in the action of

*Roeder, et al. v. The Islamic Republic of Iran, et al., 357 U.S. App D.C. 107, 333*

*F.3d 228 (2003),* applying *Transaero, Inc. v. La Fuerza Aera Boliviana, 30 F.3d*

*148 (D.C. Cir. 1994)* (a nation's air force is a "foreign state or political

subdivision", and is not an "agency or instrumentality" of the nation), holding that

Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather

than as its agent", because said Ministry's "core functions" are "governmental",

rather than "commercial" in nature.  *Roeder, et al. v. The Islamic Republic of Iran,*

*et al., 357 U.S. App D.C. 107, 333 F.3d 228 (2003).*  Applying this holding to the

instant action, this Court concludes that MOIS is part and parcel of the government

of the Islamic Republic of Iran, i.e., MOIS is not an agent or instrumentality of

Iran, but rather, MOIS is the state of Iran itself.  Accordingly, inasmuch as the

FSIA bars a claim for punitive damages against Iran, Plaintiff instantly cannot

assert a claim for punitive damages against MOIS. [See also, *Cicippio–Puleo v.*

*Islamic Republic of Iran, 359 U.S. App. D.C. 299, 353 F.3d 1024 (D.C. Cir. 2004);*

*Acree, et al. v. Republic of Iraq, et al., 361 U.S. App. D.C. 410; 370 F.3d 41 (D.C.*

*Cir. 2004)*].

**B.    PERSONAL JURISDICTION**

17.    The Foreign Sovereign Immunities Act provides that personal jurisdiction over

defendants will exist where a plaintiff establishes the applicability of an exception

to immunity pursuant to 28 U.S.C.A. §1605 and service of process has been

19

accomplished pursuant to 28 U.S.C.A. §1608. Service of process has been

accomplished in this case.

18    The Foreign Sovereign Immunities Act provides that *in personam* jurisdiction over

a foreign state defendant has been accommodated inherently in the statute for the

acts enumerated in 18 U.S.C. §1605(a)(7). *See*, H.. Rep. 94-1487 at 13-14,

reprinted at 1976 U.S.C.C.A.N. at 6611-12. In addition, international terrorism is

subject to universal jurisdiction. Thus, personal jurisdiction over a foreign state

defendant will exist where the plaintiff can establish the applicability of an

exception to immunity pursuant to 28 U.S.C. §1604, §1605 or §1607, and that

service of process has been accomplished pursuant to 28 U.S.C.A. §1608. *Flatow*

*v. Islamic Republic of Iran, 999 F.Supp. 1, 1998 W.L. 111500 at 15 (D.D.C. 1998).*

Fair play and substantial justice require that the United States Courts exercise

jurisdiction over foreign state sponsors of terrorism whose sponsorship results in

the death or personal injury of United States nationals.

**C.    LIABILITY**

19.    This Court, in *Cicippio v. The Islamic Republic of Iran, 18 F. Supp.2d 62 (D.D.C.*

*1998),* has already held that the Islamic Republic of Iran is liable to victims of state

sponsored terrorism, particularly terrorist acts committed in Lebanon, Israel and

Gaza. [See also, *Flatow v. The Islamic Republic of Iran, 999 F.Supp 2d. 1 (D.D.C.*

