# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

MANJULA PATEL, *et al.*,

         Plaintiffs

      v.

THE SOCIALIST PEOPLE'S LIBYAN
ARAB JAMAHIRIYA, *et al.*,

         Defendants.

_____

No. 06-CV-00626 (PLF)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

On September 5, 1986, five members of the infamous Abu Nidal terrorist organization ("ANO") attacked and hijacked Pan American World Airways ("Pan Am") Flight 73, while the aircraft was sitting on the tarmac at the airport in Karachi, Pakistan. As detailed in the amended complaint, 20 people were killed and many others suffered severe physical and/or emotional injuries in that attack. Each of the Defendants – the five ANO terrorists as well as the Libyan State and its agents – was in various ways responsible for the ensuing carnage. However, until three years ago Plaintiffs had no knowledge that the Libyan State played any role in this heinous attack – and had reasonably assumed since 1986 that only the five ANO terrorists were culpable.

It was not until May 2004 – when one of those five terrorists (Mr. Safarini) was sentenced for criminal charges for this attack – that a large group of diverse people, who later became Plaintiffs in this case, first gathered in one place to meet and discuss the attack, and then only in connection with Safarini's criminal case. Even then, with the full benefit of a public criminal record in this Court, Plaintiffs did not know that Libya was responsible for the Pan Am 73 terrorist attack. That role was revealed only when one of the four ANO convicted terrorists still sitting in a Pakistani jail revealed to a London <u>The Sunday Times</u> reporter, who then published the information, that, in fact, Libya had been behind the attack. Plaintiffs first learned of this article in June 2004. Thereafter, Plaintiffs moved promptly to hire experienced counsel to investigate the basis for this case, organize this large group (from all over the globe), and ultimately file suit in April 2006.

Despite these facts discussed more fully *infra*, the Libyan Defendants[1] have now moved for summary judgment asserting that this case was not timely filed according to the applicable statute of limitations. This argument is incorrect, both as a matter of law and fact. Hence, the motion must be denied.

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601, *et seq.,* requires plaintiffs who assert claims under the state sponsorship of terrorism exception to bring their claims within ten years of the date the "cause of action

---

[1]    The terms "Libyan Defendants" or "Libya" are used herein as shorthand to refer collectively to the Defendants who filed the pending summary judgment motion – the Socialist People's Libyan Arab Jamahiriya, the Libyan External Security Organization ("LESO"), Muammar Qadhafi (in his official capacity), and Abdallah Senoussi (in his official capacity).

arose." It also expressly provides that "principles of equitable tolling, including the period during which the state is immune from suit, shall apply." 28 U.S.C. § 1605(f) (1996). In the context of this case, Libya was entirely immune from suit until April 24, 1996, when President Clinton signed into law the amendments to the FSIA that permitted individuals who had been victims of certain kinds of state sponsored terrorism to sue the responsible sovereign state for damages resulting from injuries caused by such acts. *See* Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 221(a), 100 Stat. 1214 (Apr. 24, 1996), codified at 28 U.S.C. § 1605(a)(7). Accordingly, the ten year statute of limitations for Plaintiffs' claims in this case against Libya was tolled, and did not begin to run, until April 24, 1996, the date Libya's immunity was lifted. Plaintiffs thus complied with the ten year limitations period by filing their initial complaint on April 5, 2006, and their amended complaint on April 24, 2006, both within ten years of the date Libya's immunity was lifted.

Notwithstanding this clear statutory language, the Libyan Defendants contend in their summary judgment motion that Plaintiffs failed to comply with the ten year statute of limitations and that their claims are barred. Libya does not deny that it was immune from suit until April 24, 1996, and thus could not be sued before that date.[2] Nor does Libya dispute that equitable tolling applies in such cases of immunity – indeed it is mandated by the statute itself. Instead, Libya

---

[2]    In fact, Libya admits as much in paragraph 3 of its "Statement of Undisputed Material Facts" filed with its summary judgment motion.

adopts the untenable position that equitable tolling under the FSIA does not *toll* or suspend the statute of limitations during the period in which the state is absolutely immune from suit, and instead only allows Plaintiffs such brief additional time after April 24, 1996 to file *if they need it after the tolling period ends.* *See* Libyan Defendants' Memorandum in Support of Motion for Summary Judgment ("Libya Memo.") at 4. Thus, Libya essentially argues that Plaintiffs had only a five-month window in which to bring their claims – that is, from April 24, 1996, when the FSIA terrorism amendment was enacted, until September 5, 1996, a date ten years after the attack on Pan Am 73 that is at issue in this case – **even if the Plaintiffs had no factual basis upon which to allege that Libya was responsible for the attack**. *Id.*

As explained below, Libya's motion must be denied for two reasons. First, Libya misrepresents the law regarding the operation of the relevant statute of limitations and equitable tolling principles under the FSIA. Libya's position that the limitations period can run during the period of immunity conflicts with both the language and purpose of the FSIA, as well as the overwhelming weight of FSIA authority which instructs that the limitations period in § 1605(f) cannot begin before 1996 when immunity was lifted. This authority is consistent with federal common law principles of equitable tolling, as well as with Supreme Court precedent that equitable tolling operates to suspend the statute of limitations during the period a plaintiff is unable to sue. Libya's motion fails even to acknowledge the extensive precedent in this jurisdiction refuting its position, let

4

alone explain why these cases are not controlling authority. Instead, Libya relies exclusively on two recent non-binding district court FSIA cases, which we address *infra*, both of which were incorrectly decided on the law and are distinguishable on the facts.

Second, even if Libya is correct on the law (which it is not), and Plaintiffs are permitted only a reasonable amount of time to file after the expiration of the tolling period, Libya's motion still must be denied. That is because the principle of equitable tolling – typically applied in a common law setting – is statutorily mandated in this case. Indeed, it is well-established that a statute of limitations does not begin to run and is tolled where, despite all due diligence, the plaintiff was unable to obtain vital information bearing on the existence of his claim, ***including the identity of the wrongdoer.*** In this case, it was not until 2004 that Plaintiffs learned ***for the first time*** that Libya was secretly involved in and responsible for the attack on Pan Am Flight 73. When Plaintiffs became aware of Libya's involvement, they immediately took action and diligently pursued their claims. Steps they undertook included: (1) coordinating with over one-hundred and fifty victims of the attack and their families in several countries around the world; (2) retaining Crowell & Moring LLP to develop and pursue their claims; (3) initiating Freedom of Information Act ("FOIA") requests for U.S. government reports and other official documents relating to the investigation of Libya's involvement in the attack; and (4) conducting various other investigative initiatives. Plaintiffs certainly did not sit on their rights, but rather acted reasonably and diligently in

filing their initial complaint on April 5, 2006, and their amended complaint on April 24, 2006.

In sum, Plaintiffs have complied with the FSIA's statute of limitations provision and Libya's motion for summary judgment should be denied.

## FACTS

On the morning of September 5, 1986, Pan Am Flight 73 was hijacked by terrorists while it was sitting on the airport tarmac in Karachi, Pakistan.  The flight originated in Bombay, India, and stopped in Karachi to take on passengers en route to Frankfurt, Germany, and its final destination at New York's John F. Kennedy Airport.  *See United States v. Safarini*, Criminal No. 91-504 (EGS), Rule 11 Proffer of Facts dated November 12, 2003 ("Proffer") ¶ 2 (attached hereto as Exhibit C); *United States v. Safarini*, Criminal No. 91-504 (EGS), Superseding Indictment dated August 28, 2002 ("Superseding Indictment"), Count 1 (attached hereto as Exhibit D).

At approximately 6 a.m. that morning, four terrorists – Defendants Jamal Saeed Abdul Rahim ("Rahim"); Muhammad Abdullah Khalil Hussain Ar-Rahayyal ("Khalil"); Muhammad Ahmed Al-Munawar ("Mansoor"); and Zaid Hassan Abd Latif Safarini ("Safarini") – dressed as Pakistani security agents and armed with assault rifles, pistols, grenades, and belts of plastic explosives, stormed the plane as the flight was boarding, and proceeded to hold hostage approximately 380 innocent civilian passengers and crew members for 16 horrifying hours.  *See* Proffer ¶ 3, Ex. C; Superseding Indictment, Ex. D at Counts 1-11.  The pilots and flight engineers

were able to escape from the plane through a hatch in the cockpit, thus effectively grounding the plane. *See* Proffer ¶ 4, Ex. C. Defendant Al-Turk accompanied the four other terrorists to the airport, but did not board the plane. *See id.* ¶ 25.

