# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.    ) | Criminal No. 91-504 (EGS) |
| ) | |
| ZAID HASSAN ABD LATIF SAFARINI, ) | |
|   also known as MUSTAFA HASSAN   ) | |
| SAID BOMER,   ) | |
|   also known as MUSTAFA,   ) | |
| ) | |
| Defendant.   ) | |
| _____) | |

## RULE 11 PROFFER OF FACTS

Had this case proceeded to trial, the government's evidence would have proven the following facts beyond a reasonable doubt:

1. On September 5, 1986, four armed men, led by defendant Safarini, seized and took control of Pan Am Flight 73 as the aircraft was boarding passengers on the tarmac in Karachi, Pakistan. Defendant Safarini's three accomplices in seizing the aircraft were (1) Jamal Saeed Abdul Rahim, also known as Fahad Ali Al-Jaseen, also known as Fahd Ali Al-Jassem, also known as Fahad, also known as Ismael (hereinafter referred to as "co-defendant Fahad"); (2) Muhammad Abdullah Khalil Hussain Ar-Rahayyal, also known as Khalil Antwan Kiwan, also known as Khalil, also known as Walid (hereinafter referred to as "co-defendant Khalil"); and (3) Muhammad Ahmed Al-Munawar, also known as Mansoor Al-Rashid, also known as Mansour Abdul Rahman Rashed, also known as Mansoor, also known as Ashraf Naeem (hereinafter referred to as "co-defendant Mansoor") (hereinafter collectively referred to as "the hijackers" or as "defendant Safarini and his fellow hijackers"). At the time the hijackers seized control of the aircraft there were approximately 379 passengers and crew, including approximately 78 United States citizens, on board.

2. On September 5, 1986, the aircraft known as Pan Am Flight 73 bore United States registration number N656PA. On that day, Pan Am Flight 73 had originated in Bombay, India, and had stopped in Karachi en route to Frankfurt, West Germany, and was then scheduled to fly to New York. This aircraft was a "civil aircraft" and was within the "special aircraft jurisdiction of the United States" as those terms were defined in Title 49 Appendix of the United States Code and as those terms are used in Counts 1, 5, 6, 7, 8, 9 and 10 of the superseding Indictment. At the time of this offense, Pan American World Airways was an airline owned by a corporation created under the laws of a state of the United States and registered under Chapter 20, Title 49 of the United States Code, which airline flew its aircraft in commerce between the United States and other countries. Pan

American World Airways operated aircraft leased from and owned by Bankers Trust Company, a corporation created under the laws of the State of New York.

3. On September 5, 1986, defendant Safarini and his fellow hijackers were dressed as Karachi airport security guards and armed with assault rifles, pistols, grenades and plastic explosive belts. At approximately 6:00 a.m., local time, defendant Safarini drove a van that had been modified to look like an airport security vehicle through a security checkpoint at the Karachi airport, without challenge, and drove up to one of the two stairways being used to board passengers for Pan Am Flight 73. His three fellow hijackers were passengers in that van. Defendant Safarini and one of his fellow hijackers boarded the plane via the forward stairway, while the two other hijackers boarded the plane via the rear stairway. At least one of the hijackers fired rounds from an automatic weapon while entering the aircraft. Defendant Safarini grabbed one of the passengers and then one of the flight attendants and demanded that other flight attendants close the forward door of the aircraft. Meanwhile, co-defendant Mansoor ordered a different flight attendant to close the rear door to the aircraft. When the flight attendant had trouble locking the door, co-defendant Mansoor fired several shots in her direction. Eventually, the flight attendants were successful in complying with the hijackers' orders to close the doors of the aircraft.

4. While defendant Safarini and his fellow hijackers were taking control of the plane, some of the flight attendants alerted the cockpit crew by intercom, allowing the pilot, co-pilot and flight engineer to escape through a hatch in the cockpit before defendant Safarini and his fellow hijackers reached the cockpit, thereby effectively grounding the aircraft.