*1998); Anderson v. Islamic Republic of Iran, 90 F Supp.2d 107 (D.D.C. 2000);*

*Eisenfeld v. The Islamic Republic of Iran, 2000 WL 1918779 (D.D.C. 2000);*

*Sutherland v. The Islamic Republic of Iran, 2001 WL 705838 (D.D.C. 2001).*

Moreover, in *Cicippio,* this Court has already determined that plaintiff, Joseph J. Cicippio, Sr., successfully demonstrated that (1) he was injured by acts of torture and hostage-taking; (2) that the acts were perpetrated by a group receiving material support from Iran; (3) that the provision of material support was engaged in by Iranian officials, employees or agents acting within the scope of their office, employment or agency; (4) that at the time of the acts, Iran was designated as a state sponsor of terrorism under 50 U.S.C. App. § 2371; (5) that the claimant or victim was a U.S. national at the time the acts occurred; and (7) that similar acts conducted by officials, employees or agents of the U.S. while acting within the scope of his or her office, employment or agency, would also be actionable. [See, *Cicippio, et al. V. Islamic Republic of Iran, U.S.D.C., D.C., No. 96-1805 (1998) at pp. 11-12*].  Accordingly, this Court now takes judicial notice of these findings. As set forth in *Salazar v. Islamic Republic of Iran, et al., U.S.D.C., D.C.C. ,No. 02-0558 (March 29, 2005)*, should an exception to the FSIA apply and a foreign state have no sovereign immunity as to a given claim, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state *except for an agency or instrumentality thereof* shall not be liable for punitive damages."  (Emphasis in the original).

20.     Victims of state-sponsored terrorism have a valid claim against designated sovereigns under state and/or federal common law. [See *Dammarell v. Islamic Republic of Iran, 281 F.Supp.2d (D.D.C. 2003)*] Applying the Dammarell

reasoning, Plaintiffs may proceed with claims against Iran or MOIS under the laws of the State of Pennsylvania, the State of domicile. Also, in *Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46 (D.D.C. 2003),* the Court expressly rooted plaintiffs' recovery for battery, assault and intentional infliction of emotional distress in state common law.    Here Plaintiffs have proven their cause of action for intentional infliction of emotional distress.

21.    In *Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970),* the Pennsylvania Supreme Court awarded damages for intentional infliction of emotional distress to the plaintiff whose son was killed by the defendant in an automobile accident.  The defendant, after failing to notify authorities or seek medical assistance for the victim, buried the body in a field where it was later discovered.   Similarly, in *Banyas v. Lower Bucks Hospital, 293 Pa. Super. 122, 437 A.2d 1236 (1981),* plaintiff was awarded damages for defendants' actions in intentionally fabricating records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide.

22.    While Pennsylvania has not expressly recognized a cause of action for intentional infliction of emotional distress, the courts have cited the Restatement (2d) of Torts §46(2) as setting forth the minimum elements necessary to sustain such a cause of action.  *Taylor, et al. v. Albert Einstein Medical Center, et al., 562 Pa. 17, 754 A.2d 650 (2000), citing, Kazatsky v. King David Memorial Park, 515 Pa. 183, 527*

22

A.2d 988 (1987); Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745 (1998); Johnson v.

Caparelli, 425 Pa.Super. 404, 625 A.2d 668 (1993)(allocatur denied, 538 Pa. 635,

647 A.2d 511 (Pa. 1994).

Section 46 of the Restatement (2d) of Torts states as follows:

§46: Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes
severe emotional distress to another is subject to liability for such emotional
distress, and if bodily harm to another results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability
if he    intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time,
whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily
harm.

As Defendants televised their threats of executing Joseph Cicippio, Sr., the

presence requirement has been satisfied.

23.    As  recognized  in Salazar v. Islamic Republic of Iran, et al., U.S.D.C., D.C. No.

02-0558 (March 29, 2005), courts in this jurisdiction have uniformly held that a

terrorist attack–by its very nature–is directed not only at the victims but also at the

victims' families. [See, Burnett v. Al Baraka Inv. And Dev. Corp, 274 F.Supp 2d

86, D.D.C., (D.C. 2003) which held, "A terrorist attack on civilians is of course

intended to cause emotional distress to the victims' families"; see also, Jenco v.

Islamic Republic of Iran, 154 F. Supp. 2d 27, U.S.D.C., (D.C. 2001) which stated,

23

"If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability; see also, *Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d (2003)* which held that "...the evidence demonstrates that defendant's campaign of attacks against Westerners was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States].