During the hijacking, the hijackers demand that the authorities provide them with a flight crew so that they could fly to Cyprus and obtain the release of Palestinian prisoners detained there. Their demands were not met. *See id.* ¶ 5.

The terrorists threatened, assaulted, and terrorized the passengers and crew, and tortured, beat, and assassinated one passenger in plain view of the other passengers, throwing his body out of the plane onto the tarmac. *See id.* ¶ 10. At approximately 10 p.m. that night, when the plane's auxiliary power unit failed and the plane's lights went out, the terrorist hijackers recited a martyrdom prayer in Arabic, and opened fire on the passengers with automatic weapons and threw grenades in the air on the plane. In the end, 20 passengers and crew were killed that day, and many others suffered severe physical and/or emotional injuries. *See id.* ¶¶ 12-15.

Pakistani authorities arrested three of the terrorists – Rahim, Khalil, and Mansoor – on the ground of the Karachi airport immediately following the final deadly assault as they were attempting to escape with the fleeing passengers. Safarini was arrested a few hours later at a local hospital where he had been taken for treatment after being removed from the plane. About one week later, Pakistani authorities arrested Al-Turk. *See id.* ¶ 18.

Although evidence has since come to light which makes it clear that the attack on Pan Am Flight 73 was undertaken at the behest of Libya and its government officials, at the time of the attacks Libya's role in sponsoring and offering material support for the attack was not known publicly.  Critically, and in contrast to several other notorious acts of terrorism in the 1980s discussed below, Libya did not admit or even imply that it was responsible for this attack.  This did not become known publicly for another 18 years, in 2004.  Declaration of Jay Grantier ("Grantier Decl.") ¶¶ 4-5 (attached hereto as Exhibit A); Declaration of Prabhat Krishnaswamy ("Krishnaswamy Decl.") ¶ 4 (attached hereto as Exhibit B).

In 1988, Defendants Al-Turk, Safarini, Rahim, Khalil, and Mansoor voluntarily signed a joint statement in which they admitted to their role in the hijacking of Pan Am Flight 73.  In this statement, the hijackers admitted going to Pakistan to hijack an American airplane with the intent to crash the plane in the "strategic centre of the Zionist enemy" so that they might obtain the release of Palestinian freedom fighters.  Proffer ¶ 27, Ex. C; *United States v. Safarini*, Criminal No. 91-504 (EGS), Sentencing Memorandum dated April 30, 2004 ("Sentencing Memorandum"), Attachment B (attached hereto as Exhibit E).  The terrorists did not disclose any affiliation with the Abu Nidal Organization or Libya.

Shortly thereafter, the five defendants were convicted and sentenced to death by a Pakistani court.  These sentences were later commuted to life sentences to be served in Pakistan.  *See* United States Attorney's Office for the District of Columbia:  Chronology of Significant Events Relating to the Hijacking of Pan Am

Flight 73 ("Chronology of Significant Events") (attached hereto as Exhibit F).  On August 29, 1991, following an investigation of the hijacking and terrorist attack on Pan Am Flight 73, the United States government indicted Defendants Al-Turk, Safarini, Rahim, Khalil, and Mansoor.  *See United States v. Safarini*, Criminal No. 91-504 (EGS), Docket Sheet ("Safarini Docket Sheet"), at entry 1 (attached hereto as Exhibit G); *United States v. Safarini*, Criminal No. 91-504 (EGS), Indictment dated August 29, 1991 ("Indictment") (attached hereto as Exhibit H).  This was a sealed indictment not available to the public or to Plaintiffs when it was issued or for almost nine years thereafter.  Even then, when the Indictment was unsealed on June 19, 2000, it provided no information relating to Libya's support for or involvement in the hijacking of Pan Am Flight 73.  *See* Indictment, Ex. H; Safarini Docket Sheet, Ex. G at entry 3.

On September 28, 2001, shortly after he was released from a Pakistani prison, Defendant Safarini was captured by the Federal Bureau of Investigation ("FBI") and brought to the United States.  *See* Chronology of Significant Events, Ex. F.  On August 28, 2002, a Superseding Indictment was returned against Defendants Al-Turk, Safarini, Rahim, Khalil, and Mansoor.  The Superseding Indictment, like the original Indictment that was unsealed in 2000, provided *no* information relating to Libya's support for or involvement in the hijacking of Pan Am Flight 73.  In fact, Libya is not even mentioned in the Superseding Indictment.  *See* Superseding Indictment, Ex. D.

On December 16, 2003, Defendant Safarini pled guilty to all 95 counts of the superseding indictment against him in connection with the hijacking of Pan Am Flight 73.  *See* Safarini Docket Sheet, Ex. G at entry 118; *United States v. Safarini*, Criminal No. 91-504 (EGS), Plea Agreement ("Safarini Plea Agreement") (attached hereto as Exhibit I).  At the plea proceeding, Safarini did not mention or note the role of Libya in the attack.  Defendant Safarini is currently incarcerated at the United States Penitentiary in Florence, Colorado in the ADMAX facility.  *See* Chronology of Significant Events, Ex. F.  Defendants Al-Turk, Rahim, Khalil, and Mansoor remain in prison in Pakistan.

It was not until June 2004 that information about Libya's role in the hijacking of and terrorist attack on Pan Am Flight 73 first surfaced in the public media and became available to Plaintiffs.  *See* Krishnaswamy Decl. ¶13, Ex. B. While researching information regarding the hijacking of and terrorist attack on Pan Am Flight 73, Dr. Prabhat Krishnaswamy located a newspaper article by investigative reporter Jon Swain in <u>The Sunday Times</u> which had been published on March 28, 2004.  *Id.*; Grantier Decl. ¶13, Ex. A.  This article revealed for the first time that Libya had hired ANO to carry out the attack on Pan Am Flight 73.  *See* Jon Swain, *Revealed: Gadhaffi's Air Massacre Plot*, <u>The Sunday Times</u> (March 28, 2004) ("Swain article") (attached hereto as Exhibit J).

Critical to the present motion, in his article Swain emphasized that this was "the first time" Libya was publicly linked to the hijacking of Pan Am Flight 73.  The Swain article also noted that the hijacking of Pan Am Flight 73 had never been

"publicly blamed" on Libya and that the "incriminating details [had] remained secret" until the publication of the article in 2004.  *See id.*  Swain's article noted, among other things, that Libya's involvement in the hijacking of Pan Am Flight 73 "did not even come out at the trial" of the hijackers in Pakistan.  *See id.*

On July 18, 2004, an article appeared in the South Asia Tribune and confirmed that Libya was the mastermind of the attack on Pan Am Flight 73.  *See* Javed Rana, *Gaddafi Masterminded 1986 Pan Am Hijacking, Admits Jailed Hijacker*, South Asia Tribune (July 18, 2004) ("Rana article") (attached hereto as Exhibit K).  In this article, Javed Rana reported that one of the hijackers, Defendant Rahim, had corroborated Mr. Swain's revelation that Libya was responsible for the Pan Am hijacking.  *See id.*  According to Defendant Rahim, Defendants Al-Turk, Safarini, Rahim, Khalil, and Mansoor carried out the hijacking at the behest of Libya.  Defendant Rahim confirmed that Qadhafi was the "mastermind of the 1986 Pan Am hijacking . . . ."  *See id.*  Mr. Rana's article also noted that Libya's role in the attack on Pan Am Flight 73 was not revealed during the trial of Defendants Al-Turk, Safarini, Rahim, Khalil, and Mansoor in Pakistan. *See id.*

The revelation in 2004 that Libya had ordered the hijacking and terrorist attack on Pan Am Flight 73 shocked and angered the victims of the attack. Krishnaswamy Decl. ¶ 14, Ex. B; Grantier Decl. ¶ 14, Ex. A.  Between the time of the hijacking and the publication of these articles in 2004, some of the victims of the Pan Am 73 attack had searched for and assembled available information about the

attack.  Krishnaswamy Decl. ¶¶ 4-12, Ex. B; Grantier Decl. ¶¶ 4-12, Ex. A.  But

until 2004, none of the public documents or news reports contained any indication

that Libya was responsible for the hijacking of Pan Am Flight 73.  Krishnaswamy

Decl. ¶¶ 4-12, Ex. B; Grantier Decl. ¶¶ 4-12, Ex. A.