5. Over the next approximately 16 hours, defendant Safarini, as the leader of the hijackers on board the aircraft, demanded the return of a flight crew to fly the aircraft to Larnaca, Cyprus, where Safarini and his co-defendants wanted to secure the release of Palestinian prisoners being detained in Cyprus. At first Safarini communicated face-to-face with ground personnel who were using a megaphone, and later in the day, he spoke with personnel in the airport tower over the radio in the cockpit of the aircraft. During the cockpit to tower negotiations, defendant Safarini threatened to kill all of the passengers, stated that he possessed enough bombs to blow up the plane and all of its occupants, and said that the hijackers were carrying machine guns capable of killing a large number of people. He stated that he was the leader of the operation. The aircraft remained on the ground in Karachi throughout the day as negotiations between defendant Safarini and Pakistani government and Pan Am personnel continued.

6. Throughout the hijacking, defendant Safarini wore a wide belt around his waist, visible to the passengers and crew, consisting of the high explosive Semtex H, with an explosive composition of approximately 75 percent PETN and 25 percent RDX. This explosive material had the capacity to destroy the entire aircraft if the belt had been detonated on board Pan Am flight 73.

7. On board the aircraft, defendant Safarini dictated the movements of the passengers and crew. He instructed passengers to keep their hands up and heads down, a position they were forced to maintain for a substantial period of time. Throughout the hijacking, co-defendant Fahad primarily patrolled the upper deck and front cabin when defendant Safarini was elsewhere in the aircraft. Co-defendant Fahad kept various members of the flight crew from communicating with one another, and generally treated the passengers and crew roughly. He carried an automatic rifle in a sling and a grenade, and played with the grenade when the pin was pulled out. Co-defendant Khalil spent approximately the first three hours of the hijacking holding a gun and, at times, also a grenade to the head of one of the flight attendants in the rear of the aircraft. Co-defendants Mansoor and Khalil switched off guarding the rear sections of the aircraft. Both co-defendants Mansoor and Khalil were armed with handguns and grenades, and co-defendant Khalil also carried a knife with a large blade.

8. Within a short time after seizing control of the aircraft, defendant Safarini ordered the flight attendants to collect the passports of passengers. The flight attendants complied with this request but surreptitiously declined to collect some of the United States passports and hid other United States passports from the hijackers. After the flight attendants had collected the passports, defendant Safarini instructed them to separate the American passports from the others and to bring the American passports to him. Defendant Safarini became visibly distraught after the only United States passports he received belonged to passengers who were of Indian or Pakistani origin or ancestry.

9. After the passports had been collected, defendant Safarini walked through the cabin of the aircraft, asking passengers about their nationalities. When he arrived at the seat of Rajesh Kumar, a 29-year-old California resident who had recently been naturalized as an American citizen, Mr. Kumar responded that he was from India. Defendant Safarini ordered Mr. Kumar to come to the front of the aircraft, and Mr. Kumar complied. Defendant Safarini then ordered Mr. Kumar to kneel at the front doorway of the aircraft and face the front of the aircraft. Mr. Kumar had his hands behind his head and was bent over. He started to cry and told defendant Safarini that he was with his grandmother. Defendant Safarini kicked him and told him to shut up. Defendant Safarini then ordered a flight attendant to open the door of the aircraft, and defendant Safarini spoke with a Pan Am representative on the ground about getting a flight crew to fly the plane to Larnaca, Cyprus.

10. Approximately four hours into the hijacking, the Pan Am representative returned to the aircraft and told defendant Safarini that a cockpit crew was being flown in to Karachi. Defendant Safarini became angry about the delay and pulled Mr. Kumar by the scruff of the neck, threatening that he would shoot Mr. Kumar if something was not done within 15 minutes. Thereafter, defendant Safarini ordered the flight attendant to re-open the door to the aircraft. Defendant Safarini grabbed Mr. Kumar and put a pistol to his head.

      Once the door was open, defendant Safarini shot Mr. Kumar in the head in front of witnesses both on and off the aircraft. He then kicked Mr. Kumar in the bottom, heaved him out of the door onto the tarmac below, threw the gun out after Mr. Kumar and pulled the door shut. Pakistani personnel on the tarmac reported that Mr. Kumar was still breathing when he was placed in an ambulance, but he was pronounced dead shortly after arriving at a hospital in Karachi. Defendant Safarini had executed Mr. Kumar, among other reasons, to coerce and pressure the Karachi airport authorities and the authorities of the government of Pakistan to meet his demand for a cockpit crew to fly the aircraft out of Pakistan as alleged in Count 1 of the superseding Indictment.