24.    Family members suffer emotional distress due to the inherent nature of terroristic acts which is to instill fear for the safety and well being of the victims' loved ones. [See also, *Flatow v. Islamic Republic of Iran, et al., 999 F. Supp. 1 (1998)*, citing, 22 U.S.C. § 2656f(d)(2), which states, in part, as follows: ...the term "international terrorism" means activities that,...appear to be intended to intimidate or coerce a civil population,...][See also, *Acree v. The Republic of Iraq, et al., U.S.D.C., D.C. (July 30, 2003)(reversed on other grounds, 361 U.S. App.,D.C. 410, 370 F.3d 41 (2004)*].

25.    Here, each Plaintiff , by television and other media, personally observed the aftermath of the hanging of Lt. Colonel Higgins.  It was at this time, that the terrorists advised that Joseph J. Cicippio, Sr., was to be executed on a date certain.  Mr. Cicippio was able to say good-bye to his wife during televised statement and later, on the date set for execution, the Plaintiffs gathered and listened as Mr. Cicippio, once again, said good-bye to his family.  Although the execution was

24

stayed, this pattern of scheduling subsequent executions followed by stays continued causing the family great mental anguish. Additionally, as the captors had already hanged an American and displayed the body on international television, it was apparent to the family that this group would not hesitate to execute Joseph J. Cicippio, Sr. When Defendants paraded Joseph Cicippio, Sr. on international television and set several execution dates with subsequent stays, it is clear that these actions were designed to *intentionally and/or recklessly* instill fear into the hearts of the Plaintiffs that their loved one would meet the same fate as Lt. Colonel Higgins. Such were the extreme, outrageous and shocking actions of the defendants which were designed solely to instill terror in the Plaintiffs for the safety of their father and brother, Joseph J. Cicippio, Sr. In short, the continuous threat of execution was a deliberate, overt method of terrorizing this family into believing that their father and brother was to be murdered at any given moment.

26.    Plaintiffs may successfully sustain a cause of action against the defendants for intentional infliction of emotional distress. .

**III.    DAMAGES**

27.    It is firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering. *Leeper v. United States, 756 F. 2d 300 (3d Cir. 1985)* .

28.    Plaintiffs have suffered severe physical and psychological injury; during the

confinement of Joseph J. Cicippio, Sr., each family member feared for his life

every waking moment of his captivity.


29.    There is no set formula established for calculating damages for family members

such as Plaintiffs.  The determination of damages in other cases involving the

victims of terrorism is instructive.  In *Anderson v. Islamic Republic of Iran, 90*

*F.Supp.2d 107 (D.D.C. 2000)* the Court awarded damages for loss of solatium to

the daughter of former hostage, Terry Andersen, in the amount of $6,700,000.   Mr.

Anderson was captive for 2,454 days.  In *Eisenfled, et al. v. The Islamic Republic*

*of Iran, et al., 2000 WL 1918779 (D.D.C.),* the Court awarded damages to the

families of two individuals, Matthew Eisenfled and Sara Duker, who were killed as

result  of a bombing by Hamas in Jerusalem.  The mother of  Ms.Duker received

$5,000,000 while her sisters received $2,5000.000.   The family of Matthew

Eisenfeld was awarded damages for loss of solatium as follows: $5,000,000 to

decedent's mother, $5,000,000 to decedent's father and $2,500,000 to decedent's

sister.  In *Flatow v. The Islamic Republic of Iran, 999 F. Supp 1 (March 11,*

*1998),* the family members of a university student killed by a suicide bomber attack

were awarded damages for loss of solatium as follows: $5,000,000 to decedent's

father; $5,000,000 to decedent's mother and $2,500,000 to each of decedent's

siblings.  In *Jenco v. Islamic Republic of Iran, 154 F.Supp2d. 27 (U.S.D.C., D.C.),*

the siblings of a former hostage in captivity for 564 days were awarded damages

for intentional infliction of emotional distress in the amount of $1,500,000 each.