Shortly after seeing the Swain article in 2004, several victims of the terrorist

attack retained Crowell & Moring LLP to represent the victims.  Krishnaswamy

Decl. ¶ 15, Ex. B; Grantier Decl. ¶ 15, Ex. A.  The victims continued to seek

additional information about the terrorist attack.  Krishnaswamy Decl. ¶ 17, Ex. B;

Grantier Decl. ¶ 17, Ex. A.  While the pursuit and collection of information related

to Libya's role in the Pan Am Flight 73 hijacking was ongoing, some of the victims

began searching for and contacting other victims from that flight.  Krishnaswamy

Decl. ¶ 16, Ex. B; Grantier Decl. ¶ 16, Ex. A.

This was a daunting task, as there were nearly 400 passengers and crew on

Pan Am Flight 73, living in many different parts of the world, including the United

States, Europe, India, Pakistan, Canada, and Mexico, among others.

Krishnaswamy Decl. ¶ 16, Ex. B; Grantier Decl. ¶ 16, Ex. A.  The victims placed

advertisements in international newspapers to help locate other victims and their

family members.  Krishnaswamy Decl. ¶ 17, Ex. B; Grantier Decl.¶ 17, Ex. A.  In

addition, many of the 400 victims and their families did not speak English.  *See*

Proffer ¶ 1, Ex. C; Sentencing Memorandum, Ex. E.  As a result, it took many

months to locate victims and their families, and much more time to organize such a

large and diverse group and still more time to gather the information necessary to file the detailed complaint in this case.

On April 5, 2006, the Plaintiffs filed this lawsuit. *See Patel et al. v. The Socialist People's Libyan Arab Jamahiriya et al.*, C.A. No. 06-00626 (PLF), Docket Sheet, at entry 1 (attached hereto as Exhibit L). An amended complaint was filed on April 24, 2006. *See id.*, at entry 2.

## ARGUMENT

I.    **Under the FSIA, Plaintiffs Had 10 Years From the Date on Which Libya's Immunity Was Lifted to Bring Their Claims.**

A.    **The FSIA Sets Forth a Uniform Rule on Statute of Limitations for Cases Against State Sponsors of Terrorism Expressly Requiring Equitable Tolling During the Period in Which the State is Immune from Suit.**

On April 24, 1996, President Clinton signed into law amendments to the FSIA that permitted individuals in certain circumstances to sue sovereign states for damages resulting from state sponsored acts of terrorism. *See* Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 221(a), 100 Stat. 1214 (Apr. 26, 1996), codified at 28 U.S.C. § 1605(a)(7).[3] In order to be eligible for suit under the FSIA's terrorism amendments, the foreign state must have been designated as a state sponsor of terrorism at the time the act occurred or subsequently designated as such as a result of the act. *Id.; see also Kerr v. Islamic Republic of Iran,* 245 F.

---

[3]    The terrorism amendments specifically identify: (1) victims of torture; (2) extrajudicial killing; (3) aircraft sabotage; (4) hostage-taking; and (5) the provision of material support or resources for any of the foregoing acts, as the acts of terrorism for which compensation can be obtained under the statute. *See Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 262 (D.D.C. 2003) (Friedman, J.)

Supp. 2d 59, 63 & n.11 (D.D.C. 2003) (Jackson, J.).  Libya was designated a state

sponsor of terrorism on December 29, 1979, pursuant to the Export Administration

Act, 50 U.S.C. App. § 2405(j); 45 Fed. Reg. 1595, 1596 (Jan. 8, 1980) (codified at 15

C.F.R. § 385.4(d) (1980)).  It remained on the list of designated states that sponsor

terrorism until removed in 2006.  *See* 71 Fed. Reg. 31,909 (June 1, 2006); 71 Fed

Reg. 39,696-02 (July 13, 2006).

Libya remains liable for acts of terrorism it sponsored or carried out while it

was on the terrorism list, even though President Bush removed Libya from the list

last year.  *See Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya,*

C.A. No. 98-3096, 2007 WL 1876392, at *3-5 (D.D.C. June 28, 2007) (Hogan, C.J.)

(rejecting argument that court lacks subject matter jurisdiction because Libya has

been taken off the terrorism list); *Kilburn v. Socialist People's Libyan Arab*

*Jamahiriya,* 441 F. Supp. 2d 74, 76 (D.D.C. 2006) (Urbina, J.) (same), *aff'd* No. 06-

7127 (D.C. Cir. Oct. 19, 2006); *Pugh v. Socialist People's Libyan Arab Jamahiriya,*

C.A. No. 02-2026, Order of Sept. 3, 2006 (Kennedy, J.) (same), *aff'd* No. 06-7167

(D.C. Cir. Apr. 3, 2007).  *See also Acree v. Republic of Iraq*, 370 F.3d 41, 56 (D.C.

Cir. 2004) (even if a "state sponsor of terrorism is subsequently restored to good

standing, that country is still amenable to suit for acts that took place prior to the

restoration of its sovereign immunity.").

Although the Department of State began designating certain foreign states as

sponsors of terrorism in 1979, it was not until 1996, when the FSIA's terrorism

amendments were enacted, that victims of the designated acts of terrorism could

maintain a cause of action against a sovereign state. Before 1996, sovereign states were afforded absolute immunity for such acts, and thus they could not be sued in United States courts for any act of state sponsored terrorism. Various judges of this Court have uniformly held that the FSIA's terrorism amendments apply retroactively, thus permitting Plaintiffs who were victims of terrorism prior to 1996 to bring claims under the statute. *See Wagner v. The Islamic Republic of Iran*, 172 F. Supp. 2d 128, n.7 (D.D.C. 2001) ("Congress expressly directed that the FSIA be retroactively applied through its enactment of the Antiterrorism and Effective Death Penalty Act of 1996."); *Cicippio v. Islamic Republic of Iran*, 28 F. Supp. 2d 62, 68-69 (D.D.C. 1998) ("Congress expressly directed that [28 U.S.C. § 1605(a)(7)] be given retroactive application."); *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 13-14 (D.D.C. 1998) (Lamberth, J.) ("[T]he state sponsored terrorism provision implicates no Constitutionally protected interest which would prohibit the application of 28 U.S.C. § 1605(a)(7) to pre-enactment conduct."). *See also* discussion *infra,* at II.A.

Importantly for the motion currently before the Court, the 1996 Amendments provided a federal limitations period of ten years for claims arising out of state-sponsored terrorism. The statute also includes specific language directing that the limitations period is to be tolled during the period in which the sovereign defendant was immune from suit. Specifically, §1605(f) states:

> No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was

immune from suit, shall apply in calculating this limitation
period.