11. Following the murder of Mr. Kumar, defendant Safarini threatened to kill another passenger every ten minutes if his demands were not met. On board the plane, defendant Safarini selected another passenger to come forward. That passenger began to pray to Allah and when defendant Safarini satisfied himself that the passenger was a Muslim, he allowed him to return to his seat. Defendant Safarini then called forward another passenger who was a British citizen and who spent much of the rest of the hijacking kneeling in the front of the aircraft, certain that he would be the next passenger to be killed by defendant Safarini.

12. As the hours wore on and nightfall came, the lights on the aircraft began to dim and flicker. As the lights were fading, defendant Safarini told co-defendant Fahad that if commandos stormed the aircraft, co-defendant Fahad should shoot defendant Safarini.

13. Thereafter, at defendant Safarini's instruction, the hijackers herded the passengers and crew members into the center section of the aircraft, with some passengers literally on top of others. As co-defendant Mansoor moved passengers and crew forward from the rear of the aircraft, he selected certain people to go forward and others to stay closer to the rear. Defendant Safarini and co-defendant Fahad positioned themselves in front of the crowd of passengers in the right and left aisles, while co-defendants Khalil and Mansoor positioned themselves behind the crowd of passengers and crew in the right and left aisles. On defendant Safarini's signal, after the hijackers recited a martyrdom prayer in Arabic, and after the lights on the aircraft had gone out, the four hijackers opened fire on the assembled passengers and crew, throwing hand grenades into the crowd and spraying the trapped passengers with automatic weapons fire. In so doing, defendant Safarini and his fellow hijackers were attempting to kill as many passengers and crew members as possible, including the United States citizens listed in Counts 12 to 87 of the superseding Indictment. Defendant Safarini was shot by co-defendant Fahad, as he had instructed. The shot did not hit nor detonate the explosives belt worn by defendant Safarini.

14. Nineteen identified passengers and crew were killed during this final deadly assault, including a second United States citizen, 50-year-old Surendra Patel, the father of three children, then aged 14, 12 and 7, two of whom were next to him on the aircraft when he was shot. Among the 18 other identified individuals killed during that assault were

Neerja Mishra Bhanot, the 23-year-old chief purser of Pan Am Flight 73; Meherjee Minocher Kharas, a 35-year-old Pan Am maintenance employee on board the aircraft; Kuverben Patel, the grandmother of murder victim Rajesh Kumar; Kala Singh, a 38-year-old resident of the United States and citizen of India who was traveling with her husband and two of her four American-born children; Syed Nasar Ahmed, a 30-year-old legal permanent resident of the United States who taught at Harvard University and was the father of a five-year-old daughter and married to a United States citizen; Dr. Ganapathi Thanikaimoni, a 48-year-old Indian national and world renown scientist who was en route to New York to attend a UNESCO sponsored conference in the United States at the time of the hijacking; Ricardo Nunoz and Jose "Pepe" Alvarez Lamar, both Mexican nationals employed by a United States company, working in India on an off-shore drilling rig; Imran Rizvi, a 17-year-old Indian national who was the son of the United States Consul General's Senior Commercial Analyst in Karachi; and Bogby Thomachen Mellor, a seven-year-old Indian boy.

15. Scores of other passengers were injured, including seven United States citizens who suffered serious bodily injury, whose names are listed in Counts 88 to 94 of the superseding Indictment: (1) Gargi Devi, a young girl who suffered a serious head wound caused by a blow to the head; (2) David Gaiser, who suffered a gunshot wound to the leg; (3) John Harper, who suffered shrapnel wounds to both legs; (4) Nadya Hussain, a 16-year-old girl who suffered a gunshot wound to face, a fracture of the right mandible and a fracture of the right humerus; (5) Rana Khan, who suffered a gunshot wound to the abdomen and two sprained ankles; (6) Deepak Mehra, who suffered a shrapnel wound to his foot; and (7) Ajay Patel, a 15-year-old boy who suffered a gunshot wound to the right side of his skull, a gunshot wound to the right side of his chin, shrapnel wounds to the face and scalp and a broken right humerus. Most of the surviving passengers and crew, including 76 United States citizens whose names are listed in Counts 12 to 87 of the superseding Indictment, escaped through several doors of the plane which were forced open when the firing began. Many passengers and crew were forced to jump from the wing of the aircraft onto the tarmac in order to escape the hijackers.