30.     Plaintiffs  are awarded damages in the following amounts:


Elizabeth A. Cicippio Puleo in the amount of $6,500,000;
Estate of Helen Fazio in the amount of $6,500,000;
Estate of Dominic Cicippio in the amount of $6,500,000;
David B. Cicippio in the amount of $6,500,000;
Eric R. Cicippio in the amount of $6,500,000;
Richard Dennis Cicippio in the amount of $6,500,000;
Thomas J. Cicippio in the amount of $6,500,000;
Estate of Paul V. Cicippio in the amount of $6,500,000;
Allen John Cicippio in the amount of $6,500,000;
Estate of  Rose Abell in the amount of $6,500,000;
Anthony Cicippio in the amount of $6,500,000;
Estate of Alexander Cicippio in the amount of $6,500,000;
Nicholas B. Cicippio in the amount of $6,500,000; and
Estate of Joseph J. Cicippio, Jr., in the amount of $6,500,000.


Henry H Kennedy, Jr.
United States District Judge

Dated:  October 7, 2005

# ATTACHMENT 6

## Attachment 6

## Domiciles Of Each Plaintiff Who Was A United States National As Of September 5, 1986

| State | Plaintiff(s) |
|---|---|
| Alabama | (1) John Harper |
| California | (1) Preeti Bhuva; (2) Gargi Dave; (3) Giatri Dave; (4) Farhat Hussain; (5) Hameed Hussain; (6) Nabihah Hussain; (7) Anjna Mehta; (8) Yashwant Mehta; (9) Faraidoon Oshtory; (10) Ajay Patel; (11) Parvatiben Patel; (12) Nikita Patel; (13) Surendra Patel; (14) Manjula Patel; (15) Sangita Patel; (16) Mehul Patel; (17) Darrell Pieper; (18) Samir Singh; (19) Kalpana Singh |
| Connecticut | (1) Conway Dodge; (2) Zafer Khan |
| Illinois | (1) Tahira Khalid; (2) Naseeruddin Mahmood |
| Massachusetts | (1) John Stafurik |
| Michigan | (1) Alistair Sundareson; (2) Saramma Sundareson; (3) Meera Sundareson; (4) Ann Marie Meenu Sundareson |
| Missouri | (1) Dahiben Patel |
| New Jersey | (1) Sharon Bhandari Jain; (2) William Kianka; (3) Abdul Majid; (4) Clarence Maloney; (5) Deepak Mehra; (6) Nilima Shah; (7) Nilay Shah |
| North Dakota | (1) Jay Grantier |
| Vermont | (1) John Ridgway |
| Virginia | (1) David Jodice; (2) Anu Simpkinson |
| Washington | (1) Richard Melhart; (2) David Gaiser |

# ATTACHMENT 7

**Attachment 7**

**Intentional Infliction of Emotional Distress**

| State | Elements |
|---|---|
| Alabama | Plaintiff must show that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala. 1993). |
| California | Plaintiff must show that the defendant's conduct: (1) was extreme and outrageous; (2) was undertaken with the intention of causing emotional distress; and (3) was the actual and proximate causation of the emotional distress. *Cervantez v. J. C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979). |
| Connecticut | Plaintiff must show: (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *See, e.g., Gagnon v. Housatonic Valley Tourism Dist. Comm'n*, 888 A.2d 104 (Conn. 2006). |
| District of Columbia | Plaintiff must show that: (1) the defendant's conduct was extreme or outrageous; (2) the conduct was intentional or reckless; and (3) the conduct caused the plaintiff severe emotional distress, which may or may not be accompanied by physical manifestations. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984). |
| Illinois | Plaintiff must show that: (1) the conduct involved must be truly extreme and outrageous; (2) the [defendant] must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988); *see also Feltmeier v. Feltmeier*, 798 N.E.2d 75, 79-80 (Ill. 2003) (citing *McGrath*). |