28 U.S.C. § 1605(f).

Since the enactment of the FSIA, numerous cases have been filed stemming from acts of state sponsored terrorism that occurred in the 1980s and early 1990s. The vast majority of these cases have been filed in this Court. In these cases, the judges of this Court have held repeatedly that under the FSIA, plaintiffs have ten years from the date the defendant state's immunity was lifted – until April 2006 – to bring their claims. Indeed, but for two recent decisions from Judges Kennedy and Kessler of this Court, every district judge of this Court that has addressed the statute of limitations question under the FSIA, has held that the statute allows plaintiffs ten years from the date the FSIA terrorism amendments were enacted to bring their claims. *See, e.g., Flatow,* 999 F. Supp. at 23 (Lamberth, J.) (holding that "as a matter of law, . . . the earliest date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note will be April 24, 2006."); *Collett v. Socialist People's Libyan Arab Jamahiriya,* 362 F. Supp. 2d 230, 242 (D.D.C. 2005) (Urbina, J.) (holding that "the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)" and denying Libya's motion to dismiss); *Wyatt v. Syrian Arab Republic,* 398 F. Supp. 2d 131, 145 (D.D.C. 2005) (Urbina, J.) (finding July 2001 suit for abductions in August 1991 timely; "claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was

waived."); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 69 (D.D.C. 1998) (Jackson, J.) ("[T]he ten-year statute of limitations . . . does not bar the claims in this case because, once again, Congress has provided that victims of terrorism be given benefit of 'all principles of equitable tolling, including the period during which the foreign state was immune from suit . . .' Iran was immune from suit by these plaintiffs under the FSIA until the enactment of § 1605(a)(7) in 1996.") (internal citation omitted).[4]

_____

[4]    *See also Welch v. Islamic Republic of Iran*, C.A. No 01-863, 2004 WL 2216534 (D.D.C. Sept. 27, 2004) (Kay, Mag. J.) (raising no limitations bar to suit for 1982 extrajudicial killing where claim was filed in 2001); *Dodge v. Islamic Republic of Iran,* C.A. No. 03-252, 2004 WL 5353873 (D.D.C. Aug. 25, 2004) (Jackson, J.) (1982 hostage-taking case filed in February 2003); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (Lamberth, J.) (finding 2001 suit for extrajudicial killings in 1983 timely; "Iran was immune from suit until passage of Pub. L. No. 104-132, which was made effective on April 24, 1996. Accordingly, the Court concludes that the statute of limitations contained in 28 U.S.C. § 1605(f) does not bar these actions."); *Dammerell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261 (D.D.C. 2005) (Bates, J.) (raising no limitations bar to suit filed in October 2001 for embassy bombing occurring in April 1983); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 27 (D.D.C. 2003) (Urbina, J.) (in case with opposing counsel, raising no limitations bar to suit filed in June 2001 for hostage taking and extrajudicial killing occurring from 1984 to 1986), *aff'd*, 376 F.3d 1123 (D.C. Cir. 2004); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87 (D.D.C. 2003) (Bates, J.) (raising no limitations bar to suit for February 1984 hostage taking and torture filed in 2001); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 150 (D.D.C. 2002) (Sullivan, J.) (no limitations bar raised to suit filed in December 2000 for hostage taking and torture occurring in 1979 and 1980), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003); *Polhill v. Islamic Republic of Iran*, C.A. No. 00-1798, 2001 WL 34157508 (D.D.C. Aug. 23, 2001) (Jackson, J.) (where victim was taken hostage in Lebanon in 1987, released in 1990, and filed suit in 2000, court stated case was timely because the ten-year statute of limitations was tolled for the period during which Iran was immune from suit); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000) (raising no limitations bar to suit where victim was taken hostage in March 1985, released in December 1991, and filed suit in August 1999).

**B.    The *Vine* and *Buonocore* Decisions Were Wrongly Decided and Conflict With The Majority Federal Common Law Rule That the Tolling Period is Not Counted Against the Limitations Period.**

Rather than address any of the above-cited cases cases, the Libyan Defendants completely ignore them and focus entirely on two recent contrary and distinguishing decisions by Judge Kennedy and Judge Kessler. *See Vine v. Republic of Iraq,* 459 F. Supp. 2d 10 (D.D.C. 2006) (Kennedy, J.); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya,* C.A. No. 06-727, 2007 WL 2007509 (D.D.C. July 9, 2007) (Kessler, G.). *See also* Libya Memo. at 3-4.[5]

The *Vine* plaintiffs were held as hostages in Iraq and used as human shields over a several month period in 1990-91, in the time leading up to and during the first Gulf war. Judge Kennedy determined in *Vine* that the statute of limitations had run by 2001 – ten years after the events occurred, rather than ten years after the 1996 terrorism amendments were enacted. This conclusion was based in part on the factual circumstances of that case (really three consolidated cases), and his conclusion that the *Vine* plaintiffs knew in each case that they could have filed suit against Iraq in 1996, yet they waited until *after* 2001 (ten years after being held hostage) to do so. 459 F. Supp. 2d at 23-24. Judge Kennedy determined that there is a distinction in the law between when a claim "arises" and a claim "accrues." As

---

[5]    *Vine* and *Buonocore* are on appeal in the D.C. Circuit. *Vine* (on appeal as *Simon v. Socialist People's Libyan Arab Jamahiriya*) No. 06-7175, was argued on October 12, 2007 and awaits decision. *Buonocore*, No. 07-7125, has not yet been issued a briefing schedule, but is the subject of a motion to dismiss appeal, which is pending. Plaintiffs in the present case have been granted leave to participate as *amici curiae* in *Buonocore*.

he explained, "[a] claim 'arises' on the dates that the action in question occurred, yet does not 'accrue' until a prior disability to suit is removed." *Id.* at 21. Thus, he concluded that the *Vine* claims *arose*, at the latest in 1991, when they plaintiffs were released as hostages. *Id.* He went on to analyze equitable tolling in the statute and concluded there was no basis to toll in *Vine* because everything plaintiffs needed to know to file suit they knew in 1996 when the terrorism amendments were enacted, and tolling was not necessary to support their claims. *Id.* at 22.[6]

Judge Kessler reached the same conclusion via the same analysis in *Buonocore.* In that case, the plaintiffs were victims of terrorist bombings at the Rome, Italy airport on December 27, 1985. Judge Kessler essentially adopted Judge Kennedy's legal analysis *in toto*, and determined that the statute of limitations began to run at the time of the bombing – December 1985. She also concluded that

---

[6]     Judge Kennedy was not persuaded by Plaintiffs arguments to the contrary in *Vine,* in part because many of the decisions they relied upon for their statute of limitations argument, including *Peterson, Polhill, Cicippio, Flatow*, *Welch*, *Dodge*, and *Dammerell* were decisions issued in the context of a default judgment. 459 F. Supp. 2d at 21 n.9. Contrary to Judge Kennedy's view, this fact does not and should not diminish the persuasive value of those decisions. Indeed, as this Court noted in *Surette,* 231 F. Supp. 2d at 262, for a party to obtain a default judgment against a foreign state, a plaintiff must have "establishe[d] his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). In that case, as in most, this means a multi-day *"ex parte* evidentiary hearing – effectively a trial –" when the terrorist state defendant does not participate in the case. As this Court did in *Surette*, the court in each of the cases we cite, *supra*, on pages 16-17 and in footnote 4, was required to, and did, undertake an independent review and analysis to establish that plaintiffs, in fact, were entitled to relief against the foreign state *including that their claims are not time-barred.* Judge Kennedy's conclusion to the contrary in *Vine* is unwarranted.

"principles of equitable tolling permit suit for a reasonable period of time" after the terrorism amendments were enacted in April 1996. *Buonocore*, 2007 WL 2007509, at *1-3. In applying equitable tolling, Judge Kessler determined that the case had been filed too late. In contrast to Libya's secret role in the present case, Judge Kessler noted that "Libya did little to conceal its role in the Rome Airport Attack" and there was nothing significant learned about the event after the terrorism amendments were enacted in 1996 that would justify waiting, as plaintiffs did, until April 21, 2006 to file their complaint. *Id.* at *3-4. Thus, she concluded on those facts that waiting almost the full ten years after the enactment of the terrorism amendments in 1996, was outside the statute of limitations. *Id.*

In our view, *Vine* and *Buonocore* were incorrectly decided on the law, and are distinguished on their unique facts from the present case. In both decisions, the Court departed from established precedent tolling the FSIA limitations period for the period during which the state is immune and held for the first time that the limitations period continues to run during the tolling period and only allows plaintiffs extra time if it is "needed," and then only for a "reasonable period." *Id.* at *2; *Vine*, 459 F. Supp. 2d at 20-23. This Court should not follow those decisions.