16. By detonating hand grenades and firing automatic weapons on board the aircraft, defendant Safarini and his fellow hijackers knowingly, intentionally, willfully, unlawfully and maliciously damaged, destroyed and disabled the aircraft, as alleged in Counts 5, 9 and 10 of the superseding Indictment. The hand grenades carried and detonated by defendant Safarini and his fellow hijackers aboard the aircraft were each a "destructive device" as that term is defined in Section 921 of Title 18 of the United States Code and as that term is used in Counts 1 and 6 of the superseding Indictment. Each hand grenade was also an "explosive" as that term is used in Section 844 of Title 18 of the United States Code and Counts 9 and 10 of the superseding Indictment.

17. Although there were claims, after the hijacking, by some Pakistani officials and by the hijackers that Pakistani "commandos" had raided the plane, in fact, to the contrary, no

        Pakistani officials or commandos entered the plane until after the final deadly assault by the hijackers had ended and all passengers and crew who were physically able to evacuate themselves from the aircraft had done so.

18. Pakistani authorities arrested defendant Safarini's three fellow hijackers on the grounds of the Karachi airport immediately following the final deadly assault as they were attempting to escape with fleeing passengers. Defendant Safarini was arrested a few hours later at a local hospital where he had been taken for medical treatment after being removed from the aircraft, still wearing the Semtex explosive belt around his waist. About one week later, Pakistani authorities arrested Wadoud Muhammad Hafiz Al-Turk, also known as Wadoud Muhammad Fahd Al-Turk, also known as Salman Ali El-Turki, also known as Sliman Ali El-Turki, also known as Bou Baker Muhammad (hereinafter referred to as "co-defendant Al-Turk"), as he was attempting to leave Pakistan.

19. Defendant Safarini and his co-defendants committed the offenses charged in this case as members of the Abu Nidal Organization, also called the ANO, a foreign terrorist organization. Defendant Safarini joined the ANO in 1979, aware that the ANO was widely viewed as an extremely violent organization. Defendant Safarini knew that ANO leaders traveled extensively, womanized and partied at discotheques, which was a lifestyle that was attractive to him. Between 1979 and 1986, defendant Safarini trained in ANO training camps in the use of weapons and explosives, among other things, and he served as a member of the organization, stationed at various times in Iraq, Lebanon and Syria.

20. In 1986, defendant Safarini traveled to Damascus, Syria, where he met with an individual named Zuhair Rabaa, a leader of the ANO. Rabaa told defendant Safarini, "If you are ready to die for the cause, we have a mission." Defendant Safarini was informed that the ultimate goal of the mission, in addition to winning the release of Palestinian prisoners held in Cyprus and Israel, was to blow the plane up over Israel. This was to be the ANO's first suicide mission and was to demonstrate the ANO's commitment to the Palestinian cause. Rabaa provided defendant Safarini with passports and money for the hijacking mission through co-defendant Al-Turk

21. After meeting with Rabaa, defendant Safarini departed Syria and traveled to Bangkok, Thailand, where he stayed for approximately 10 days. On about August 8, 1986, defendant Safarini flew to Pakistan, using a falsified Bahraini passport. Safarini stayed in Karachi, Pakistan, at various hotels, using the false Bahraini passport as identification.

22. Co-defendant Al-Turk was a leader in the Special Missions Branch of the ANO and was a higher ranking member of the ANO than defendant Safarini. Co-defendant Al-Turk was responsible for providing the tactical and logistical plans for the mission to hijack Pan Am Flight 73. Co-defendant Al-Turk arrived in Pakistan on about July 22, 1986, ahead of the other team members, so that he could procure weapons and choose a target. To

support the mission, co-defendant Al-Turk obtained and stashed weapons for the hijackers to use during the hijacking. Once defendant Safarini arrived in Karachi, he met with co-defendant Al-Turk at the Metropole Hotel, where co-defendant Al-Turk provided the logistical and tactical plans for the operation to defendant Safarini, including the selection of Pan Am Flight 73 as the target. Defendant Safarini met with co-defendant Al-Turk numerous times throughout the period leading up to the hijacking.