| | |
|---|---|
| Massachusetts | Plaintiff must show that: (1) the defendant intended to inflict emotional distress or knew that emotional distress was the likely result of the conduct; (2) the conduct was extreme and outrageous; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress was severe. *See, e.g., Tetrault v. Mahoney, Hawkes & Goldings,* 681 N.E.2d 1189, 1197 (Mass. 1997). |
| Michigan | Plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto-Owners Ins. Co.,* 374 N.W.2d 905 (Mich. 1985) (citing the RESTATEMENT (SECOND) OF TORTS § 46). |
| Missouri | Plaintiff must show that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress. *Thomas v. Special Olympics Mo., Inc.,* 31 S.W.3d 442, 446 (Mo. Ct. App. 2000). |
| New Jersey | Plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Young v. Hobart West Group,* 897 A.2d 1063, 1074 (N.J. Super. Ct. App. Div. 2005). |
| North Dakota | Plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Muchow v. Lindblad,* 435 N.W.2d 918, 924 (N.D. 1989) (citing the RESTATEMENT (SECOND) OF TORTS § 46). |
| Vermont | Plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Fromson v. State,* 848 A.2d 344 (Vt. 2004) (citing *Sheltra v. Smith,* 136 Vt. 472, 476, 392 A.2d 431, 433 (1978)). |
| Virginia | Plaintiff must show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it affronts against the generally accepted standards of decency and morality; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *Womack v. Eldridge,* 210 S.E.2d 145, 148 (Va. 1974) (citing RESTATEMENT (SECOND) OF TORTS §46). |
| Washington | Plaintiff must show: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. The conduct in question must be outrageous. *Seaman v. Karr,* 59 P.3d 701, 710 (Wash. Ct. App. 2002). |

# ATTACHMENT 8

## Attachment 8

## Assault

| State | Elements |
|---|---|
| Alabama | Plaintiff must show that the defendant made "an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Wright v. Wright*, 654 So.2d 542, 544 (Ala. 1995); *see also Allen v. Walker*, 569 So.2d 350, 351 (Ala. 1990). |
| California | Plaintiff must show an apprehension of imminent physical violence caused by the defendant's action or threat. *Thing v. La Chusa*, 771 P.2d 814, 816 (Cal. 1989). |
| Connecticut | Plaintiff must show that defendant intentionally caused imminent apprehension of harmful or offensive contact. *Dewitt v. John Hancock Mut. Life Ins. Co.*, 501 A.2d 768 (Conn. App. Ct. 1985); *see also Norman v. Distasio*, Civil Action No. 96-0389982, 2001 WL 761135 (Conn. Super. Ct. June 15, 2001). |
| District of Columbia | Plaintiff must show that the defendant intentionally and unlawfully attempted or threatened, either by words or acts, to do physical harm to the plaintiff. *Smith v. District of Columbia*, 882 A.2d 778, 787 (D.C. 2005) (citing *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)). |
| Illinois | Plaintiff must show that the defendant made an intentional, unlawful offer of corporal injury by force, under such circumstances as to create a reasonable fear in imminent peril. *See, e.g., Rosenberg v. Packerland Packing Co., Inc.*, 370 N.E.2d 1235 (Ill. App. Ct. 1977). |
| Massachusetts | Plaintiff must show that he reasonably apprehended imminent serious physical harm. *Ginsberg v. Blacker*, 852 N.E.2d 679, 684 (Mass. App. Ct. 2006). |
| Michigan | Plaintiff must show that the defendant made an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. App. Ct. 1991) (citing *Tinkler v. Richter*, 295 N.W. 201 (Mich. 1940)). |