Both *Vine* and *Buonocore* rely heavily, if not exclusively, on one D.C. Circuit decision, *Phillips v. Heine,* 984 F.2d 489 (D.C. Cir. 1993) (Williams, S.). *Phillips,* however, is not controlling in this case and is distinguishable in several regards. *Phillips* involved the statute of limitations of the Death on the High Seas Act ("DOSHA") – a statute distinct from the FSIA. *Id.* at 490. Unlike the FSIA,

20

DOSHA did not codify equitable tolling into the statute as a congressional mandate, and thus did not require a uniform and certain equitable tolling rule. *Id.* (citing 46 U.S.C. app. § 763a). Moreover, the DOSHA statute at issue had a unique legislative history which guided the court's analysis in *Phillips*. The court noted that an earlier version of the DOSHA statute expressly provided for equitable tolling but only for 90 days. *Id.* at 492. Thus, the court reasoned that when Congress amended the statute and deleted any reference to tolling, it could not have intended to grant plaintiffs more than 90 days from the end of the tolling event. *Id.* In light of this history, the court concluded that plaintiffs were entitled to 90 days after the tolling period ended – not the full length of the statute of limitations period. *Id.*

Indeed, *Phillips* cannot be the controlling federal common law rule on equitable tolling in all cases because in a more recent case, *United States v. Saro,* 252 F.3d 449, 453-55 (D.C. Cir. 2001), the D.C. Circuit, in the context of analyzing the limitations period for a § 2255 habeas corpus claim, did *not* apply the *Phillips'* "reasonable period" framework, but rather instructed that equitable tolling, as a matter of law, *suspends* the statute of limitation during the tolling period. Quoting the Supreme Court's decision in *United States v. Ibarra,* the D.C. Circuit explained the calculation as follows:

> [P]rinciples of equitable tolling usually dictate that when a time bar has been *suspended* and then begins to run again upon a later event, the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock stopped.

*Id.* at 454 (quoting *Ibarra*, 502 U.S. 1, 4, n.2 (1991)) (emphasis added). The new deadline, the court explained, "may be calculated in an equivalent way by tacking on the length of the tolled period . . . onto the original limitations deadline. . . ." *Id.* at 454 n. 6. *See also Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1999) ("Both equitable estoppel and equitable tolling operate, in a practical sense, to toll a limitations period."); *but see Chung v. U.S. Dept. of Justice*, 333 F.3d 273 (D.C. Cir. 2003) (stating that equitable tolling ensures that plaintiffs are not deprived of a "reasonable time" in which to file suit).

It is the court's approach in *Saro,* not *Phillips,* which is in line with Supreme Court precedent and the majority federal common law rule on equitable tolling. The Supreme Court has long held that common law equitable tolling principles operate to suspend the statute of limitations during the period in which a plaintiff is legally barred from bringing suit. For example, in *Hanger v. Abbott,* 73 U.S. 532, 539-40 (1867), a case arising just after the Civil War, the Supreme Court held that the three year limitations period for a contract claim was "suspended" during the duration of the war due to the inability of plaintiffs to bring suit against defendants who resided in the Confederacy. The Court explained that "[a]bsolute suspension of the right, and prohibition to exercise it, exist[ed] during the war by the law of nations . . . [thus] the operation of the statute of limitation is also suspended during the period the creditor is prohibited, by the existence of the war and the law of nations, from enforcing his claim." *Id.* The period of time therefore "*should be deducted*" from the statutory limitations period under this common law rule. *Id.* at

541 (emphasis added); *see also United States v. Wiley,* 78 U.S. 508, 515 (1870)

(holding that "all the time *to be deducted* during which the suit could not be

prosecuted by reason of resistance to the laws, or interruption of judicial

proceedings, whether such time was before or after its passage.") (emphasis added);

*The Protector,* 76 U.S. 687 (1869) (deducting the period during which plaintiffs could

not sue because of the civil war from the limitations period and thus finding claims

to be timely).

Significantly, in the relatively more recent case, *Burnett v. New York Cent.

R.R. Co.,* 380 U.S. 424, 434-35 (1965), the Supreme Court not only affirmed this

common law rule, but *expressly rejected* the "reasonable time" approach proposed by

Libya and applied by the *Vine* and *Buonocore* courts. In *Burnett*, the plaintiff

brought a claim in state court under the Federal Employers' Liability Act which was

later dismissed for lack of venue. The Court held that the limitations period was

"tolled during the pendency of the state suit" and did not restart until the state

court order become final. 380 U.S. at 435. In so holding, the majority expressly

declined to adopt the view that plaintiffs should have a "reasonable time" after the

state court dismissal to bring suit, concluding that such an approach "would create

uncertainty as to exactly when the limitation period again begins to run." *Id.* at

435. The Court explained:

> We conclude that a uniform rule tolling the federal statute for
> the period of the pendency of the state court action and until the
> state court dismissal order becomes final is fair to both plaintiff
> and defendant, carries out the purposes of the FELA, and best
> serves the policies of uniformity and certainty underlying the
> federal limitation provision.

*Id.* at 435-36.  Accordingly, the Court held that the limitations period was tolled and only restarted once the legal impediment to suit was lifted.  *Id.*  Other Supreme Court cases similarly have adopted this uniform approach in the context of other federal statutes.  *See, e.g., Ibarra*, 502 U.S. at 4 n.2 (explaining that in Federal Tort Claims Act cases, "[p]rinciples of equitable tolling usually dictate that when a time bar has been suspended and then begins to run again upon a later event, the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped."); *American Pipe & Constr., Co. v. Utah*, 414 U.S. 538, 539 (1974) ("the commencement of [an antitrust] class action . . . suspended the running of the limitations period.").

The *Phillips* court failed to address the Supreme Court's holding in *Burnett*, and instead relied exclusively on a Seventh Circuit decision authored by Judge Posner in *Cada v. Baxter Healthcare Corp.*, 920 F.3d 446, 452-53 (7th Cir. 1990). The reasoning in *Cada*, however, does not translate to this case.  *Cada* did not address an equitable tolling situation where the plaintiff was legally barred from suing, but rather involved a case where the plaintiff did not have the requisite facts necessary to bring his or her claim.  *Id.*  The court reasoned that in such a case, the tolling period is not well-defined and could allow a plaintiff conceivably to extend the limitations period in virtually all cases, making the fixed deadline illusory.  *Id.* at 453.  Under these circumstances, the court elected to apply a reasonableness test instead.  *Id.*

Here, the tolling period is well-defined and expressly set forth in the FSIA statute, and thus the rationale in *Cada* does not apply in this case. Moreover, subsequent Seventh Circuit decisions make clear that *Cada* was not meant to be extended all cases of equitable tolling conflicts. *See, e.g., Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 877 (7th Cir. 1997) (discussing "subtracting out" the tolling period); *Law v. Medco Research*, 113 F.3d 781, 785 (7th Cir. 1997) (noting that "the statute of limitations would be tolled (interrupted), as permitted by the doctrine of equitable tolling, until the investors had enough facts in hand to enable them to file a complaint . . . ."). To do so would fly in the face of *Burnett* and other Supreme Court precedent.

Indeed, the well-established federal common law rule as applied by the majority of circuits makes clear that the tolling period must be *subtracted* from the limitations period. *See, e.g., Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007) ("[e]quitable tolling suspends the running of a statute"); *O'Donnell v. Vencor Inc.*, 465 F.3d 1063 (9th Cir. 2006) (equitable tolling required subtracting the time during which the claimant could not protect her claim); *Rakes v. United States*, 442 F.3d 7, 24 (1st Cir. 2006) (equitable tolling "halts the running of the clock"); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1156 (11th Cir. 2005) ("[w]hen a statute is equitably tolled, the statutory period does not begin to run until the impediment to filing a cause of action is removed."); *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 698 (7th Cir. 2003) ("[e]quitable tolling delays the running of the statute of limitations"); *Knight v. Schofield*, 292 F.3d 709, 712

(11th Cir. 2002) ("[t]olling means just what it says – the clock is stopped while

tolling is in effect.").[7] Thus, on this basis alone this Court should not follow the

path of *Vine* and *Buonocore*.

### C. Congress Intended the FSIA Limitations Period to Operate the Same Way as the Torture Victims Protection Act and Suspend the Statute of Limitations from Running During the Tolling Period.