23. The tactical plan which was related to defendant Safarini by co-defendant Al-Turk involved posing as Pakistani airport security guards. To accomplish this plan, co-defendant Al-Turk drove defendant Safarini to the Karachi airport in a rental car and showed defendant Safarini the gate where the hijackers were to gain entry to the tarmac. Defendant Safarini went to a local car rental agency in Karachi and rented a tan-colored Suzuki van that resembled the vehicles driven by security officials at the airport. Co-defendant Al-Turk took the rented van to a local mechanic and had it outfitted with a siren and other accessories to make it resemble even further an airport security van. Co-defendant Al-Turk also hired a local tailor to make three shirts for defendant Safarini and his fellow hijackers, to resemble the uniforms worn by Karachi airport security forces.

24. Co-defendants Fahad, Khalil and Mansoor arrived in Pakistan for the hijacking mission on about August 5, 1986. Co-defendant Al-Turk was in charge of hiding the hijackers in Karachi during the period leading up to the hijacking. Co-defendant Fahad had brought two explosives belts with him to Pakistan and provided one of them to defendant Safarini prior to the hijacking. On at least one occasion, co-defendant Fahad also accompanied defendant Safarini in conducting surveillance of the Karachi Airport in preparation for the hijacking.

25. On the morning of the hijacking, co-defendant Al-Turk accompanied defendant Safarini and his fellow hijackers to the Karachi Airport. Co-defendant Al-Turk collected the hijackers' passports and extra money. Co-defendant Al-Turk later told defendant Safarini that, during the hijacking, he roamed the airport and tried unsuccessfully to get a flight to Tripoli, Libya.

26. As has been described in this Factual Proffer, from on or about July 22, 1986, to on or about September 5, 1986, within Pakistan and elsewhere outside the United States, defendant Safarini and his co-defendants entered into a conspiracy, that is, an agreement, to commit the ten crimes listed in paragraphs 5a through 5j of Count 1 of the superseding Indictment and, in furtherance of that conspiracy, they committed the overt acts listed in paragraphs 12a through 12k of Count 1 of the superseding Indictment. Defendant Safarini joined in that agreement voluntarily and intentionally. In addition, during the same time period, defendant Safarini voluntarily and intentionally entered into a conspiracy with his co-defendants to murder United States nationals outside the United States, as alleged in Count 2 of the superseding Indictment and, in furtherance of that conspiracy, they committed the overt acts listed in paragraphs 4a through 4j of Count 2 of

the superseding Indictment.

27. At their joint trial in Pakistan, defendant Safarini, his three fellow hijackers and co-defendant Al-Turk, each of whom was represented by counsel, voluntarily submitted a 19-page statement to the Court, signed by each of them, in which the defendants admitted that they came to Pakistan to hijack an American airplane to draw the world's attention to the Palestinian cause. The joint statement included the assertions that the aim of the hijackers was to fly the plane toward some "sensitive strategic centre of the Zionist enemy and to blow it there with us inside," and that they wanted to "destroy sensitive strategic centre of Zionists situated in Palestine through American weapon, i.e., explosion of American aeroplane," since they "wanted to strike at both enemies with one weapon at the same time." The joint statement expressed the disappointment of the hijackers that they had not achieved their goal of blowing up the aircraft over Palestine, stating that it was their "dream and desire to saturate the land of Palestine with our blood. That is why we planned to blow the plane over Palestine. No doubt, this time we failed but one day we will be successful."

### DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed this Rule 11 Proffer of Facts fully with my attorney, Robert Tucker. I agree and acknowledge by my signature that this Proffer of Facts is true and accurate. The information set forth in this Proffer of Facts is not intended to be exhaustive, or to include all relevant information known to me. Instead, this Proffer of Facts contains those facts that were both known to the government prior to my guilty plea and deemed by the government to be relevant to my plea of guilty to the superseding Indictment in this matter.

Date: 11/12/03

_____
Zaid Hassan Abd Latif Safarini

Date: 11/12/03

_____
Robert Tucker, Esquire
Attorney for the Defendant