| | |
|---|---|
| Missouri | Plaintiff must show that defendant made "any unlawful offer or attempt to injure another with the apparent present ability to effectuate the attempt under circumstances creating a fear of imminent peril." *Geiger v. Bowersox,* 974 S.W.2d 513, 516 (Mo. Ct. App. 1998). |
| New Jersey | Plaintiff must show that defendant intends to cause apprehension that a non-consensual touching is imminent. *Kelly v. County of Monmouth*, 883 A.2d 411, 415 (N.J. Super. Ct. App. Div. 2005) (citing PROSSER AND KEETON, *The Law of Torts* at § 9). |
| North Dakota | Plaintiff might show that defendant willfully caused bodily injury to another human being. *Bosch v. Bumann*, 147 B.R. 44, 47 (Bankr. N.D. 1992) (applying North Dakota law). |
| Vermont | Plaintiff must show that defendant intends to cause apprehension that a non-consensual touching is imminent. *Kent v. Katz*, 146 F. Supp. 2d 450, 463 (D.Vt. 2001) (applying Vermont law). |
| Virginia | Plaintiff must show that the defendant "performed 'an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in the other person's mind a reasonable apprehension of an imminent battery'." *Etherton v. Doe*, 597 S.E.2d 87, 89 (Va. 2004) (quoting *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003)). |
| Washington | Plaintiff must show an apprehension of imminent physical violence caused by the defendant's action or threat. *Brower v. Ackerley*, 943 P.2d 1141, 1143 (Wash. Ct. App. 1997) (citing *St. Michelle v. Robinson,* 759 P.2d 467 (Wash. Ct. App. 1988)). |

# ATTACHMENT 9

## Attachment 9

## Battery

| State | Elements |
|---|---|
| Alabama | Plaintiff must show: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *See, e.g., Harper v. Winston County*, 892 So.2d 346, 353 (Ala. 2004) (applying Alabama law). |
| California | Plaintiff must show that: (1) defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to the plaintiff. *See Priest v. Rotary*, 634 F. Supp. 571, 584 (N.D. Cal. 1986) (applying California law). |
| Connecticut | Plaintiff must show: (1) that the defendant intends to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact; and (2) a harmful contact with the person of the other directly or indirectly results. *Alteiri v. Colasso*, 362 A.2d 798 (Conn. 1975). |
| District of Columbia | Plaintiff must show that "an intentional act that causes harmful or offensive bodily contact." *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (citations omitted). |
| Illinois | Plaintiff must show that the defendant intends to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results. *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. Ct. 1995) (citing RESTATEMENT (SECOND) OF TORTS § 13). |
| Massachusetts | Plaintiff must show that the defendant intends to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results. *Waters v. Blackshear*, 591 N.E.2d 184, 185 (Mass. 1992) (citing RESTATEMENT (SECOND) OF TORTS § 13). |
| Michigan | Plaintiff must show that defendant committed a "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. App. Ct. 1991). |

| | |
|---|---|
| Missouri | Plaintiff must show that defendant committed intentional offensive bodily contact with another. *Geiger v. Bowersox*, 974 S.W.2d 513, 516 (Mo. Ct. App. 1998). |
| New Jersey | Plaintiff must show that defendant engaged in an intentional non-consensual touching of the plaintiff's body or of anything which is attached to it or identified with it. *Kelly v. County of Monmouth*, 883 A.2d 411, 415 (N.J. Super. Ct. App. Div. 2005) (internal citations omitted). |
| North Dakota | Plaintiff must show that: (1) defendant intends to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact; and (2) an offensive contact with the person of the other directly or indirectly results. *See, e.g., Wishnatsky v. Huey*, 584 N.W.2d 859 (N.D. 1998). |
| Vermont | Plaintiff must show that the defendant intends to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results. *Christman v. Davis*, 889 A.2d 746, 749 (Vt. 2005) (citing RESTATEMENT (SECOND) OF TORTS § 13). |
| Virginia | Plaintiff must show that defendant committed an unwanted touching which is neither consented to, excused, nor justified. *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). |
| Washington | Plaintiff must show that defendant intended an offensive touching, and the plaintiff must show there was no consent to the touching. *Bundrick v. Stewart*, 114 P.3d 1204, 1208 (Wash. Ct. App. 2005) (citing *Garratt v. Dailey*, 279 P.2d 1091 (Wash. Ct. App. 1955)). |