The *Vine* and *Buonocore* decisions also failed to recognize that courts have

consistently held that under the Torture Victims Protection Act, 28 U.S.C. § 1350

("TVPA") – the statute upon which the FSIA limitations provision was modeled –

the tolling period is not counted toward the limitations period.  Congress modeled

the 1996 FSIA terrorism amendments specifically after the TVPA, an Act which

similarly provides individuals a claim for relief against private individuals and

entities for torture, extrajudicial killing, and other torts committed in violation of

---

[7]    *See also Doe,* 112 F.3d at 877 (the rule in the Seventh Circuit is to subtract the tolling period from the calculation of the statute of limitations period); *Tristar Corp. v. Freitas,* 84 F.3d 550, 553 (2d Cir. 1996) ("the running of the statute is suspended" by equitable tolling); *Oshivar v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1387 (3d Cir. 1994) ("[e]quitable tolling functions to stop the statute of limitations from running."); *Ott v. Midland-Ross Corp.*, 660 F.2d 24, 33 (6th Cir. 1979) (granting plaintiff "the full amount of time allowed by Congress for commencement of his action, undiminished by an period of time [that may have been tolled]."); *Socop-Gonzalez v. I.N.S.,* 272 F.3d 1176, 1195 (9th Cir. 2001) (*en banc*) (the "conventional rule" is "that when a statute of limitations is tolled, the days during a tolled period simply are not counted against the limitations period."); *Justice v. United States,* 6 F.3d 1474, 1478 n. 10 (11th Cir. 1993) (equitable tolling requires that "the time remaining is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped"); s*ee also* 51 Am. Jur. 2d *Limitation of Actions* § 210 (2d. ed. 2000) ("if some paramount authority prevents a person from exercising a legal remedy, the time during which the person is thus prevented from suing is not to be counted against him or her in determining whether the statute of limitations has run.").

the law or nations or a treaty of the United States. *See* H.R. Rep. No. 103-702, at 4 (1991) (noting that the 1996 Amendments to the FSIA were "modeled after the Torture Victim Protection Act"). In particular, the statute of limitations provision in the FSIA was modeled on the limitations provision in the TVPA which provides in identical form that "[n]o action shall be maintained under this section unless the action is commenced not later than 10 years after the date on which the cause of action arose," 28 U.S.C. § 1305. *See* H.R. Rep. No. 103-702, at 6 (1991) (FSIA "includes a 10-year statute of limitations, as in the TVPA . . .").

Although unlike the FSIA, the TVPA does not incorporate an express clause in the statute requiring the application of principles of equitable tolling, courts have nonetheless incorporated equitable tolling principles into the statute based on the TVPA's legislative history. That history states in relevant part that the limitations period "should be tolled during the time the defendant was absent from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, provided that the remedy in that jurisdiction is adequate and available." S. Rep. No. 102-249, at 11 (1991).

In addressing the TVPA limitations provision, courts have held that equitable tolling operates to stop the limitations clock from running during the tolling period. For example, in *Jean v. Dorélien*, 431 F.3d 776, 778 (11th Cir. 2005), the plaintiffs alleged that the defendant, Carl Dorélien, a Colonel in the Haitian Armed Forces and Chief of Personnel from 1992 to 1994, was responsible for the torture, inhumane treatment, arbitrary detention, and extrajudicial killing of

plaintiffs or their family members.  The alleged incidents occurred between April

and June 1993, but the plaintiffs did not file their claims until October 23, 2003,

more than ten years after the acts had taken place.  *Id.*  Citing the legislative

history of the TVPA, the Eleventh Circuit concluded that because the defendant

maintained a position of power in an oppressive regime and was not physically

present in the United States until 1994, equitable tolling  applied and the statute of

limitations was suspended until at least 1994 when the defendant, Dorélien,

entered the United States.  *Id.* at 780 (quoting S. Rep. No. 102-249, at 11 (1991) and

citing *Hilao v. Marcos*, 103 F.3d 767, 773 (9th Cir. 1996)) ("[t]he Senate Report on

the TVPA states that the ten-year statute is subject to equitable tolling, including

for periods in which the defendant is absent from the jurisdiction.").  Thus, the

appellate court held that the plaintiffs complied with the statute of limitations,

calculating that the ten-year statute did not begin to run until 1994 when Dorélien

entered the U.S.  *Id.  See also Arce v. Garcia,* 434 F.3d 1254 (11th Cir. 2006)

(suspending the statute of limitations until the defendants left El Salvador to reside

in the United States); *Cabello,* 402 F.3d at 1156 (granting plaintiffs ten years from

date information surrounding decedent's death became available and specifically

noting that the interpretation that equitable tolling starts and stops the clock "is

equally applicable in the context of other statutes."); *Chavez v. Carranza*, C.A. No.

03-2932, 2006 WL 2434934 at *3 (W.D. Tenn. Aug. 15, 2006) ("widespread human

rights abuses carried out by the Salvadorian military against civilians during the

country's civil war and Plaintiffs' fear of reprisal against themselves or their family

members in El Salvador constitute 'extraordinary circumstances" sufficient to toll

the statute of limitations."); *Forti v. Suarez-Mason,* 672 F. Supp. 1531, 1549-51

(N.D. Cal. 1987) (*rev'd on other grounds*) (suspending the statute of limitations

during the time that defendant was concealing himself).

Similarly, courts addressing Alien Tort Claims Act ("ATCA") cases also have

held that federal common law principles of equitable tolling rule operate to suspend

the limitations period during the tolling period.  Because the ATCA does not have

an express statute of limitations, courts have adopted the limitations provision in

the TVPA as an appropriate analogous statute.  *See Papa v. U.S.*, 281 F.3d 1004

(9th Cir. 2002) (collecting cases).  Thus, as with the TVPA cases, courts addressing

ATCA claims have suspended the ten year statute of limitations period for the

tolling period and started or restarted the clock when relief from such

circumstances is achieved.  *See, e.g., Hilao,* 103 F.3d at 773 (suspending the

limitations period until death of former President due to intimidation and fear of

reprisal suffered by victims of torture in the Philippines); *Burma v. Unocal,* 176

F.R.D. 329, 359-60 (S.D. Cal. 1997) (allowing plaintiff leave to amend complaint in

order to plead facts demonstrating that he was entitled to equitable tolling

suspending the statute because he was unable to obtain access to judicial review in

Burma due to his refugee status).

There is no basis – and certainly the Libyan Defendants have offered none –

to interpret the FSIA's terrorism amendments' statute of limitations provision

differently from the TVPA or ATCA.  To do so would ignore the legislative history of

the statute and Congress' mandate, as well as create inconsistent standards in federal statutes of limitations, which are otherwise identical in every material way. *See*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 85 (2006) ("when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its …judicial interpretations as well.'") (citing *Bragdon v. Abbott,* 524 U.S. 624, 645 (1998)).

###    D.    The Cause of Action Did Not Arise Until 1996 When Plaintiffs Could First File Suit and Obtain Relief.

Equitable tolling principles aside, the limitations period did not begin in this case until 1996 for the additional reason that the cause of action did not arise until Congress passed the amendment permitting plaintiffs to sue.  28 U.S.C. § 1605 (a)(7)(f) instructs that the limitations period begins on "the date on which the cause of action arose."  Where a statute provides a limitations period to run from "the date on which the cause of action arose," the Supreme Court has held that this language incorporates the standard rule that the limitations period commences when the plaintiff has 'a complete and present cause of action.'"  *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)).  The Supreme Court explained that "[u]nless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief."  *Id.*

Here, Plaintiffs had no legal basis to "file suit and obtain relief" with respect to their injuries from the attack and hijacking of Pan Am Flight 73 until 1996, when the amendments lifting the immunity of state-sponsors of terrorism were enacted. Thus, because Plaintiffs' cause of action was not "complete and present" for limitations purposes, it did not "arise" until April 24, 1996, the date the FSIA was amended.

Contrary to this Supreme Court precedent, the district court in *Vine* held that the cause of action *arose at the time of the act of terrorism* in that case, when the plaintiffs were kidnapped and held hostage in 1990 and 1991. *Vine*, 459 F. Supp. 2d at 20. *See also Buonocore*, 2007 WL 2007509 (following the holding in *Vine*). The *Vine* court's reasoning, however, was flawed. The court improperly focused on the distinction between the words "arise" and "accrue" where in fact the operative phrase which should have been the "cause of action." It is not the injury or terrorist act which is to "arise" or "accrue" but the "cause of action."

A cause of action cannot "arise" or "accrue" until the plaintiff has the right to enforce her cause of action. *United States v. One 1961 Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972). This requirement is not satisfied by the mere existence of an injury; instead, there must also be a cognizable legal claim that entitles a party to sustain an action and the right to seek a judicial remedy. Indeed,

> [t]he test to determine when a cause of action arises or accrues is when the plaintiff has suffered a legal injury, that is, when he or she has the right to maintain an action or first may maintain an action to a successful conclusion, or when the action can be brought without being subject to dismissal for failure to state a claim."

51 Am. Jur. 2d *Limitation of Actions* § 148 (2d ed. 2000).  Hence, it is axiomatic that

Plaintiffs' "cause of action arose" on April 24, 1996, the date on which Libya was no

longer immune from suit providing a judicial remedy for plaintiffs.  Prior to that

time, any claim brought by Plaintiffs would have been dismissed based on Libya's

immunity.  It simply defies common sense for the limitations period to have

commenced prior to the date in which Plaintiffs were permitted to sue a foreign

sovereign for claims based on acts of terrorism.

Moreover, the *Vine* court's distinction between "accrue" and "arise" is a

distinction without a difference.  The rule of statutory construction provides that

absent an express definition of a statutory term, the intent of Congress is to adopt

the same meaning of the term that was recognized at common law at the time of the

statute's enactment.  *See United States v. Shabani*, 513 U.S. 10, 13 (1994).

According to Black's Law Dictionary, "arise" means "to spring up, originate, to come

into being or notice; to become operative, sensible, visible, or audible; to present

itself."  Black's Law Dictionary 108 (6th ed. 1990).  Black's defines "accrue" as

meaning "*to arise*, to happen, to come into force or existence."  *Id*. at 20 (emphasis

added).  Finally, Black's defines "cause of action" as "[a] situation or state of facts

which would entitle [a] party to sustain action and give him right to seek a judicial

remedy in his behalf."  *Id*. at 221.  Often times, the words "arise" and "accrue" are

used interchangeably.  *See Van Den Hul v. Baltic Farmers Elevator Co.*, 716 F.2d

504, 510 n.4 (8th Cir. 1983) (explaining that "in certain contexts, the words 'accrue'

and 'arise' have significantly different meanings" but concluding that the "words

'arise' and 'accrue' as applied to this factual situation may be considered interchangeable.").

If Congress' intent was to have the limitations period commence when the injury occurred, it would have plainly stated as such. In fact, Congress made such a distinction in § 1605(g), which provides: "no stay shall be granted or continued . . . after the date that is *10 years after the date on which the incident that gave rise to the cause of action occurred.*" 28 U.S.C. § 1605(g)(2)(A) (emphasis added). The D.C. Circuit has held that "the use of different terminology within a statute indicates that Congress intended to establish a different meaning." *Nat'l Insulation Transp. Comm. v. ICC*, 683 F.2d 533, 537 (D.C. Cir. 1982). Thus, it is clear that Congress intended the two phrases to have different meanings when in the very same section the statute provides that an action must be commenced "not later than *10 years after the date on which the cause of action arose.*" 28 U.S.C. § 1605(f) (1996) (emphasis added). Therefore, the phrase "cause of action arose" cannot mean the time in which the injury occurred; instead, it reflects the date in which the Plaintiff obtained the legal right to sue, here, not earlier than April 24, 1996.

**II.    Even Under Libya's Flawed Reading of the Statute, Plaintiffs Have Complied With the Statute of Limitations Because They Diligently Pursued Their Claims and Filed Suit Within a Reasonable Time After They First Learned that Libya was Responsible for the Hijacking of Pam Am Flight 73.**

The language, legislative history, and controlling precedent direct that Plaintiffs had 10 years from April 1996 – the date Libya's immunity was lifted with respect to Plaintiffs' claims – and thus, Plaintiffs claims were timely filed. Nevertheless, even if this Court were to follow *Vine* and *Buonocore* and hold, as a

33

matter of law, that the limitations period somehow ran while Libya was immune from suit, Libya's motion must still be denied because Plaintiffs filed within a "reasonable time" after first finding out that Libya was responsible for the horrific acts on Pan Am Flight 73.

### A. Courts Have Tolled the Statute of Limitations Until Plaintiffs First Learn that Their Injuries Were Caused by the Defendant's Wrongful Acts

It is well-established that "equitable tolling . . . applies when the plaintiff 'despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim.'" *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003) (quoting *Currier v. Radio Free Europe*, 159 F.3d 1363 at 1367 (D.C. Cir. 1998)). *See also Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006). Indeed, in the *Cada* decision, the case upon which the *Phillips* court so heavily relied, the Seventh Circuit explained that equitable tolling allows a plaintiff to avoid the statute of limitations bar if "he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." *Cada*, 920 F.2d at 451.

Other courts are in agreement that where a plaintiff, despite due diligence, was unable to discover the facts necessary to identify the defendant as the wrongdoer, the statute of limitations is tolled. *See, e.g., Arce,* 434 F.3d at 1262 (noting that statutes of limitation "should also be tolled where "the *plaintiff has been unable to discover the identity of the offender*.") (emphasis added); *Cabello*, 402 F.3d at 1155-56 (tolling limitations period because it was nearly impossible for the victims to discover the wrongs perpetrated against them and by whom); *Limone v.*

*United States,* 336 F. Supp. 2d 18, 48 (D. Mass. 2004) (statute of limitations tolled until the FBI's complicity in a murder cover-up was revealed); *Socop-Gonzalez*, 272 F.3d at 1193 (equitable tolling applies in situations where the party invoking equitable tolling is unable to obtain vital information bearing on the existence of the claim); *Attallah v. United States,* 955 F.2d 776, 780 (1st Cir. 1992) (tolling limitations period where plaintiffs could not have learned of government involvement in wrongful act until four years later when agents were indicted for murder); *Smith v. United States,* 2007 WL 2932569 (D.D.C. Oct. 9, 2007) (Walton, J.) (citing cases) (tolling statute of limitations until plaintiff learned causal connection between government and her injury).

Indeed, as we noted *supra*, this was not the situation that existed in either *Vine* or *Buonocore*. The Court in *Vine* held that plaintiffs could not proceed because they could have filed suit anytime between 1996 and 2001, given *that the Court determined that they had all the facts they needed for suing Iraq at the time the FSIA terrorism amendments were enacted.* 459 F. Supp. 2d at 21-22. Similarly, the Court in *Buonocore* rejected the plaintiffs' claims because *Libya acknowledged its responsibility publicly within a few days after the December 1985 Rome airport attack.* Thus, there was no basis, according to the Court, to wait until 2006 to file suit. 2007 WL 2007509, at *3-4.

Thus, even those decisions – essentially the only ones upon which Libya relies – make clear that equitable tolling applies where the Plaintiffs do not have

the facts necessary to bring a complaint against Libya.  But that is clearly not this case.

**B.    Plaintiffs Did Not Learn that Libya Was Responsible for the Attack and Hijacking of Pan Am Flight 73 At Least Until 2004.**

As set forth in the factual discussion, *supra*, as well as in the attached declarations, Plaintiffs in this case timely filed suit because they acted diligently and reasonably in developing their case and filing suit less than two years after first learning of Libya's involvement in the Pan Am 73 attack.  It was not until 2004 – at the earliest – when Plaintiffs first learned that Libya was responsible for the attack and hijacking of Pan Am Flight 73.

On March 28, 2004, a news article appeared in The Sunday Times and revealed *for the first time* that Libya had hired ANO to carry out the attack on Pan Am Flight 73.  *See* Jon Swain, *Revealed: Gadhaffi's Air Massacre Plot*, The Sunday Times (March 28, 2004) (attached hereto as Exhibit J).  Jon Swain, the author of the article, emphasized that this was "the first time" that Libya had been publicly linked to the hijacking of Pan Am Flight 73.  The Swain article confirmed the hijacking of Pan Am Flight 73 had never been "publicly blamed" on Libya and that the "incriminating details [had] remained secret" until the publication of his article on March 28, 2004.  *See id.*  Swain reported that Libya's involvement in the hijacking of Pan Am Flight 73 "did not even come out at the trial" of the hijackers in Pakistan.  *See id.*

Similarly, on July 18, 2004, an article appeared in the South Asia Tribune and confirmed that Libya was responsible for the attack on Pan Am Flight 73.  *See*

Javed Rana, *Gaddafi Masterminded 1986 Pan Am Hijacking, Admits Jailed Hijacker*, <u>South Asia Tribune</u> (July 18, 2004) (attached hereto as Exhibit K). In this article, the author, Javed Rana, reported that one of the hijackers, Defendant Rahim, through his attorney, had corroborated Mr. Swain's revelation that Libya was responsible for the Pan Am hijacking. *See id.* According to Defendant Rahim, the hijackers carried out the attack at the behest of Libya. *See id.* The article also confirmed that Libya's role in the attack on Pan Am Flight 73 was not revealed during the trial of the hijackers in Pakistan. *See id.*

Critically, these were only newspaper articles, not admissions by Libya or public confessions in a courtroom. As such, even these first "notices" of Libya's involvement in the Pan Am 73 attack do not constitute the type of "notice" or "admission" that Judge Kessler and Judge Kennedy held were sufficient to provide plaintiffs an opportunity to file suit against Libya. Indeed, filing a serious case involving notorious acts of terrorism should not and cannot be filed simply because a newspaper publishes a story. Indeed, it was only when Plaintiffs heard about these news stories that they initiated the search for experienced counsel – which then conducted the due diligence necessary to support and organize such a case. Accordingly, even the news stories did not meet the threshold for "triggering" plaintiffs' notice sufficient to go to the courthouse. *See In re Swine Flu Products Liability Litigation*, 764 F.2d 637, 640-41 (9th Cir. 1985) (holding that government's showing of public awareness of connection between GBS and swine flu inoculation was insufficient to put plaintiff on notice as to the cause of his wife's death).

Between the time of the hijacking in 1986 and the publication of these articles in 2004, Plaintiffs diligently sought information *about the attack* by, *inter alia*, closely following newspaper and television coverage of the attack, subsequent investigation, trial in Pakistan, and arrest of Defendant Safarini. *See* Declaration of Jay Grantier ("Grantier Decl.") ¶¶ 4-12 (attached hereto as Exhibit A); Declaration of Prabhat Krishnaswamy ("Krishnaswamy Decl.") ¶¶ 4-12 (attached hereto as Exhibit B). Yet  Plaintiffs, did not learn anything – even an allegation – of *Libya's direct role in the attack* on Pan Am Flight 73 until at least the publication of the news articles in the Summer of 2004 – or perhaps even later given the need to investigate these allegations and prepare this complex case, involving so many persons from around the world.  Krishnaswamy Decl. ¶ 16-17, Ex. B; Grantier Decl. ¶ 16-17, Ex. A.  The Libyan Defendants have offered no evidence to the contrary.  Indeed, they have not even alleged in their motion that the plaintiffs somehow were on notice of Libya's role in the attack nor have they pointed to any evidence akin to those in *Buonocore*, where Libya *acknowledged publicly* in some fashion that it was responsible for the hijacking and attack.  To the contrary, the Libyan Defendants in this case have explicitly denied that they were responsible for the attack in their Answer.

With such a record, the Plaintiffs acted reasonably to investigate Libya's role in the Pan Am 73 attack when they first read the allegations in the 2004 news articles and brought this case within a reasonable time after conducting their due diligence and organization activities.  On these facts, the Plaintiffs timely filed suit.

**III.    The Statute of Limitations Period is Procedural Not Jurisdictional And The Discovery Ordered By the Court Should Proceed.**

Finally, it should be noted that the statute of limitations set forth in the FSIA is procedural, not jurisdictional, and thus there is no question that this case may proceed with discovery during the pendency of this motion, as this Court has now ordered.  The D.C. Circuit recently held that federal statutes of limitations – including those which relate to federal laws providing jurisdiction to sue a sovereign – are not jurisdictional where such limitations provisions are subject to principles of equitable tolling.  *See Chung,* 333 F.2d at 276-77.

In *Chung,* the D.C. Circuit noted that prior to the Supreme Court's decision in *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990), statutes of limitations in suits against the government were deemed "jurisdictional."  *Id*. at 276.  However, after the Court in *Irwin* held that principles of equitable tolling to limitations statutes in suits against the government, the jurisdictional element of the limitations period was negated by the application of equitable tolling.  Because "equitable tolling is a traditional feature of the procedural landscape," statutes of limitations which apply equitable tolling principles are procedural.  *Id.* at 276, 278 n. * (finding that the limitations period in the Privacy Act is procedural not jurisdiction because equitable tolling applied).  *See also Smith*, 2007 WL 2932569 (D.D.C. Oct. 9, 2007) (holding that 28 U.S.C. § 2401(b) – the Federal Tort Claims Act ("FTCA") statute of limitations provision – is not jurisdictional but rather is an affirmative defense).

Although the D.C. Circuit has not directly addressed whether the FSIA statute of limitations is jurisdictional or procedural, the court's reasoning in *Chung* and *Smith* in Privacy Act and FTCA cases equally applies to the FSIA. Here, the FSIA limitations provision expressly provides for equitable tolling, and thus there is no question that the statute of limitations is procedural. Therefore, the statute of limitations issues raised in these motions have no bearing on the Court's jurisdiction in this case. On that basis, the discovery ordered by the Court should proceed during the pendency of the present motion.

## **CONCLUSION**

For the reasons set forth above, based on the undisputed facts and applicable law, Plaintiffs have complied with the statute of limitations set forth in § 1605(f) of the FSIA. Thus, Libya's motion for summary judgment should be denied.

Respectfully submitted,


_____/s/_____
Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Andy Liu, D.C. Bar No. 454986
Justin P. Murphy, D.C. Bar No. 477718
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 628-5116 facsimile

Counsel for Plaintiffs

December 7, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of December 2007, a true and correct copy of the foregoing and its attachments was filed via the Court's Electronic Filing/Case Management System.  In addition, I hereby certify that a copy of the foregoing was sent via first-class mail, postage prepaid, this 7th day of December 2007, to Defendants Qadhafi, Senoussi, Rahim, Ar-Rahayyal, Al-Munawar, and Al-Turk at the following addresses:

Muammar Qadhafi
Libyan External Security Organization
Ministry of Foreign Affairs
Tripoli, Libya

Abdallah Senoussi
Libyan External Security Organization
Ministry of Foreign Affairs
Tripoli, Libya

Jamal Saeed Abdul Rahim
Adiala Jail
Rawalpindi, Pakistan

Muhammad Abdullah Khalil Hussain Ar-Rahayyal
Adiala Jail
Rawalpindi, Pakistan

Muhammad Ahmed Al-Munawar
Adiala Jail
Rawalpindi, Pakistan

Wadoud Muhammad Hafiz Al-Turk
Adiala Jail
Rawalpindi, Pakistan


_____/s/_____
Peter J. Eyre

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MANJULA PATEL, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>THE SOCIALIST PEOPLE'S<br>ARAB JAMAHIRIYA, *et al.*,<br><br>　　　　　　　Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )　　No. 06-CV-00626 (PLF) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PROPOSED ORDER

Upon consideration of the Libyan Defendants' Motion for Summary Judgment, Plaintiffs' response thereto, any Reply, and the entire record in this matter, it is hereby

ORDERED, that Libyan Defendants' Motion for Summary Judgment is DENIED.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Judge Paul L. Friedman
　　　　　　　　　　　　　　　　　　United States District Court